(Chief Judge Damich)
No. 02-1894C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONSUMERS ENERGY COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D. C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

July 9, 2004

TABLE OF CONTENTS

PAGE(S)

SUMMARY OF ARGUMENT . . . 2

ARGUMENT . . . 4

I. THE STANDARD OF REVIEW . . . 4

II. CONSUMERS IS REQUIRED TO PAY ITS ONE-TIME FEE BEFORE DOE IS OBLIGATED TO BEGIN ACCEPTING CONSUMERS' SNF . . . 5

III. BECAUSE CONSUMERS HAS FAILED TO PAY ITS ONE-TIME FEE, IT HAS FAILED TO SATISFY A CONDITION TO DOE'S OBLIGATION TO BEGIN ACCEPTING CONSUMERS' SNF . . . 7

A. Consumers' Payment Of The One-Time Fee Is A Condition Precedent To DOE's Obligation To Accept Any Of Consumers' SNF . . . 7

B. Consumers Cannot Claim Damages For A *Partial* Breach Of Contract Before It Satisfies Its Condition To DOE's Obligation To Accept Its SNF . . . 9

IV. TO THE EXTENT THAT THE COURT DOES NOT DISMISS PLAINTIFF'S COMPLAINT AND AWARDS PLAINTIFF DAMAGES FOR PARTIAL BREACH, DEFENDANT IS ENTITLED TO RECOVER THE UNPAID ONE-TIME FEE, PLUS ACCRUED INTEREST . . . 18

CONCLUSION . . . 21

TABLE OF AUTHORITIES

CASES PAGE(S)

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 4, 5

Apex Pool Equipment Corp. v. Lee,
419 F.2d 556 (2d Cir. 1969) . . . . . . . . . . 15

Avia Group International, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . 5

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002), aff'd in relevant part, 366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 11

Bluebonnet Savings Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 18, 19, 21

Cecile Industries, Inc. v. Cheney,
995 F.2d 1052 (Fed. Cir. 1993) . . . . . . . . . . 20, 21

Celotex Corp. v. Catrett,
477 U.S.317 (1986) . . . . . . . . . . 5

Cities Service Helix, Inc. v. United States,
211 Ct. C 543 F.2d 1306 (1976) . . . . . . . . . . 11

City of Fairfax, Va. v. Washington Metropolitan Area Transit Authority,
582 F.2d 1321 (4th Cir. 1978), cert. denied, 440 U.S. 914 (1979) . . . . . . . . . . 13

Danzig v. AEC Corp.,
224 F.3d 1333 (Fed. Cir. 2000) . . . . . . . . . . 12

DPJ Co. v. FDIC,
30 F.3d 247 (1st Cir. 1994) . . . . . . . . . . 18

First Federal Savings & Loan Associate v. United States,
58 Fed. Cl. 139 (2003) . . . . . . . . . . 20

Franconia Associates v. United States,
536 U.S. 129 (2002) . . . . . . . . . . 12, 13, 17

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

In re Gober,
100 F.3d 1195 (5th Cir. 1996) . . . . . . . . . . 20

Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . 11

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) . . . . . . . . . . 13

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . 21

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . 8, 9

Lester v. Resolution Trust Corp.,
994 F.2d 1247 (10th Cir. 1993) . . . . . . . . . . 8

Lovink v. Guilford Mills, Inc.,
878 F.2d 584 (2d Cir. 1989) . . . . . . . . . . 10, 11

Lucente v. IBM Corp.,
310 F.3d 243 (2d Cir. 2002) . . . . . . . . . . 14, 15, 16

Madden v. United States,
178 Ct. Cl. 121, 371 F.2d 469 (1967) . . . . . . . . . . 19

Massachusetts Bay Transportation Authority v. United States,
129 F.3d 1226 (Fed. Cir. 1997) . . . . . . . . . . 18

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 4

PVI, Inc. v. Ratiopharm,
253 F.3d 320 (8th Cir. 2001) . . . . . . . . . . 10

Pinewood Realty Ltd. P'ship v. United States,
223 Ct. Cl. 98, 617 F.2d 211 (1980) . . . . . . . . . . 11

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Project Map, Inc. v. United States,
203 Ct. Cl. 52, 486 F.2d 1375 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

REW Enterprises, Inc. v. Premier Bank, N.A.,
49 F.3d 163 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Roboserve, Inc. v. Kato Kagaku Co.,
78 F.3d 266 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Roehm v, Horst,
178 U.S. 13 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

S&R Corp. v. Jiffy Lube International, Inc.,
968 F.2d 371 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

San Carlos Irrigation & Drainage District v. United States,
23 Cl. Ct. 276 (1991), aff'd, 111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . 10

Sinclair Oil Corp. v. United States,
291 F.3d 822 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Tretchick v. Department of Transportation,
109 F.3d 749 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Dekonty Corp.,
109 F.3d 749 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Munsey Trust Co.,
332 U.S. 234 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Vari-Build, Inc. v. City of Reno,
622 F. Supp. 97 (D. Nev. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

White v. Delta Construction International, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Wisconsin Power & Light Co. v. Century Indemnity Co.,
130 F.3d 787 (7th Cir.1997) . . . . . . . . . . 13

REGULATIONS

10 C.F.R. § 961.11 . . . . . . . . . . passim

MISCELLANEOUS

3A A. Corbin, Corbin on Contracts § 639 (1960) . . . . . . . . . . 7

4 A. Corbin, Corbin on Contracts § 972 (1951) . . . . . . . . . . 14

8 C. McCauliff, Corbin on Contracts § 31.2 (rev. ed. 1999) . . . . . . . . . . 8

S. Williston, Contracts § 669 (3d ed. 1961) . . . . . . . . . . 8

Black's Law Dictionary 1275 (6th ed. 1990) . . . . . . . . . . 20

Restatement (Second) of Contracts § 236 cmt. b (1981) . . . . . . . . . . 13

Restatement (Second) of Contracts § 253 cmt. a . . . . . . . . . . 13

Restatement (Second) of Contracts § 253 cmt. b . . . . . . . . . . 13

Restatement (Second) of Contracts, Ch. 9, Topic 5 Conditions and Similar Events (1981) . . . 8

# INDEX TO APPENDIX


| DOCUMENT | PAGE |
|---|---|
| Letter from Eugene R. VanHoof, Consumers Power Company, to Mr. Christopher Jedrey, Department of Energy, dated May 31, 1985 | 1 |
| Internal memorandum from Consumers Power Company entitled "Responses to R J Ancona Letter of May 1, 1984 Regarding Spent Nuclear Fuel Costs And The Nuclear Fuel Waste Disposal Act | 2 |
| Internal Correspondence from T.C. Bordine, Consumers Power Company, dated May 7, 1992, regarding "Spent Nuclear Fuel Shipments To DOE" | 5 |
| Memorandum from T.C. Bordine, Consumers Power Company, dated January 21, 1993, regarding "DOE Allocations – SNF Shipments" | 6 |
| Letter from Thomas C. Bordine, Consumers Power, to Linda Stroud, Contracting Officer, Department of Energy, dated April 13, 1993 | 8 |
| Internal Correspondence from K.J. Shields, Consumers Power Company, to T.C. Bordine regarding "Correcting DCS forms," dated June 18, 1993 | 10 |
| Internal Correspondence from K.J. Shields, Consumers Power Company, to R.W. Sinderman regarding "SNM Inventory to 2007 based on DCS's," dated August 16, 1993 | 12 |
| Letter from Thomas C. Bordine, Consumers Power, to Beth Tomasoni, Contracting Officer, Department of Energy, dated August 19, 1993 | 15 |
| Unsigned Delivery Commitment Schedule for 1999 with handwritten notes | 17 |
| Approved Delivery Commitment Schedules for 1999 | 18 |
| Approved Delivery Commitment Schedules for 2000 | 22 |
| Approved Delivery Commitment Schedules for 2001 and 2002 | 26 |
| Pages from Consolidated Accounting and Investment System, Nuclear Waste Fund, Quarterly Statement of Payments, dated April 2, 2004 | 29 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSUMERS ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1894C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully submits this motion for summary judgment and requests that this Court dismiss, in their entirety, Counts I and II of plaintiff's complaint. For the reasons explained below, plaintiff, Consumers Energy Company ("Consumers"), has failed to satisfy a condition to the Government's obligation to accept any of Consumers' spent nuclear fuel ("SNF") or high-level radioactive waste ("HLW"). There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In the alternative, to the extent that the Court does not dismiss plaintiff's complaint in its entirety, defendant respectfully requests that the Court grant partial summary judgment in defendant's favor, finding that defendant is entitled to recover fees that Consumers has not paid under the Standard Contract or, in the alternative, that defendant is entitled to recoup those fees against any judgment awarded in Consumers' favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

## SUMMARY OF ARGUMENT

This case is one of 63 cases currently pending before this Court in which plaintiffs are alleging damages arising from a partial breach by the Department of Energy ("DOE") of the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract") published at 10 C.F.R. § 961.11. Although this Court has found the Government liable for a partial breach of contract in several of the pending Standard Contract cases, this case presents an issue that exists in only a few of the pending cases and that precludes a finding of liability here.

Under the Standard Contract, contract holders are required to pay two "sets" of fees. One of the fees that each contract holder must pay is a continuing quarterly fee, the amount of which is determined by reference to the amount of electricity that the contract holder generates and sells, that continue to accrue throughout the life of the Standard Contract as long as the contract holder continues to generate electricity ("the continuing fee"). When the Standard Contracts were executed in 1983, however, most, if not all, commercial nuclear utilities already possessed SNF that DOE would be required to accept pursuant to the Standard Contract. To pay for DOE's acceptance and disposal of that pre-existing SNF, each contract holder was required to pay a fee, calculated by reference to a formula contained in the Standard Contract, to compensate DOE for accepting and disposing of that pre-existing SNF ("the one-time fee").

Under the Standard Contact, the contract holder was required, within two years after contract execution, to elect one of three options for payment of the one-time fee for the pre-existing SNF. One option required the contract holder to pay the one-time fee immediately (in the early 1980s), another option allowed the contract holder to defer its payment until a date

prior to the date that DOE was first to accept any of that contract holder's SNF (although it required the contract holder to pay interest incurred from 1983 through the date of actual payment), and a final option required the contract holder to make 40 quarterly pro rata payments of its one-time fee, with the 40th payment due before the first date for DOE's acceptance of that contract holder's SNF. Under any of the options for payment of the one-time fee, the contract holder was required to pay the entirety of the one-time fee before DOE began accepting any of that contract holder's SNF.

Consumers has never satisfied this condition upon which DOE's obligation to accept any of Consumers' SNF rested. In accordance with the requirements of the Standard Contract, Consumers elected to pay its pre-existing SNF fee of $44,286,408 through "Option 2," which required Consumers to pay its one-time fee prior to DOE's acceptance of its SNF. Consumers has never paid its one-time fee, which, with interest, now totals approximately $139,445,944. Having failed to satisfy this condition to DOE's obligation to accept any of its SNF, Consumers has no basis for seeking damages for DOE's partial breach of the Standard Contract through its failure to begin accepting Consumers' SNF. Accordingly, Consumers' complaint should be dismissed.

Apparently, Consumers will claim that it was justified in not paying its one-time fee based upon DOE's anticipatory repudiation, or anticipatory breach, of the Standard Contract. However, Consumers cannot rely upon that doctrine as a basis to avoid paying its one-time fee or satisfying its condition precedent to DOE's obligation to begin accepting Consumers' SNF. In this litigation, Consumers is not alleging a total breach of contract by DOE, but instead relies solely upon allegations of a partial breach of contract. This distinction is important because, had

it alleged a total breach of contract, DOE's obligations to accept any of Consumers' SNF would end, and DOE would be responsible to Consumers only for damages resulting from the total breach. Under a partial breach theory, however, Consumers can both seek damages for DOE's partial breach and, at the same time, expect DOE to perform its obligations under the Standard Contract at a future date. However, by electing to sue under a partial breach theory, Consumers may not use DOE's alleged "anticipatory breach" to avoid satisfying its condition precedent to DOE's obligation to accept Consumers' SNF, as there is no such legal doctrine as an "anticipatory partial breach." That is, an anticipatory breach must be total, not partial. Because it cannot rely upon an anticipatory partial breach to avoid its own contractual obligations, Consumers' decision not to pay its one-time fee, which Consumers had to pay before DOE began accepting Consumers' SNF, resulted in Consumers' failure to satisfy a condition to DOE's obligation to begin SNF acceptance from Consumers. Because Consumers did not satisfy that condition, DOE's obligation to begin SNF acceptance from Consumers has not yet arisen, and Consumers has no basis for seeking partial breach of contract damages from DOE.

## ARGUMENT

### I. THE STANDARD OF REVIEW

Summary judgment is a wholly acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S.

317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment.

## II. CONSUMERS IS REQUIRED TO PAY ITS ONE-TIME FEE BEFORE DOE IS OBLIGATED TO BEGIN ACCEPTING CONSUMERS' SNF

Pursuant to the Standard Contract, each contract holder is required to pay ongoing quarterly fees "in the amount of 1.0 mil per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s)" and sold, designed to cover SNF generated after April 7, 1983. 10 C.F.R. § 961.11, Art. VIII.A.1 & B.1. In addition to that quarterly fee, each contract holder is responsible for paying a separate fee for the disposal of the SNF and/or HLW that it had generated prior to April 7, 1983: "For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power prior to April 7, 1983, a one-time fee will be assessed." Id., Art. VIII.A.2 (emphasis added). This fee for SNF generated prior to April 7, 1983 "shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII." Id. (emphasis added).

Paragraph B of Article VIII provides each contract holder with three options for the payment of the fee for the disposal of SNF generated prior to April 7, 1983. Under the first option, Option 1, the contract holder agrees to pay its fee prorated evenly over 40 quarters, the

last of which must be made prior to the date scheduled for DOE's first acceptance of that contract holder's SNF as identified in an approved DCS. 10 C.F.R. § 961.11, Art. VIII.B.2(a) (emphasis added). Pursuant to the second option, Option 2, the contract holder may elect to satisfy its financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. Id., Art. VIII.B.2(b). Pursuant to the third option, Option 3, the contract holder must pay his entire fee prior to June 30, 1985. Id., Art. VIII.B.2(c).

The contract holder is obligated to elect the payment option for its fee relating to the disposal of its pre-April 7, 1983 SNF within two years after contract execution: "For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options: . . . ." Id., Art. VIII.B.2 (emphasis added). Consumers executed the Standard Contract that is at issue here on June 3, 1983. Compl. ¶ 1.[1] Accordingly, pursuant to the provisions of Article VIII(B)(2), Consumers had until June 3, 1985, which would have been "within two years of contract execution," to notify DOE as to which of the three available payment options Consumers would elect to pay for the disposal of its pre-April 7, 1983 SNF.

On or about May 31, 1985, Consumers elected to pay its one-time fee pursuant to Option 2. App. 1. Accordingly, Consumers was required to make its entire fee payment at "anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance." 10 C.F.R. § 961.11, Art.

---

[1] "Compl. ¶ ___" refers to the plaintiff's complaint in this case, filed December 16, 2002. "App. __" refers to the appendix to this motion.

VIII.B.2(b). Consumers subsequently submitted DCSs seeking to obtain DOE's commitment to accept SNF from Consumers' Big Rock Point facility beginning in 1999 and from its Palisades facility beginning in 2000, and DOE approved those DCSs. App. 18-25. Accordingly, in compliance with Consumers' May 31, 1985 election pursuant to Article VIII.B.2(b), Consumers was required, if it wanted DOE to begin acceptance of its SNF in 2002, to pay its one-time fee for its pre-April 7, 1983 SNF under its contract prior to the 1999 acceptance. In any event, under any of the options for payment of the one-time fee, the contract holder was required to pay the entirety of its one-time fee before DOE began acceptance of that contract holder's SNF and/or HLW. See 10 C.F.R. § 961.11, Art. VIII.B.2. In fact, section 302(a) of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10222(a)(5), expressly indicates that DOE's obligation to dispose of any utility's SNF is "in return for the payment of fees established by this section," conditioning DOE's acceptance obligation upon that payment. To the present day, Consumers has not paid its one-time fee.

## III. BECAUSE CONSUMERS HAS FAILED TO PAY ITS ONE-TIME FEE, IT HAS FAILED TO SATISFY A CONDITION TO DOE'S OBLIGATION TO BEGIN ACCEPTING CONSUMERS' SNF

### A. Consumers' Payment Of The One-Time Fee Is A Condition Precedent To DOE's Obligation To Accept Any Of Consumers' SNF

Because Consumers has not yet paid its one-time fee, it has failed to satisfy a condition to DOE's obligation to begin acceptance of Consumers' SNF and/or HLW. "A fact or event may be made a condition of a contract right and duty by any form of words capable of interpretation." 3A A. Corbin, Corbin on Contracts § 639, at 51 (1960). Such conditions "are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before

there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." 3A A. Corbin, Corbin on Contracts § 628, at 16 (1960);[2] see 8 C. McCauliff, Corbin on Contracts § 31.2, at 49 (rev. ed. 1999); S. Williston, Contracts § 669 (3d ed. 1961) ("Since an express condition . . . depends for its validity on the manifested intention of the parties, it has the same sanctity as the promise itself. Though the court may regret the harshness of such a condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties."). That is, "[a] condition precedent is one which must be performed before . . . the other party is obligated to perform." Lester v. Resolution Trust Corp., 994 F.2d 1247, 1254 (10th Cir. 1993). Moreover, "if a contractual duty is subject to a condition precedent, that condition must be satisfied before the duty arises." Landmark Land Co. v. United States, 256 F.3d 1365, 1376 (Fed. Cir. 2001) (emphasis in original).

Under the terms of the Standard Contract and the NWPA, Consumers, regardless of the one-time fee payment option that it selected, was required to pay its one-time fee before DOE began acceptance of its SNF and/or HLW. Accordingly, Consumers' obligations in paying its fee for pre-April 7, 1983 SNF "were clearly intended to be performed prior to [DOE's] obligation to" accept Consumers' SNF. Lester, 994 F.2d at 1254. Consumers elected not to pay its one-time fee in 1985, which it could have done, but instead elected to defer its one-time fee payment, in

[2] Although Professor Corbin uses the term "condition precedent," the American Law Institute ("ALI"), because of the confusion sometimes engendered by the distinctions between conditions subsequent and conditions precedent, prefers the more generic term "conditions." Restatement (Second) of Contracts, Ch. 9, Topic 5, Conditions and Similar Events, at 159 (1981). ALI defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Id. § 224, at 160.

accordance with Option 2, and to satisfy that financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. 10 C.F.R. § 961.11, Art. VIII.B.2(b). Because Consumers' first scheduled "delivery" of SNF to DOE was in 1999, Consumers was required to make its Option 2 fee payment no later than the date by which it wanted DOE to begin acceptance of its SNF. Until that payment is made, DOE has no obligation to accept Consumers' SNF. Because Consumers has, to date, failed to make that payment, Consumers has failed to perform its Option 2 fee payment obligation. Consumers' Option 2 fee payment obligation is a condition to DOE's contractual duty to accept SNF under Consumers' Standard Contract. Accordingly, DOE's duty to accept SNF under Consumers' Standard Contract has yet to arise. See Landmark, 256 F.3d at 1376. Because DOE's duty to perform has not arisen, no cause of action for breach of this duty can have accrued to Consumers under its Standard Contract.

B. Consumers Cannot Claim Damages For A *Partial* Breach Of Contract Before It Satisfies Its Condition To DOE's Obligation To Accept Its SNF

It appears that Consumers may attempt to avoid its obligation to satisfy its condition precedent to DOE's obligation to begin acceptance of Consumers' SNF by asserting that, once DOE announced that it would not be able to begin SNF acceptance from the industry as a whole beginning in 1998, Consumers was no longer required to pay its one-time fee until some unidentified date in the future. However, until Consumers actually pays its one-time fee, DOE will not be under an obligation to begin accepting Consumers' SNF. Although Consumers might be able to avoid paying its one-time fee in response to DOE's announcement had it viewed DOE's announcement as a total breach of the Standard Contract, Consumers has not claimed a total

breach of contract in this case. To the contrary, Consumers is seeking damages in this litigation only for a partial breach of contract. The distinctions between a total breach claim and a partial breach claim are essential to a determination of Consumers' rights and continuing obligations under the Standard Contract.

"When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). "He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." Id. That is, a claim for partial breach is one for damages based upon "only part of the injured party's remaining rights to performance," while a claim for damages for total breach is "one for damages based on all of the injured party's remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citations omitted), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). Consequently, the damages recoverable for a partial breach of contract are necessarily less than those recoverable for a total breach. See Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 279 (7th Cir. 1996) (concluding that the jury's determination that damages for partial breach of contract exceeded those for total breach was "obviously irrational"). In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). The distinction between partial and total breach "is particularly important in executory contracts." Id. at 586.

Aside from the different measure of damages applicable to a partial and total breach, these claims can also be distinguished based upon the remedies that they provide to an injured

party. Indeed, a plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). A "total breach justifies termination of the contract and damages for complete failure of performance," but a "partial breach does not." Lovink, 878 F.2d at 587; see Pinewood Realty Ltd. P'ship v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211, 215 (1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"); Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004). As the Court held in Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306 (1976), a contractor must make an election in response to an anticipatory breach either to view the contract as concluded or to continue contract performance:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Id. at 234, 543 F.2d at 1313; accord Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 323 (2002), aff'd in relevant part, 366 F.3d 1360 (Fed. Cir. 2004).

Here, Consumers' decision to continue the contract and insist upon the Government's performance of its obligations after DOE announced that it could not begin SNF acceptance in 1998 has three consequences. First, because the Government's contractual obligations were not discharged as a result of Consumers' suit for partial breach, it did not discharge the Government's ultimate obligation to accept and dispose of Consumers' SNF. Second, it obligated Consumers to continue to pay its fees into the Nuclear Waste Fund ("NWF"). Third, it limited the recovery of Consumers' damages to those for partial breach.

The only basis upon which Consumers could attempt to excuse its failure to pay its one-time fee would be its reliance upon DOE's announcement in 1996 that it would not be able to begin SNF acceptance in 1998, viewing DOE's 1996 announcement as some type of anticipatory repudiation of the Standard Contract. An anticipatory repudiation is a "renunciation of a contractual duty *before* the time fixed in the contract for performance." Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (emphasis in original). It "entails a statement or voluntary affirmative act indicating that the promisor will commit a breach when performance becomes due." Id.; see Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) ("[a]t common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract"); Tretchick v. Department of Transportation, 109 F.3d 749, 752 (Fed. Cir. 1997) (anticipatory repudiation "must be a distinct unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made").

An anticipatory repudiation of a contract is, in and of itself, a breach of contract that "generally gives rise to a claim for damages for total breach even though it is not accompanied or

preceded by a breach by non-performance." Restatement (Second) of Contracts § 253(1) cmt. a; see Wisconsin Power & Light Co. v. Century Indem. Co., 130 F.3d 787, 793 (7th Cir.1997) ("[t]he disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived"). However, an anticipatory repudiation of a contract constitutes a total breach "only if the promisee 'elects to treat it as such.'" Franconia Assocs., 536 U.S. at 143 (emphasis added) (citing Roehm v. Horst, 178 U.S. 13 (1900)). Repudiation "gives the promisee the right of electing either to treat the declaration as *brutum fulmen*, and, holding fast to the contract, to wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm, 178 U.S. at 13. Therefore, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia Assocs., 536 U.S. at 143; see United States v. Dekonty Corp., 109 F.3d 749, 752 (Fed. Cir. 1991) (injured party who elects to sue for anticipatory breach of contract must "treat th[e] refusal [to perform] as a breach and commence an action at once therefor").

Unfortunately for Consumers, "a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts § 253 cmt. b (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Further, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see Indiana Michigan Power Co. v.

United States, 60 Fed. Cl. 639, 648 (2004) (in spent nuclear fuel case, "[a]nticipatory repudiation does not apply in a partial breach situation"); 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations.

The Court of Appeals for the Second Circuit's decision in Lucente v. IBM Corp., 310 F.3d 243 (2d Cir. 2002), is instructive on the effect of a partial breach theory on damages. In Lucente, a former executive of IBM had entered into a "letter agreement" with IBM that prohibited him from working for a competitor and provided for cancellation of his stock options in the event of his violation of the agreement. Id. at 249. Two years later, in 1993, Lucente became an executive of Digital Equipment Corporation ("Digital"), a competitor of IBM, and IBM sent a cancellation letter to Lucente informing him that his restricted stock and stock options at IBM were now cancelled as a result of his employment with Digital. Id. at 250. From 1993 to 1999, the value of IBM stock significantly rose. In 1999, Lucente filed a suit against IBM, arguing that IBM's 1993 cancellation letter was an anticipatory repudiation that he elected to ignore while awaiting IBM's future performance. Id. at 251. In 2001, Lucente attempted to exercise his options by tendering $1.89 million to IBM. IBM rejected Lucente's purported exercise of his options and returned Lucente's check. Subsequently, the district court granted Lucente leave to amend his complaint to treat IBM's cancellation letter as an anticipatory repudiation with respect to his stock options. Id. at 252. Lucente's amended complaint also alleged that IBM's cancellation letter was a breach for the purposes of Lucente's restricted stock.

Id. The district court awarded Lucente $4.8 million, concluding that Lucente had properly exercised his stock options.

The Court of Appeals for the Second Circuit reversed, finding that Lucente could not treat IBM's 1993 cancellation letter as both a breach and an anticipatory repudiation that he chose to ignore. The court stated that, "[a]part from allowing Lucente to have his cake and eat it too, such a result is antithetical to the common law percepts of anticipatory repudiation and the election of remedies doctrine." Id. at 258. The court explained that, when confronted with a anticipatory repudiation, the non-breaching party must make a choice:

> When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.

Id. (citations omitted). "The non-repudiating party must, however, make an affirmative election" and "'cannot at the same time treat the contract as broken and subsisting,' for '[o]ne course of action excludes the other.'" Id. (citations omitted). Indeed, "[t]he law simply does not . . . permit a party to exercise two alternative or inconsistent . . . remedies." Id. (quoting Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969)). "Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed." Id. at 258-59.

The court further recognized that, under an anticipatory repudiation theory, a contract holder who elects to treat a repudiated contract as binding and valid waives any action against the

repudiating party until an actual breach occurs and can recover damages only for the actual breach:

> Under an anticipatory repudiation theory, a plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs. Since it is undisputed that Lucente failed to take action to exercise any of his stock options before filing this suit, Lucente had no claim for breach against IBM under the theory of anticipatory repudiation. Therefore, the only claim that Lucente could possibly have asserted in 1999 was that IBM breached its contractual obligations by cancelling his restricted stock and stock options in April 1993.

Id. at 259. The court further held that "damages for breach of contract are to be measured *from the date of the breach*." Id. at 262 (emphasis added).

Here, Consumers' decision to proceed under a partial breach theory following DOE's failure to begin accepting Consumers' SNF at the contractually required time, and not to declare the Standard Contract at an end following some earlier alleged anticipatory repudiation, clearly indicates that Consumers elected to waive any anticipatory repudiation theory. Had Consumers elected to proceed based upon anticipatory repudiation at an appropriate time before DOE was obligated to begin accepting Consumers' SNF and sought to recover damages accruing from the date of the repudiation, Consumers would have had to file its suit at that time and, further, would have to have elected to consider the Standard Contract at an end, eliminating both parties' further performance obligations. However, Consumers has sued only for partial breach, presumably because it does not want to discharge DOE's obligation to accept Consumers' SNF. Having made this election, Consumers then is obligated to continue its own performance under the Standard Contract and cannot attempt to claim damages both for a partial breach of contract, based upon DOE's failure to begin accepting Consumers' SNF, and for an anticipatory total breach of

contract at some point earlier than the date upon which DOE was otherwise obligated to begin accepting Consumers' SNF, while at the same time seeking to enforce DOE's continuing performance obligations under the Standard Contract without paying its mandatory contract fees.

Because Consumers has elected to pursue a partial breach theory in its suit, Consumers cannot claim that it is entitled to avoid or defer (to some future unidentified date) paying fees that it would otherwise have to pay before DOE's obligation to begin SNF acceptance would arise. See Franconia Associates, 536 U.S. at 143 (party treats an anticipatory repudiation as a present breach "by filing suit prior to the date indicated for performance," but, otherwise, "breach would occur when . . . [the repudiating party's] responsive performance become[s] due"). Absent an anticipatory breach or repudiation of the Standard Contract, Consumers would have no basis for delaying its payment of its one-time fee until after DOE began accepting its SNF. To the contrary, Consumers was obligated under the terms of the Standard Contract to pay its one-time fee before DOE was obligated to accept any of Consumers' SNF. Because it cannot rely upon the doctrine of anticipatory repudiation if it has elected to pursue only a partial breach claim, it cannot rely upon DOE's actions preceding its failure to begin accepting Consumers' SNF to justify non-payment of its one-time fee. In fact, if this Court were to award damages to Consumers now, but Consumers were later to refuse to pay its one-time fee when DOE eventually comes to accept Consumers' SNF, it is not clear how DOE would recoup the damages that this Court awarded for DOE's prior "failure" to conduct activities that are typically conditioned upon pre-payment of that fee. Because the rules typically applicable to partial breach of contract claims preclude an award of damages before conditions precedent to the

alleged breaching party's breach have been satisfied, the Court should find that, in fact, Consumers has not yet suffered a partial breach.

## IV. TO THE EXTENT THAT THE COURT DOES NOT DISMISS PLAINTIFF'S COMPLAINT AND AWARDS PLAINTIFF DAMAGES FOR PARTIAL BREACH, DEFENDANT IS ENTITLED TO RECOVER THE UNPAID ONE-TIME FEE, PLUS ACCRUED INTEREST

"One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir.1997)). "Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Id. (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). "[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

As demonstrated above, before DOE ever began accepting Consumers' SNF, Consumers would have been required to have paid its one-time fee pursuant to Article VIII.B.2(b) of the Standard Contract. The amount of that fee was originally $44,286,408.32, see App. 30, but, with interest calculated in accordance with the terms of Article VIII(B)(2), now exceeds approximately $139,445,944. App. 30. Had DOE begun accepting Consumers' SNF in 1999, in accordance with Consumers' approved DCSs, or at any other time that Consumers alleges, Consumers first would have had to pay the entirety of its one-time fee. Because Consumers now seeks damages for DOE's failure to begin accepting its SNF and seeks to be placed in the

financial position in which it would have been had DOE timely begun SNF acceptance, and to the extent that the Court determines that Consumers is entitled to damages for a partial breach of the Standard Contract, DOE should be entitled to recover the amount of Consumers' unpaid one-time fee (plus the interest calculated from April 7, 1983, as identified in Article VIII.B.2(b) of the Standard Contract) before the Court requires DOE to pay any damages for DOE's delay in performance – that is, the Court should require the satisfaction of the condition to DOE's obligation to accept Consumers' SNF before awarding Consumers damages. If the Court were to require DOE to pay damages for failing to begin acceptance of Consumers' SNF, but failed to allow DOE to recover the monies that it would have received had it timely begun SNF acceptance, the Court would place Consumers in a better position than it would have been in had there been no breach. See Bluebonnet Savings Bank, 339 F.3d at 1345.

Even if the Court did not allow the Government to force satisfaction of the condition precedent in its entirety prior to awarding damages to Consumers, the Court should allow DOE to recoup the amount of the one-time fee against any judgment in Consumers' favor. The Supreme Court and the Federal Circuit have long recognized the Government's common law right to offset or recoup debts owed to the Government against contract payments and damages due to the debtor. The right of offset was first recognized by the Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947), in which the Court held that the "government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." Consistent with the Supreme Court's decision in Munsey Trust, the Court of Claims similarly recognized the Government's right of offset in Madden v. United States, 178 Ct. Cl. 121, 371 F.2d 469, 473 (1967), in which

the Court held that the Government's right to offset debts owed to it against damages awarded to the debtor for an equitable adjustment of contract was superior to an attorney's lien.

Since the invocation of the common law doctrine of offset in Munsey Trust and Madden, the Government's right to offset or recoup contractual debts owed to it has been sustained in numerous decisions. See, e.g., First Federal Savings & Loan Assoc. v. United States, 58 Fed. Cl. 139, 165 (2003) (Government's right to offset damages can be raised as a "defense or argument in mitigation" during the damages phase of proceedings); Cecile Industries, Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) (Debt Collection Act of 1982, 31 U.S.C. § 3716, does not abrogate or constrict "the Government's long-standing common law right to offset contract debts against contract payments"); Project Map, Inc. v. United States, 203 Ct. Cl. 52, 486 F.2d 1375, 1376 (1973) (Government could withhold amounts owed to a contractor under a contract when the contracting officer had found that plaintiff was overpaid on two other contracts, even though the determination of overpayment was on appeal before the Board of Contract Appeals); Sinclair Oil Corp. v. United States, 291 F.3d 822, 828 (Fed. Cir. 2002) (proceeds received by a purchaser of gasoline from its settlement with a refiner would offset the gasoline purchaser's asserted refund from a DOE fund).[3]

---

[3] Offsets are permissible whether the Government is seeking to recoup or to setoff contractor debts. "Recoupment" is "a demand asserted [by a defendant] to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim," while a "setoff" "arises out of a transaction extrinsic to the plaintiff's claim." In re Gober, 100 F.3d 1195, 1207 (5th Cir. 1996) (emphasis added); see REW Enters., Inc. v. Premier Bank, N.A., 49 F.3d 163, 170 (5th Cir. 1995) (recoupment involves recovery of "part of a claim upon which one is sued" by means of a "counterclaim arising out of the same transaction"); Vari-Build, Inc. v. City of Reno, 622 F. Supp. 97, 99 (D. Nev. 1985) ("claim in recoupment must concern matters arising out of the same transaction that is the basis for the plaintiff's claim for relief"); Black's Law Dictionary 1275 (6th ed. 1990) ("[r]ecoupment is a purely defensive matter growing out of transaction constituting plaintiff's cause of action and is available only to reduce or satisfy

The Government's common law right to offset contractual debts owed to the Government against contract payments due to the debtor (and damages awarded to a plaintiff) is consistent with the contractual principle that damages for breach of contract cannot place the plaintiff in a better position than it would have been in had there been no breach. The offset doctrine thus mandates that damages for breach of contract be reduced by the amount of contractual debts owed by a plaintiff to the Government to prevent unjust enrichment. "To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet, 339 F.3d at 1345 (emphasis added). Accord LaSalle Talman Bank v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003) ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach").

In this case, to the extent that the Court awards any damages to Consumers, Consumers' damages should be reduced by the amount of its unpaid one-time fee (plus interest calculated in accordance with Article VIII.B.2(b)) pursuant to the Government's common law right of offset. See Munsey Trust Co., 332 U.S. at 239; Cecile Indus., 995 F.2d at 1054-55; Sinclair Oil, 291 F.3d at 828. If the Court did not require recoupment of this unpaid fee, it would place Consumers in a better position than it would have been in had DOE performed the Standard Contract, contrary to established precedent.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant summary judgment in the Government's favor and dismiss Consumers' breach of contract claims, as set forth in

---

plaintiff's claim . . .").

Counts I and II of its complaint. In the alternative, we respectfully request that the Court grant summary judgment in our favor regarding the Government's right to recover onsumers' one-time fee or to offset it against any judgment in Consumers' favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

July 9, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 9th day of June 2004, a copy of foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.

(Chief Judge Damich)
No. 02-1894C

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CONSUMERS ENERGY COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D. C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

July 9, 2004

# INDEX TO APPENDIX


| DOCUMENT | PAGE |
|---|---|
| Letter from Eugene R. VanHoof, Consumers Power Company, to Mr. Christopher Jedrey, Department of Energy, dated May 31, 1985 | 1 |
| Internal memorandum from Consumers Power Company entitled "Responses to R J Ancona Letter of May 1, 1984 Regarding Spent Nuclear Fuel Costs And The Nuclear Fuel Waste Disposal Act | 2 |
| Internal Correspondence from T.C. Bordine, Consumers Power Company, dated May 7, 1992, regarding "Spent Nuclear Fuel Shipments To DOE" | 5 |
| Memorandum from T.C. Bordine, Consumers Power Company, dated January 21, 1993, regarding "DOE Allocations – SNF Shipments" | 6 |
| Letter from Thomas C. Bordine, Consumers Power, to Linda Stroud, Contracting Officer, Department of Energy, dated April 13, 1993 | 8 |
| Internal Correspondence from K.J. Shields, Consumers Power Company, to T.C. Bordine regarding "Correcting DCS forms," dated June 18, 1993 | 10 |
| Internal Correspondence from K.J. Shields, Consumers Power Company, to R.W. Sinderman regarding "SNM Inventory to 2007 based on DCS's," dated August 16, 1993 | 12 |
| Letter from Thomas C. Bordine, Consumers Power, to Beth Tomasoni, Contracting Officer, Department of Energy, dated August 19, 1993 | 15 |
| Unsigned Delivery Commitment Schedule for 1999 with handwritten notes | 17 |
| Approved Delivery Commitment Schedules for 1999 | 18 |
| Approved Delivery Commitment Schedules for 2000 | 22 |
| Approved Delivery Commitment Schedules for 2001 and 2002 | 26 |
| Pages from Consolidated Accounting and Investment System, Nuclear Waste Fund, Quarterly Statement of Payments, dated April 2, 2004 | 29 |

Consumers Power Company

Eugene R VanHoof
*Director of Nuclear Fuel Supply*

1945 West Parnall Road, Jackson, MI 49201 • (517) 788-1545

May 31, 1985

ERV-85-74

Mr Christopher T Jedrey
US Department of Energy
Procurement and Assistance
Management Directorate
Office of Procurement Operations
Washington, DC 20585

Dear Mr Jedrey

Pursuant to Article VIII.B.2 of our Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated June 3, 1983, (DE-CR01-83NE44374), Consumers Power Company selects as its fee payment, Option 2, the single payment prior to delivery of the spent nuclear fuel.

Respectfully

ERVanHoof

CC RJOdlevak
SNSpring
JLBacon
ABBass
TCCampbell
GLSchwass

OC0585-0038A-FS02

recd
6/5/85

CONSUMERS POWER COMPANY
Responses to R J Ancona Letter of May 1, 1984
Regarding Spent Nuclear Fuel Costs and The Nuclear Fuel Waste Disposal Act

1. Does your Company have a contract with the DOE for disposing of spent nuclear fuel?

Response: Consumers Power executed with DOE the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (SNF/HLW) on June 3, 1983. A copy of the Contract has been furnished to your Mr R C Callen.

2. For fuel burned prior to April 7, 1983, how much is there and how many dollars are owed to the DOE?

Response: For fuel burned prior to April 7, 1983, there is approximately 238,000 kgU for which $44,280,786.21 is owed DOE.

3. For fuel burned prior to April 7, 1983, how many dollars have been collected from your ratepayers for spent fuel disposal (by year of collection)?

Response:

| | | |
|---|---|---|
| Through | 1974 | $1,690,199 |
| | 1975 | 2,067,118 |
| | 1976 | 4,332,968 |
| | 1977 | 4,006,031 |
| | 1978 | 2,152,836 |
| | 1979 | 2,602,268 |
| | 1980 | 2,070,961 |
| | 1981 | 2,889,407 |
| | 1982 | 2,661,047 |
| | 1983 | 1,275,006 |
| Total | | $25,747,841 |

4. Is the money referred to in question 3 in a special account?

Response: No.

5. Has your Company decided on how it will make the payment for fuel burned prior to April 7, 1983? If so, which option?

Response: Consumers Power has not elected an option on payment for spent fuel burned prior to April 7, 1983. A decision is scheduled to be made by approximately April 1985.

6. If the money collected from the ratepayers is not in a special account, where would the cash come from to meet a 1985 lump-sum payment (please answer regardless of which option has been chosen by your Company)?

Response: Should Consumers Power elect the 1985 lump-sum payment option, the cash will be provided from internally generated funds and external financing.

01010488

7. For fuel burned after April 7, 1983, trace the dollars between the time it is collected through Account 518 to the time it is paid to the DOE.

Response: Amounts payable to the DOE are charged monthly to Account 518 and credited to Account 232 based on 1 mill per kilowatthour (kWh) of gross nuclear generation. Quarterly payments of these amounts are payable to the DOE on the last day of the month following each quarter. Collection of these costs from our customers is dependent upon estimated power supply cost recovery (PSCR) factors and sales levels; therefore, the timing of collection is not known until the annual PSCR reconciliation.

8. How long after it is collected is it paid to the DOE?

Response: As stated in the response to question 7, payment to the DOE is based on a monthly charge of 1 mill per kWh and not on the amount actually collected from customers. To the extent that the PSCR factor accurately estimates fuel costs, including the 1 mill per kWh, and sales levels, customers are billed currently for the DOE assessment and the bills are due 21 days after billing.

9. Please provide your Company's evaluation of the Nuclear Waste Disposal Act.

Response: The Nuclear Waste Policy Act (NWPA) of 1982 establishes by law the method, the means, the responsibility, the schedule and the institutional process by which SNF/HLW will ultimately be disposed of. Consumers Power supports the NWPA of 1982.

10. Please provide your Company's evaluation of the DOE thus far in administering the Act.

Response: DOE has accepted the responsibility under the NWPA of 1982 to carry out the Act by establishing management organizations in all appropriate areas to carry out the provisions of the Act. Contracts have been executed with all generators and holders of SNF/HLW providing revenues to support the SNF/HLW program budget. Efforts are underway to develop the SNF/HLW containment technology and to carry out the institutional process of site selection. Schedules have been developed to meet the January 31, 1998 date for receiving SNF/HLW. Progress to date in meeting key dates established in the Act appears to be satisfactory.

01010489

11. Please provide your Company's evaluation of what will happen in the near future with the Act and the DOE.

Response: In the near future it is expected that DOE will continue to hold workshops with the individual states that have land areas under consideration for SNF/HLW disposal site selection. Some members of the Michigan Governors Task Force were scheduled to attend their third workshop this past winter 1984. The final version of the Mission Plan Volume I (DOE report to Congress) should be published in August 1984. A draft of the Mission Plan Volume II should be published for comment by August 1984. The Site Selection Guidelines should be finalized by September 1984. A recommendation to the President on the three sites to be characterized in the selection process for the first disposal facility should be made by January 1985. A reduction of approximately 220 areas down to about 20 areas under consideration for characterization in the selection process for the second disposal site should be made by June 1985. The 1 mill/kWh fee should remain the same through 1985. Finally, it is expected that the permanent Director of the Office of Civilian Radioactive Waste Management, recently nominated by the President, should be confirmed by the Senate in the near future.

12. Please provide your Company's estimated timing of a permanent storage site.

Response: It is expected that DOE will begin accepting SNF/HLW by January 31, 1998 unless the NWPA-1982 is amended. DOE will store the SNF/HLW accepted in the operational storage site or a backup monitored retrievable storage (MRS) facility until the storage site is complete.

01010490

Doc Disposal SNF

| | | |
|---|---|---|
| To | GRBoss, Big Rock Point<br>RJGerling, Palisades<br>MGMlynarek, Palisades | |
| From | TCBordine, P-24-602 | CONSUMERS POWER COMPANY |
| Date | May 7, 1992 | |
| Subject | SPENT NUCLEAR FUEL SHIPMENTS TO DOE | Internal Correspondence |
| CC | DPHoffman, P-26-117A<br>WLBeckman, Big Rock Point<br>DEEngle, Palisades<br>MAFerens, Palisades<br>DRHughes, P-24-420A<br>RDOrosz, Palisades<br>JSRang, P-24-614A<br>RWSinderman, P-24-401<br>GBSlade, Palisades<br>ERVanHoof, P-24-113B<br>GCWithrow, Big Rock Point | TCB 92-47 |

Attached is a copy of DOE's Annual Capacity Report (ACR) published December 1991 and received March 1992. The report stipulates the annual allocation of Spent Nuclear Fuel that may be shipped to a disposal facility for each utility for a ten-year period, the first year beginning in 1998. Our first allocation begins in the second year, 1999, and is for 2.5 MTU of spent fuel which is equivalent to 18 Big Rock Point fuel assemblies. Our second allocation begins in the third year, 2000, and is for 87.3 MTU of spent fuel which is equivalent to 22 Big Rock Point fuel assemblies and 205 Palisades fuel assemblies.

Although it is questionable whether or not DOE will have a facility ready to receive our spent nuclear fuel beginning in the year 1999, since we are paying 1 mill/KWh for DOE to dispose of our spent fuel assemblies, it is appropriate that we complete all contractual requirements in order that we do not lose our shipment allocations. The contract requires that beginning January 1, 1992, and at least 63 months prior to any allocated shipment, we must complete a form identified as the Delivery Commitment Schedule (DCS). The form should, therefore, be submitted sometime between now and August, 1993 to facilitate our first shipment. Since each DCS received by DOE is date-stamped and approved (or disapproved), within 3 months of receipt, it is in our best interest to submit the form early in order to take advantage of the "first come, first serve" contractual obligation that the DOE must follow.

The decision that needs to be made prior to submitting out first DCS is how to split up our allocations between Big Rock Point and Palisades. Each allocation can be divided between plants or assigned all to Palisades or Big Rock Point. Even though the first year allocation of 2.5 MTU was established by 18 fuel assemblies discharged from Big Rock Point, we may choose to have Palisades utilize the allocation and Big Rock Point utilize all of the 87.3 MTO allocation the following year, or vice versa.

Since it is more likely that Big Rock Point will have reached the end of its' operating license by the time the DOE has an operating MRS facility, it may be appropriate to use all allocations assigned to Big Rock Point first, until all fuel has been transferred offsite to DOE, and then begin shipping Palisades spent fuel.

A meeting is suggested to establish appropriate disposal strategy for our spent fuel shipments to DOE. Please contact me with your preferences for a meeting location, time and those individuals who should be involved in the decisions regarding our spent fuel shipments. Any persons, by copy of this memo, who have input, please feel free to call me on 80665.

01001270

CONSUMERS POWER COMPANY

TCB-93-09

To: GRBoss, Big Rock Point
RJGerling, Palisades
PJKluskowski, Palisades

From: TCBordine, P24-602

Date: January 21, 1993

Subject: DOE Allocations - SNF Shipments

CC: MAFerens, Palisades
GHGoralski, Palisades
HAReyner, Palisades
WEKessler, P24-616
DEEngle, Palisades
JSRang, P24-614
SRMaclean, Palisades
KFKrueger, Palisades
JJFremeau, P24-414A
RAHarrington, P24-606

---

Last July 14, 1992 we held a meeting to discuss the DOE Disposal Contract allocations for spent nuclear fuel shipments, currently scheduled to begin, for CPCo, in the year 1999. In attendance were those addressees and recipients by copy of this memo. In that meeting, we concluded that decisions regarding DOE allocations between BRP and PAL should await completion of an economic study conducted by JSRang to look at various costs and identify the minimum costs for BRP decommissioning.

I have been briefed by WEKessler and JSRang concerning the results of the decommissioning study as applicable to BRP spent nuclear fuel shipments. The least cost alternative for BRP is to maximize BRP's use of our DOE allocations, however, BRP cannot utilize all the authorized shipments, therefore the following scenario is offered for your approval.

DOE has authorized CPCo 2.5 MTU worth of SNF shipments in the second year (1999), 87.3 MTU in the third year (2000), 2.7 MTU in the fourth year (2001) and 27.3 MTU in the fifth year (2002). Fuel must decay five years in the spent fuel pool before it can be shipped via dry cask storage. Hence the fuel shipped in the year 2000 must be discharged into the spent fuel pool during the year 1995. BRP's spent fuel inventory is as follows:

| | |
|---|---|
| Present # of assemblies = | 294 |
| 1993 end of cycle 26 discharge (+22) = | 316 |
| 1994 end of cycle 27 discharge (+20) = | 336 |
| 1995 end of cycle 28 discharge (+20) = | 356 |

1. BRP gets the first allocation of 2.5 MTU = 18 assemblies for the year 1999.

2. BRP remaining assemblies for possible shipment in year 2000 = 356 - 18 = 338 assemblies.

3. 338 BRP assemblies = 46.9 MTU worth of allocation.

01001955

4. Palisades gets the remaining 87.3 - 46.9 = 40.4 MTU worth of allocation for the year 2000.

5. 40.4 MTU of Palisades spent fuel assemblies = from 94 to 100 assemblies depending on which ones we ship.

6. BRP gets the third allocation of 2.7 MTU = 22 assemblies for fuel discharged in 1996 and shipment in the year 2001.

7. BRP/Palisades similar split in the year 2002 for the 27.3 MTU allocation as was done in 2000, (ie, 20 assemblies for BRP = 2.7 MTU and balance of 24.6 MTU = 61 Palisades assemblies.

A meeting is requested in order to reach consensus regarding the split of our authorized DOE allocations between BRP and PAL. I recommend Thursday, February 4, 1993 after lunch, ie, 1:00-3:00. Paul Kluskowski/Bud Gerling is requested to obtain a meeting room location and finalize the meeting date and time.

It is my intent that following the meeting, GRBoss commit to filling out two (2) Delivery Commitment Schedule (DCS) forms (attached), one for the year 1999 and one for the year 2000 and PJKluskowski complete one form for the agreed balance shipment in the year 2000. Our DOE contract requires at least a 63 month notification, however, it is in our best interest to submit our notification as early as possible in order not to lose it to a "squeekier wheel" that would cause re-allocation of priorities (eg, Trojan, Rancho Seco, ~~Maine~~ Yankee, LaCrosse, etc).
Yankee Rowe

01001956

Consumers Power
POWERING MICHIGAN'S PROGRESS
General Offices: 1945 West Parnall Road, Jackson, MI 49201 • (517) 788-0550

April 13, 1993

US Department of Energy
Contracting Officer
Office of Placement and Admin
PR-322.1
1000 Independence Avenue, SW
Washington, DC 20585

Dear Ms Linda Stroud:

Our contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste specifies under Article V.B, the requirement to submit Delivery Commitment Schedules sixty-three (63) months in advance of our intended shipment date.

DOE letter dated March 4, 1992 specifies that "the allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." The ACR established Consumers Power Company's first year allocation at 0 MTU, second year allocation at 2.5 MTU and third year allocation at 87.3 MTU. The March 4, 1992 letter further requests us to submit as many allocations as possible to assist the DOE in planning of the Federal Waste Management System (FWMS).

Attached are Consumers Power Company's completed DCS forms for our first two allocations. The services under our contract, per Article II are required to begin "not later than January 31, 1998". Since our first year allocation is zero, the attached DCS forms reflect our allocations for the years 1999 and 2000.

The instructions permit division of the allocations between our Big Rock Point and Palisades Plants as we deem appropriate. Since by 1998, Big Rock Point will no longer have full core discharge capability, it is our intent to maximize use of our allocations for Big Rock Point deliveries. The balance remaining after assignment from Big Rock Point has been designated for Palisades.

Big Rock Point will actually lose full core discharge capability in 1996. If additional allocations should become available for the first year, 1998, Consumers Power Company requests the opportunity to utilize some of those additional allocations for our Big Rock Point discharged fuel. We understand that Article V.E. of our standard contract permits the exchange of approved DCS's between purchasers. If you should become aware of any approved DCS's that are available for exchange from 1998 for a later time, please feel free to inform the party of our request for exchange or notify us of any party desiring such exchange.

Our 1999 allocation of 2.5 MTU is divided into four (4) DCS's, all assigned to Big Rock Point Plant. They are divided as follows:

01001996

| DCS # | Description | MTU |
|---|---|---|
| 99-1201-01 | 188 pins | 0.17 |
| 99-1201-02 | 5 Assemblies | 0.59 |
| 99-1201-03 | 14 Assemblies | 1.64 |
| 99-1201-04 | Non fuel components | 0.10 |

Specific pin and assembly identification information is attached to each DCS.

Our 2000 allocation of 87.3 MTU is divided such that Big Rock Point Plant is designated 44.32 MTU total and the balance of 42.98 MTU is designated to Palisades Plant.

The Big Rock Point Plant allocations are divided into three (3) DCS's, as follows:

| DCS # | Description | MTU |
|---|---|---|
| 00-1201-01 | 30 Assemblies | 3.84 |
| 00-1201-02 | 287 Assemblies | 37.84 |
| 00-1201-03 | ~~20 Assemblies~~ | 2.64 |

Specific assembly identification information is included for the Big Rock Point DCS's.

The Palisades Plant allocations are divided into two (2) DCS's, as follows:

| DCS # | Description | MTU |
|---|---|---|
| 00-1204-01 | 60 Assemblies | 24.0 |
| 00-1204-02 | 47 Assemblies | 18.98 |

Specific assembly identification information is not included with the Palisades DCS forms.

If you have any questions or require more information concerning the attached nine (9) DCS forms, please feel free to contact the respective plant contact person identified on the DCS forms or me at (517) 788-0665.

Yours very truly,

Thomas C Bordine
Nuclear Fuel Supply Director
TCB-93-34

CC:

USDOE
Chief Logistics and Utility Interface Branch
Office of Nuclear Radioactive Waste Management
RW-432
1000 Independence Avenue, SW
Washington, DC 20585

JCDodge, M-645A
DEBarth, M-1033
JJFremeau, P24-414A
PJKluskowski, PAL
GRBoss, BRP
KMFarr, M-877

01001997

To: TCBordine, P24-~~503~~ [signature] 6/18/93
From: KJShields

Date: 06/18/93

Subject: Correcting DCS forms

CC: TCMort, Big Rock Point
RJKluskowski, Palisades

CONSUMERS POWER COMPANY

Internal Correspondence

KJS-93-015

References: 1) To Thomas C. Bordine (CPCo) From Beth Tomasoni (DOE), 07/23/93.

2) TCB-93-12, To GRBoss (CPCo), RJKluskowski (CPCo), From TCBordine (CPCo) 02/01/93.

3) To Linda Stroud (DOE), From TCBordine (CPCo), 04/13/93.

Reference 1 ask for corrections to the Delivery Commitment Schedule's (DCS's) sent in Reference 3. This letter will address those corrections.

DCS No. 99-1201-4374-01
The DOE rejected the DCS because the earliest discharge date 2.6, 03/23/74 corresponded to Cycle 11 fuel which was reported to be all shipped off site. The data for these fuel pins was reported incorrectly. The range of dates should be 06/02/74 to 09/26/93 which corresponds to Cycles 12 and 26. The Cycle 26 RW-859 is assumed to be submitted this year, and the piece list has been updated to reflect the cycle discharge date of each item. Corrected DCS attached.

DCS No. 99-1201-4374-02
DOE Accepted. Copy with actual cycle base discharged dates attached.

DCS No. 99-1201-4374-03
DOE Accepted. Copy with actual cycle base discharged dates attached.

DCS No. 99-1201-4374-04
The DOE rejected the DCS because the present process does not handle non-fuel material. This DCS is resubmitted as a single BWR fuel assembly with the full range of acceptable delivery dates. The intention is to change the DCS later as the DOE expands its process.

DCS No. 00-1201-4374-01
DOE Accepted. Copy with actual cycle base discharged dates attached.

DCS No. 00-1201-4374-02
The DOE rejected the DCS because the discharge dates 2.6, do not correspond to the end of Big Rock Point Cycles. Big Rock Point predicted discharge dates into the future and the DOE does not want this. The DCS has been revised to reflect only assemblies discharged as of the latest cycle, Cycle 26 06/26/93. Corrected DCS attached.

DCS No. 00-1201-4374-03
The DOE rejected the DCS because the discharge dates 2.6, do not correspond to the end of Big Rock Point Cycles. Big Rock Point predicted discharge dates into the future and the DOE does not want this. The DCS has been deleted since it deals only with future discharge assemblies.

01001966

DCS No. 00-1204-4374-01
The DOE rejected the DCS because the Identification number was unacceptable. Palisades assumed that the 12 digit number had to be unique, however the DOE requests that the purchaser or contract number be sequenced per year. Given this and the above DCS being deleted the DCS number should be 00-1204-4374-03.

DCS No. 00-1204-4374-02
The DOE rejected the DCS because the Identification number was unacceptable. Palisades assumed that the 12 digit number had to be unique, however the DOE requests that the purchaser or contract number be sequenced per year. Given this and the above DCS being deleted the DCS number should be 00-1204-4374-04.

Big Rock Point Cask
The Big Rock Point Crane is rated for 75 tons, however it is limited to only 25 tons over the spent fuel pool. The possible loading of shipping casks will be;

1) Use the 24 ton transfer cask from SFP to the 60 ton Shipping Cask on the reactor deck.
2) Move the 60 ton shipping cask to the floor of containment from the reactor deck.
3) Truck the 60 ton shipping cask off site.

Palisades Cask
To be address in a later letter.

01001967

AUG 18 1993

To: RWSinderman, P24-401
From: KJShields, Big Rock Point

Date: 08/16/93

Subject: SNM Inventory to 2007 based on DCS's

CC: TCMort, Big Rock Point
RJKluskowski, Rx Eng-Palisades
RHHarrington, P24-606
TCBordine, P24-602

CONSUMERS POWER COMPANY

Internal Correspondence

KJS-93-014

References:

1) KJS-93-006 "SNM Shipping DCS forms and draft schedule", To TCBordine (CPCo), From KJShields(CPCo), 02/24/93.

2) TCB-93-12 To GRBoss (CPCo), RJKluskowski (CPCo), From TCBordine (CPCo), 02/01/93

3) To Thomas Bordine (CPCo), From M. Detmer Contracting Officer, Office of Placement and Administration (DOE), 03/04/92

4) "PALISADES Fuel Schedule to End of Plant Life", RJKluskowski (CPCo) 04/02/93.

5) GRB 93-15 "FSDD For I8 Fuel", To TCBordine (CPCo), From GRBoss (CPCo), 05/18/93.

In response to our discussion 08/16/93 the following pages provide an estimate of the fuel shipments as per our planned 10CFR961 Delivery Commitment Schedule's (DCS's).

The following assumptions are made in the development of the table.

<u>BRP ASSUMPTIONS</u>

1. Last core will off loaded on 05/01/2000.
2. There will be four more reloads at BRP I8, I9, IA, and IB
3. Reloads I8, I9, IA, and IB will average 131704 gms/assembly
4. BRP will have priority over Palisades in the DOE allocations.
5. BRP will ship the smaller items first.
6. MTU = initial Pu + initial U
7. The fuel that has decayed 5 years in November of the year 2000 will get shipped out in the year 2000.

<u>PALISADES ASSUMPTIONS</u>

1. There will be nine more reloads between 1994 and 2007.
2. Each reload will be 60 assemblies.
3. Each Fuel Assembly is 0.4 MTU.

01001992



CPT001 0111

| Year | DOE ALLOCATION MTU Reference 3 | BRP ALLOCATION Reference 1 | POSSIBLE PALISADES ALLOCATION |
|---|---|---|---|
| 1998 | 0.0 | 0.0 MTU | 0.0 MTU |
| 1999* | 2.5 | 2.40 MTU<br>19 Assemblies<br>188 pins | 0.10 MTU<br>0 Assemblies<br>? pins |
| 2000* | 87.3 | 44.32 MTU<br>337 Assemblies | 42.98 MTU<br>107 Assemblies |
| 2001 | 2.7 | 0.0 MTU | 2.70 MTU<br>6 Assemblies |
| 2002 | 27.3 | 2.63 MTU<br>20 Assemblies | 24.66 MTU<br>61 Assemblies |
| 2003 | 3.5 | 2.63 MTU<br>20 Assemblies | 0.87 MTU<br>2 Assemblies |
| 2004 | 26.5 | 0.00 MTU | 26.50 MTU<br>66 Assemblies |
| 2005 | 0.0 | 0.00 MTU | 0.0 MTU |
| 2006 | 2.8 | 2.80 MTU<br>21 Assemblies | 0.0 MTU |
| 2007 | 30.8 | 8.30 MTU<br>63 Assemblies | 22.50 MTU<br>56 Assemblies |
| Total | 183.4 | 63.06 MTU<br>480 Assemblies<br>188 pins | 120.34 MTU<br>298 Assemblies<br>? pins |

* DCS's submitted to DOE, must be submitted 63 months prior to shipment.

BRP SUMMARY
1. 441 locations in BRP SFP
2. 84 locations in BRP Reactor

| Year | Assemblies Shipped | Assemblies Received | Assemblies In SFP | Assemblies In Reactor | Assemblies On-Site |
|---|---|---|---|---|---|
| 1993 | 0 | 22 | 316 | 84 | 400 |
| 1994 | 0 | 20 | 336 | 84 | 420 |
| 1995 | 0 | 20 | 356 | 84 | 440 |
| 1996 | 0 | 20 | 376 * | 84 | 460 |
| 1997 | 0 | 0 | 376 * | 84 | 460 |
| 1998 | 0 | 20 | 396 * | 84 | 480 |
| 1999 | 19 | 0 | 377 * | 84 | 461 |
| 2000 | 337 | 0 | 124 | 0 | 124 |
| 2001 | 0 | 0 | 124 | 0 | 124 |
| 2002 | 20 | 0 | 104 | 0 | 104 |
| 2003 | 20 | 0 | 84 | 0 | 84 |
| 2004 | 0 | 0 | 84 | 0 | 84 |
| 2005 | 0 | 0 | 84 | 0 | 84 |
| 2006 | 21 | 0 | 63 | 0 | 63 |
| 2007 | 63 | 0 | 0 | 0 | 0 |

* No Full Core Off Load

01001993

PALISADES SUMMARY TO END-OF INITIAL LICENSE
1. 887 locations in PALISADES SFP
2. 204 locations in PALISADES Reactor

| Year | Assemblies Shipped | Assemblies Received | Assemblies In SFP | | Assemblies In Reactor | Assemblies On-Site | |
|---|---|---|---|---|---|---|---|
| 1993 | 0 | 60 | 733 | * | 204 | 937 | |
| 1994 | 0 | 60 | 793 | * | 204 | 997 | |
| 1995 | 0 | 0 | 793 | * | 204 | 997 | |
| 1996 | 0 | 60 | 853 | * | 204 | 1057 | |
| 1997 | 0 | 60 | 887 | * | 204 | 1117 | ** + 26 |
| 1998 | 0 | 0 | 887 | * | 204 | 1117 | ** + 26 |
| 1999 | 0 | 60 | 887 | * | 204 | 1177 | ** + 86 |
| 2000 | 107 | 60 | 887 | * | 204 | 1130 | ** + 39 |
| 2001 | 6 | 60 | 887 | * | 204 | 1184 | ** + 93 |
| 2002 | 61 | 0 | 887 | * | 204 | 1123 | ** + 32 |
| 2003 | 2 | 60 | 887 | * | 204 | 1181 | ** + 90 |
| 2004 | 66 | 60 | 887 | * | 204 | 1175 | ** + 84 |
| 2005 | 0 | 0 | 887 | * | 204 | 1175 | ** + 84 |
| 2006 | 0 | 60 | 887 | * | 204 | 1235 | ** +144 |
| 2007 | 56 | 0 | 887 | * | 204 | 1179 | ** + 88 |
| 2008+ | ? | ? | ? | * | ? | ? | |

* No Full Core off load
** + nnn No Room in the Pool or Reactor, nnn have to go to alternate storage

WITH CASKS PALISADES SUMMARY TO END-OF INITIAL LICENSE
1. 887 locations in PALISADES SFP
2. 204 locations in PALISADES Reactor
3. 24 Assemblies per Cask

| Year | Assemblies Shipped | Assemblies Received | Assemblies In SFP | Assemblies In Casks | Assemblies In Reactor | Assemblies On-Site |
|---|---|---|---|---|---|---|
| 1993 | 0 | 60 | 685 | 48 | 204 | 937 |
| 1994 | 0 | 60 | 481 | 312 | 204 | 997 |
| 1995 | 0 | 0 | 385 | 408 | 204 | 997 |
| 1996 | 0 | 60 | 445 | 408 | 204 | 1057 |
| 1997 | 0 | 60 | 481 | 432 | 204 | 1117 |
| 1998 | 0 | 0 | 457 | 456 | 204 | 1117 |
| 1999 | 0 | 60 | 517 | 456 | 204 | 1177 |
| 2000 | 107 | 60 | 423 | 504 | 204 | 1130 |
| 2001 | 6 | 60 | 427 | 552 | 204 | 1184 |
| 2002 | 61 | 0 | 367 | 552 | 204 | 1123 |
| 2003 | 2 | 60 | 401 | 576 | 204 | 1181 |
| 2004 | 66 | 60 | 371 | 600 | 204 | 1175 |
| 2005 | 0 | 0 | 347 | 624 | 204 | 1175 |
| 2006 | 0 | 60 | 407 | 624 | 204 | 1235 |
| 2007 | 56 | 0 | 303 | 672 | 204 | 1179 |
| 2008+ | ? | ? | ? | ? | ? | ? |

01001994

Consumers Power
POWERING MICHIGAN'S PROGRESS
General Offices: 1945 West Parnall Road, Jackson, MI 49201 • (517) 788-0550

August 19, 1993

US Department of Energy
Contracting Officer
PR-322.1
1000 Independence Ave, SW
Washington, DC 20585

Dear Ms Beth Tomasoni:

References: 1) To Thomas C Bordine (CPCo) from Beth Tomasoni (DOE), 7/23/93
2) To Linda Stroud (DOE), from TCBordine (CPCo), 4/13/93.

Reference 1 asks for corrections to the Delivery Commitment Schedule's (DCS's) sent in Reference 2. This letter will address those corrections.

DCS No. 99-1201-4374-01

The DOE rejected the DCS because the earliest discharge date 2.6, 3/23/74 corresponded to Cycle 11 fuel which was reported to be all shipped off-site. The data for these fuel pins was reported incorrectly. The range of dates should be 6/2/74 to 9/26/93 which corresponds to Cycles 12 and 26. The Cycle 26 RW-859 will be submitted this year, as required 90 days after cycle start-up. The piece list has been updated to reflect the cycle discharge date of each item. Corrected DCS forms are also attached.

DCS No. 99-1201-4374-04

The DOE rejected the DCS because the present process does not handle non-fuel material. This DCS is resubmitted as a single BWR fuel assembly with the full range of acceptable delivery dates. The intention is to change the DCS later as the DOE expands its process.

DCS No. 00-1201-4374-02

The DOE rejected the DCS because the discharge dates 2.6, do not correspond to the end of Big Rock Point Cycles. Big Rock Point predicted discharge dates into the future and the DOE requires that only discharge dates specified by completed RW-859's be used. The DCS has been revised to reflect only assemblies discharged as of the latest cycle, Cycle 26, 6/26/93.

DCS No. 00-1201-4274-03

The DOE rejected the DCS because the discharge dates 2.6, do not correspond to the end of Big Rock Point Cycles, since Big Rock Point predicted discharge dates into the future. The DCS has been deleted since it deals only with future discharge assemblies.

01002026

A CMS ENERGY COMPANY

DCS No. 00-1204-4374-01

The DOE rejected the DCS because the Identification number was unacceptable. Palisades assumed that the 12 digit number had to be unique, however the DOE requests that the purchaser or contract number be sequenced per year. Given this and the above DCS being deleted the DCS number should be 00-1204-4374-03. Also note that the specified discharge date of 6/4/93 will be specified in the next RW-859 which is due 90 days after cycle start-up from our current refueling outage.

DCS No. 00-1204-4374-02

The DOE rejected the DCS because the Identification number was unacceptable. Palisades assumed that the 12 digit number had to be unique, however the DOE requests that the purchaser or contract number be sequenced per year. Given this and the above DCS being deleted the DCS number should be 00-1204-4374-04. Also note that the specified discharge date of 6/4/93 will be specified in the next RW-859 which is due 90 days after cycle start-up from our current refueling outage.

Big Rock Point Cask

The Big Rock Point Crane is rated for 75 tons, however it is limited to only 25 tons over the spent fuel pool. The possible loading of shipping casks will be:

1) Use the 24 ton transfer cask from SFP to the 60 ton shipping cask on the reactor deck.

2) Move the 60 ton shipping cask to the floor of containment from the reactor deck.

3) Truck the 60 ton shipping cask off site.

Palisades Cask

We will submit a response to your concerns regarding the Palisades Cask at a later date by separate cover letter.

Yours very truly,

Thomas C Bordine
Nuclear Fuel Supply Director

CC: JJFremeau, P24-414A
KJShields, BRP
JCDodge, M-645A
PJKluskowski, PAL
GRBoss, BRP
DGBarth, M-1074

01002027

NWPA-830C

NWPA-830C OMB No.: 1901-0260
Expires: 11/30/93

Return copy to me

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10CFR961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, E1-73, 1000 Independence Ave., S.W., Washington,D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 99-1201-4374-02

1.2 Contact Person:
(a) Name: GR Boss
(b) Telephone (include Area Code): 616-547-8251

1.3 Contact Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point Nuclear Plant
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 25 ton Transfer , 60 ton shipping
2.2 Shipping Lot Number: ____
2.3 Proposed Shipping Mode: Truck X ; Rail ____; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: ____
2.6 Range of Discharge Dates: 07 23 77 to 10 31 80
(Earliest to Latest) Mo/ Day/ Yr to Mo/ Day/ Yr
2.7 Metric Tons Uranium: 0.59
2.8 Number of Assemblies: BWR 5 PWR ____ Other ____

These 3 have been approved!

### 3.0 CERTIFICATIONS

Purchaser hereby that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent fuel nuclear fuel to DOE.

3.1 ____________________ Authorized Purchaser Signature ____ Date

3.2 ____________________ Name (Please Type or Print)

3.3 ____________________ Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

____________________ Technical Representative ____ Title ____ Date

4.2 ____________________ Contracting Officer ____ Date

01002069

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 99-1201-4374-01

1.2 Contact Person:
(a) Name: GRBoss
(b) Telephone (include Area Code): 616/547-8251

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix, MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 25 ton transfer, 60 ton shipping
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) 06 02 74 (Mo / Day / Yr) to 06 26 93 (Mo / Day / Yr)
2.7 Metric Tons Uranium: (Initial) 0.17 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR ____ Other 139 pins

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] Authorized Purchaser Signature — Date: 5/20/93

3.2 D P Hoffman — Name (Please Type or Print)

3.3 Vice President Nuclear Operations — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] Technical Representative — Title: Chief, Logistics and Utility Interface Branch — Date: 12-14-93

4.2 [signature] Contracting Officer — Date: 1/14/94

01000076

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0011

NWPA-830C

APPROVED BY DOE ON JULY 23, 1993

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 99-1201-4374-02

1.2 Contact Person:
(a) Name: GRBoss
(b) Telephone (include Area Code): 616-547-6537 Ext: 251

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point Nuclear Plant
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix, MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 24 tn transfer, 60 tn shipping

2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)

2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____

2.4 Proposed Delivery Date: 1999

2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)

2.6 Range of Discharge Dates: (Earliest to Latest) 7 23 77 Mo / Day / Yr to 10 31 80 Mo / Day / Yr

2.7 Metric Tons Uranium: (Initial) 0.59 (Discharged) (Not Required)

2.8 Number of Assemblies: BWR 5 PWR ____ Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] Authorized Purchaser Signature — Date: 4/22/96

3.2 D P Hoffman — Name (Please Type or Print)

3.3 Vice President Nuclear Operations — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] Technical Representative — Title — Date

4.2 [signature] Contracting Officer — Date

01000077

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0012

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 99-1201-4374-03

1.2 Contact Person:
(a) Name: GRBoss
(b) Telephone (include Area Code): 616-547-6537 Ext: 251

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point Nuclear Plant
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix, MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 24 ton transfer; 60 ton shipping
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) 1 30 76 Mo / Day / Yr to 1 2 89 Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 1.64 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 14 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 4/22/93
Authorized Purchaser Signature — Date

3.2 D P Hoffman
Name (Please Type or Print)

3.3 Vice President Nuclear Operations
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] Chief, Logistics Utility Interface RW-432 7/4/93
Technical Representative — Title — Date

4.2 [signature] 7/20/93
Contracting Officer — Date

01001232

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 99-1201-4374-04

1.2 Contact Person:
(a) Name: GRBoss
(b) Telephone (include Area Code): 616/547-8251

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix, MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 25 ton transfer, 60 ton shipping
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) 06 02 74 Mo / Day / Yr to 06 26 93 Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 0.10 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 1 PWR ____ Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] Authorized Purchaser Signature — Date 8/20/93

3.2 D P Hoffman — Name (Please Type or Print)

3.3 Vice President Nuclear Operations — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] Technical Representative — Title: Chief, Logistics and Utility Interface Branch — Date: 12-14-93

4.2 [signature] Contracting Officer — Date 1/14/94

01000079

Copy Distribution: 1 White, DOE Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0014

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 00-1201-4374-01

1.2 Contact Person:
(a) Name: GRBoss
(b) Telephone (include Area Code): 616-547-6537 Ext: 251

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point Nuclear Plant
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix, MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 24 ton transfer; 60 ton shipping
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ___ ; Barge ___
2.4 Proposed Delivery Date: 2000
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) 7 23 77 Mo / Day / Yr to 10 31 80 Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 3.84 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 30 PWR ___ Other ___

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 4/22/93
Authorized Purchaser Signature — Date

3.2 D P Hoffman
Name (Please Type or Print)

3.3 Vice President Nuclear Operations
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] RW-432 Chief, ... 7/16/93
Technical Representative — Title — Date

4.2 [signature] 7/22/93
Contracting Officer — Date

01001233

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.. 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: CO-1201-44374-02

1.2 Contact Person:
(a) Name: GRBoss
(b) Telephone (include Area Code): 616/547-8251

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Big Rock Point
(b) Address: 10269 US 31 North
(c) City, State & Zip Code: Charlevoix, MI 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): ______
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X . Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 2000
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 06 02 74 to 06 26 93
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 35.21 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 267 PWR ____ Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] 8/20/93
Authorized Purchaser Signature — Date

3.2 D P Hoffman — 3.3 Vice President Nuclear Operations
Name (Please Type or Print) — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] — Chief, Logistics and Utility Interface Branch — 12-14-93
Technical Representative — Title — Date

4.2 [signature] — 1/14/94
Contracting Officer — Date

01000081

Copy Distribution: 1 White, DOE Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0016

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 30-1204-4374-03

1.2 Contact Person:
(a) Name: Paul Kluskowski
(b) Telephone (include Area Code): 616/764-8913 ext: 113

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Palisades
(b) Address: 27780 Blue Star Highway
(c) City, State & Zip Code: Covert, MI 49043

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 100 ton
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____; Barge ____
2.4 Proposed Delivery Date: 2000
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) 01 01 76 Mo / Day / Yr to 06 04 93 Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 24.25 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 60 Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] 8/20/93
Authorized Purchaser Signature — Date

3.2 D P Hoffman — Name (Please Type or Print)

3.3 Vice President Nuclear Operations — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] — Technical Representative
Chief, Logistics and Utility Interface Branch — Title
12-14-93 — Date

4.2 [signature] — Contracting Officer
1/14/94 — Date

01000082

Copy Distribution: 1 White, DOE Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 00-1204-4374-04

1.2 Contact Person:
(a) Name: Paul Kluskowski
(b) Telephone (include Area Code): 616/764-8913 ext 113

1.3 Contract Number: DE-CR01-83NE44374

1.4 Reactor/Facility Information:
(a) Name: Palisades
(b) Address: 27780 Blue Star Highway
(c) City, State & Zip Code: Covert, MI 49043

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 100 ton
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck x ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 2000
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 01 01 76 to 06 04 93
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 24.00 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 60 Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] 8/20/93
Authorized Purchaser Signature — Date

3.2 D P Hoffman
Name (Please Type or Print)

3.3 Vice President Nuclear Operations
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] — Chief, Logistics and Utility Interface Branch — 12-14-93
Technical Representative — Title — Date

4.2 [signature] 1/14/94
Contracting Officer — Date

01000083

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0018

MAR [illegible]

**Department of Energy**
Washington, DC 20585

Darlene,
please file under
Spent Fuel +
Delivery Commitment
Schedule [illegible]

Ms. Ruth Harrington
Consumer's Power Company
1945 West Parnell Road
Jackson, Michigan 49201

MAR 0 5 1996

Dear Ms. Harrington:

The Department of Energy (DOE) has reviewed and approved the Delivery Commitment Schedules (DCS) submitted by Consumers Power Company dated October 16, 1995 (DCS number 02-1204-4374-01) for spent nuclear fuel from Palisades and (DCS number 01-1201-4374-01) for spent nuclear fuel from Big Rock Point. Copies of the approved DCSs are enclosed for your records. The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed pursuant to law.

Additionally, item 1.2 of one of the DCSs has been completed incorrectly. As stated in the DCS Instructions, Item 1.2 should be a 12-digit unique identification number, where the first two digits correspond to the last two digits of the delivery year. The correct DCS numbers should be:

| DCS number as submitted | Correct DCS number |
|---|---|
| 00-1204-4374-01 | 02-1204-4374-01 |

If you have any questions, please contact Doug Baptist of my staff on (202) 634-4455 or Elissa Turner, Office of Civilian Radioactive Waste Management, on (202) 586-1710.

Sincerely,

Beth A. Tomasoni

Beth A. Tomasoni
Contracting Officer
Office of Placement and Administration

01001415

Printed with soy ink on recycled paper

NWPA-830C
Revised 09/10/93

OMB No.: 1901-0260
Expires: 05/31/97

# U.S. DEPARTMENT OF ENERGY
## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 Name of Purchaser: Consumers Power Company

1.2 DCS Identification Number: 01 - 1201 - 4374 - 01

1.3 Contact Person:
(a) Name: T.C. Mort
(b) Telephone: ( 616 ) 547-8267

1.4 Contract Number: DE - CR01 - 83NE44374

1.5 Reactor/Facility Information:
(a) Name: Big Rock Point
(b) Address: 10269 U.S. 31 North
(c) City: Charlevoix
(d) State: MI (e) Zip Code: 49720

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 25 Tons Transfer; 60 Ton Shipping
2.2 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.3 Proposed Delivery Year: 2001 *
2.4 Range of Discharge Dates: 10 01 94 to 12 31 94 (Earliest to Latest) Mo/Day/Yr to Mo/Day/Yr
2.5 Metric Tons Uranium: (Initial) 2.7
2.6 Number of Assemblies: BWR 20 PWR ____ Other ____

*The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act.

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 ________________ Authorized Purchaser Signature ________ Date

3.2 Robert Fenech — Name (Please Type or Print)
3.3 Vice President, NOD — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the Unites States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE ACTION

4.1 ☒ Approved ☐ Disapproved

4.2 [signature] Technical Representative — C.O.T.R. Title — 11/30/1996 Date

[signature] Contracting Officer — Date

**01001416**

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0037

NWPA-830C
Revised 09/10/93

OMB No.: 1901-0260
Expires: 05/31/97

# U.S. DEPARTMENT OF ENERGY
## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 Name of Purchaser: Consumers Power Company

1.4 Contract Number: DE - CR01 - 83NE44374

1.2 DCS Identification Number: US-1204 - 4374 - 01

1.5 Reactor/Facility Information:
(a) Name: Palisades Nuclear Plant
(b) Address: 27780 Blue Star HWY
(c) City: Covert
(d) State: MI. (e) Zip Code: 49043

1.3 Contact Person:
(a) Name: Allen Williams
(b) Telephone: ( 616 ) 764-8913 ext. 0113

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 100 Ton
2.2 Proposed Shipping Mode: Truck X ; Rail ___ ; Barge ___
2.3 Proposed Delivery Year: 2002 *
2.4 Range of Discharge Dates: 1 1 76 to 10 31 90
(Earliest to Latest) Mo/Day/Yr to Mo/Day/Yr
2.5 Metric Tons Uranium: (Initial) 21.8
2.6 Number of Assemblies: BWR ___ PWR 53 Other ___

* The proposed delivery date is dependent upon the existence of an operational repository or an inter storage facility constructed under the act.

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 ___ Authorized Purchaser Signature ___ Date

3.2 Robert Fenech — Name (Please Type or Print)

3.3 Vice President, NOD — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the Unites States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE ACTION

4.1 ☒ Approved ☐ Disapproved

4.2 [signature] Technical Representative — [illegible] Title — 1/30/96 Date

[signature] Contracting Officer — Date

01001417

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



CPT001 0038

Consolidated Accounting and Investment System
Nuclear Waste Fund
Quarterly Statement of Payments
(NE44374) Consumers Power Company
Fiscal Quarter: 01/01/2004 thru 03/31/2004

| | Big Rock Point (1201) | Palisades (1204) | Contract Total |
|---|---|---|---|
| Net KWH Payments thru Prior Quarter: | 5,260,393.10 | 77,519,719.02 | 82,780,112.12 |
| KWH Payments to DOE this Quarter: | | | |
| KWH Fees | 0.00 | 1,589,069.00 | 1,589,069.00 |
| Adjustments | 0.00 | 0.00 | 0.00 |
| Less KWH Fee Credits/Refunds this Quarter: | | | |
| KWH Fee Credits | 0.00 | 0.00 | 0.00 |
| KWH Fee Refunds | 0.00 | 0.00 | 0.00 |
| Adjustments | 0.00 | 0.00 | 0.00 |
| Net KWH Payments to Date | 5,260,393.10 | 79,108,788.02 | 84,369,181.12 |
| KWH Interest Credits/Refunds thru Prior Quarter: | 145,791.60 | 1,019,472.18 | 1,165,263.78 |
| KWH Interest Credits/Refunds this Quarter: | | | |
| KWH Interest Credits | 0.00 | 0.00 | 0.00 |
| KWH Interest Refunds | 0.00 | 0.00 | 0.00 |
| Adjustments | 0.00 | 0.00 | 0.00 |
| KWH Interest Credits/Refunds to Date | 145,791.60 | 1,019,472.18 | 1,165,263.78 |
| KWH Penalties Assessed thru Prior Quarter: | 21,897.74 | 1,254.87 | 23,152.61 |
| KWH Penalties Assessed this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total KWH Penalties Assessed | 21,897.74 | 1,254.87 | 23,152.61 |
| KWH Penalties Paid thru Prior Quarter: | 21,897.74 | 1,254.87 | 23,152.61 |
| KWH Penalties Paid this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total KWH Penalties Paid to Date | 21,897.74 | 1,254.87 | 23,152.61 |
| BALANCE of KWH Penalties DUE | 0.00 | 0.00 | 0.00 |

Consolidated Accounting and Investment System
Nuclear Waste Fund
Quarterly Statement of Payments
(NE44374) Consumers Power Company (continued)
Fiscal Quarter: 01/01/2004 thru 03/31/2004

| | Big Rock Point (1201) | Palisades (1204) | Contract Total |
|---|---|---|---|
| SNF Penalties Assessed thru Prior Quarter: | 0.00 | 0.00 | 0.00 |
| SNF Penalties Assessed this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total SNF Penalties Assessed | 0.00 | 0.00 | 0.00 |
| SNF Penalties Paid thru Prior Quarter: | 0.00 | 0.00 | 0.00 |
| SNF Penalties Paid this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total SNF Penalties Paid to Date | 0.00 | 0.00 | 0.00 |
| BALANCE of SNF Penalties DUE | 0.00 | 0.00 | 0.00 |
| SNF Principal Due thru Prior Quarter: | 4,339,857.88 | 39,946,550.44 | 44,286,408.32 |
| SNF Principal Due this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total SNF Principal Due | 4,339,857.88 | 39,946,550.44 | 44,286,408.32 |
| SNF Interest Accrued thru Prior Quarter: | 9,294,471.95 | 85,551,667.83 | 94,846,139.78 |
| SNF Interest Accrued this Quarter | 30,711.33 | 282,684.75 | 313,396.08 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total SNF Interest Accrued | 9,325,183.28 | 85,834,352.58 | 95,159,535.86 |
| Total SNF Principal & Interest Due | 13,665,041.16 | 125,780,903.02 | 139,445,944.18 |
| SNF Principal Paid thru Prior Quarter: | 0.00 | 0.00 | 0.00 |
| SNF Principal Paid this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total SNF Principal Paid to Date | 0.00 | 0.00 | 0.00 |
| SNF Interest Paid thru Prior Quarter: | 0.00 | 0.00 | 0.00 |
| SNF Interest Paid this Quarter | 0.00 | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 | 0.00 |
| Total SNF Interest Paid to Date | 0.00 | 0.00 | 0.00 |
| Total SNF Principal & Interest Paid to Date | 0.00 | 0.00 | 0.00 |
| BALANCE of SNF Principal & Interest Due | 13,665,041.16 | 125,780,903.02 | 139,445,944.18 |

CERTIFICATE OF FILING

I hereby certify that on this 9th day of June 2004, a copy of foregoing "APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.