IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSUMERS ENERGY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-1894C<br>(Chief Judge Damich) |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully submits this motion for summary judgment and requests that this Court dismiss, in their entirety, Counts I and II of plaintiff's complaint. For the reasons explained below, plaintiff, Consumers Energy Company ("Consumers"), has failed to satisfy a condition to the Government's obligation to accept any of Consumers' spent nuclear fuel ("SNF") or high-level radioactive waste ("HLW"). There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In the alternative, to the extent that the Court does not dismiss plaintiff's complaint in its entirety, defendant respectfully requests that the Court grant partial summary judgment in defendant's favor, finding that defendant is entitled to recover fees that Consumers has not paid under the Standard Contract or, in the alternative, that defendant is entitled to recoup those fees against any judgment awarded in Consumers' favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

## SUMMARY OF ARGUMENT

This case is one of 63 cases currently pending before this Court in which plaintiffs are alleging damages arising from a partial breach by the Department of Energy ("DOE") of the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract") published at 10 C.F.R. § 961.11. Although this Court has found the Government liable for a partial breach of contract in several of the pending Standard Contract cases, this case presents an issue that exists in only a few of the pending cases and that precludes a finding of liability here.

Under the Standard Contract, contract holders are required to pay two "sets" of fees. One of the fees that each contract holder must pay is a continuing quarterly fee, the amount of which is determined by reference to the amount of electricity that the contract holder generates and sells, that continue to accrue throughout the life of the Standard Contract as long as the contract holder continues to generate electricity ("the continuing fee"). When the Standard Contracts were executed in 1983, however, most, if not all, commercial nuclear utilities already possessed SNF that DOE would be required to accept pursuant to the Standard Contract. To pay for DOE's acceptance and disposal of that pre-existing SNF, each contract holder was required to pay a fee, calculated by reference to a formula contained in the Standard Contract, to compensate DOE for accepting and disposing of that pre-existing SNF ("the one-time fee").

Under the Standard Contact, the contract holder was required, within two years after contract execution, to elect one of three options for payment of the one-time fee for the pre-existing SNF. One option required the contract holder to pay the one-time fee immediately (in the early 1980s), another option allowed the contract holder to defer its payment until a date

prior to the date that DOE was first to accept any of that contract holder's SNF (although it required the contract holder to pay interest incurred from 1983 through the date of actual payment), and a final option required the contract holder to make 40 quarterly pro rata payments of its one-time fee, with the 40th payment due before the first date for DOE's acceptance of that contract holder's SNF. Under any of the options for payment of the one-time fee, the contract holder was required to pay the entirety of the one-time fee before DOE began accepting any of that contract holder's SNF.

Consumers has never satisfied this condition upon which DOE's obligation to accept any of Consumers' SNF rested. In accordance with the requirements of the Standard Contract, Consumers elected to pay its pre-existing SNF fee of $44,286,408 through "Option 2," which required Consumers to pay its one-time fee prior to DOE's acceptance of its SNF. Consumers has never paid its one-time fee, which, with interest, now totals approximately $139,445,944. Having failed to satisfy this condition to DOE's obligation to accept any of its SNF, Consumers has no basis for seeking damages for DOE's partial breach of the Standard Contract through its failure to begin accepting Consumers' SNF. Accordingly, Consumers' complaint should be dismissed.

Apparently, Consumers will claim that it was justified in not paying its one-time fee based upon DOE's anticipatory repudiation, or anticipatory breach, of the Standard Contract. However, Consumers cannot rely upon that doctrine as a basis to avoid paying its one-time fee or satisfying its condition precedent to DOE's obligation to begin accepting Consumers' SNF. In this litigation, Consumers is not alleging a total breach of contract by DOE, but instead relies solely upon allegations of a partial breach of contract. This distinction is important because, had

it alleged a total breach of contract, DOE's obligations to accept any of Consumers' SNF would end, and DOE would be responsible to Consumers only for damages resulting from the total breach. Under a partial breach theory, however, Consumers can both seek damages for DOE's partial breach and, at the same time, expect DOE to perform its obligations under the Standard Contract at a future date. However, by electing to sue under a partial breach theory, Consumers may not use DOE's alleged "anticipatory breach" to avoid satisfying its condition precedent to DOE's obligation to accept Consumers' SNF, as there is no such legal doctrine as an "anticipatory partial breach." That is, an anticipatory breach must be total, not partial. Because it cannot rely upon an anticipatory partial breach to avoid its own contractual obligations, Consumers' decision not to pay its one-time fee, which Consumers had to pay before DOE began accepting Consumers' SNF, resulted in Consumers' failure to satisfy a condition to DOE's obligation to begin SNF acceptance from Consumers. Because Consumers did not satisfy that condition, DOE's obligation to begin SNF acceptance from Consumers has not yet arisen, and Consumers has no basis for seeking partial breach of contract damages from DOE.

## ARGUMENT

### I. THE STANDARD OF REVIEW

Summary judgment is a wholly acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S.

317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment.

## II. CONSUMERS IS REQUIRED TO PAY ITS ONE-TIME FEE BEFORE DOE IS OBLIGATED TO BEGIN ACCEPTING CONSUMERS' SNF

Pursuant to the Standard Contract, each contract holder is required to pay ongoing quarterly fees "in the amount of 1.0 mil per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s)" and sold, designed to cover SNF generated after April 7, 1983. 10 C.F.R. § 961.11, Art. VIII.A.1 & B.1. In addition to that quarterly fee, each contract holder is responsible for paying a separate fee for the disposal of the SNF and/or HLW that it had generated prior to April 7, 1983: "For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power prior to April 7, 1983, a one-time fee will be assessed." Id., Art. VIII.A.2 (emphasis added). This fee for SNF generated prior to April 7, 1983 "shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII." Id. (emphasis added).

Paragraph B of Article VIII provides each contract holder with three options for the payment of the fee for the disposal of SNF generated prior to April 7, 1983. Under the first option, Option 1, the contract holder agrees to pay its fee prorated evenly over 40 quarters, the

last of which must be made prior to the date scheduled for DOE's first acceptance of that contract holder's SNF as identified in an approved DCS. 10 C.F.R. § 961.11, Art. VIII.B.2(a) (emphasis added). Pursuant to the second option, Option 2, the contract holder may elect to satisfy its financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. Id., Art. VIII.B.2(b). Pursuant to the third option, Option 3, the contract holder must pay his entire fee prior to June 30, 1985. Id., Art. VIII.B.2(c).

The contract holder is obligated to elect the payment option for its fee relating to the disposal of its pre-April 7, 1983 SNF within two years after contract execution: "For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options: . . . ." Id., Art. VIII.B.2 (emphasis added). Consumers executed the Standard Contract that is at issue here on June 3, 1983. Compl. ¶ 1.[1] Accordingly, pursuant to the provisions of Article VIII(B)(2), Consumers had until June 3, 1985, which would have been "within two years of contract execution," to notify DOE as to which of the three available payment options Consumers would elect to pay for the disposal of its pre-April 7, 1983 SNF.

On or about May 31, 1985, Consumers elected to pay its one-time fee pursuant to Option 2. App. 1. Accordingly, Consumers was required to make its entire fee payment at "anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance." 10 C.F.R. § 961.11, Art.

[1] "Compl. ¶ ___" refers to the plaintiff's complaint in this case, filed December 16, 2002. "App. __" refers to the appendix to this motion.

VIII.B.2(b). Consumers subsequently submitted DCSs seeking to obtain DOE's commitment to accept SNF from Consumers' Big Rock Point facility beginning in 1999 and from its Palisades facility beginning in 2000, and DOE approved those DCSs. App. 18-25. Accordingly, in compliance with Consumers' May 31, 1985 election pursuant to Article VIII.B.2(b), Consumers was required, if it wanted DOE to begin acceptance of its SNF in 2002, to pay its one-time fee for its pre-April 7, 1983 SNF under its contract prior to the 1999 acceptance. In any event, under any of the options for payment of the one-time fee, the contract holder was required to pay the entirety of its one-time fee before DOE began acceptance of that contract holder's SNF and/or HLW. See 10 C.F.R. § 961.11, Art. VIII.B.2. In fact, section 302(a) of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10222(a)(5), expressly indicates that DOE's obligation to dispose of any utility's SNF is "in return for the payment of fees established by this section," conditioning DOE's acceptance obligation upon that payment. To the present day, Consumers has not paid its one-time fee.

## III. BECAUSE CONSUMERS HAS FAILED TO PAY ITS ONE-TIME FEE, IT HAS FAILED TO SATISFY A CONDITION TO DOE'S OBLIGATION TO BEGIN ACCEPTING CONSUMERS' SNF

### A. Consumers' Payment Of The One-Time Fee Is A Condition Precedent To DOE's Obligation To Accept Any Of Consumers' SNF

Because Consumers has not yet paid its one-time fee, it has failed to satisfy a condition to DOE's obligation to begin acceptance of Consumers' SNF and/or HLW. "A fact or event may be made a condition of a contract right and duty by any form of words capable of interpretation." 3A A. Corbin, Corbin on Contracts § 639, at 51 (1960). Such conditions "are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before

there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." 3A A. Corbin, Corbin on Contracts § 628, at 16 (1960);[2] see 8 C. McCauliff, Corbin on Contracts § 31.2, at 49 (rev. ed. 1999); S. Williston, Contracts § 669 (3d ed. 1961) ("Since an express condition . . . depends for its validity on the manifested intention of the parties, it has the same sanctity as the promise itself. Though the court may regret the harshness of such a condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties."). That is, "[a] condition precedent is one which must be performed before . . . the other party is obligated to perform." Lester v. Resolution Trust Corp., 994 F.2d 1247, 1254 (10th Cir. 1993). Moreover, "if a contractual duty is subject to a condition precedent, that condition must be satisfied before the duty arises." Landmark Land Co. v. United States, 256 F.3d 1365, 1376 (Fed. Cir. 2001) (emphasis in original).

Under the terms of the Standard Contract and the NWPA, Consumers, regardless of the one-time fee payment option that it selected, was required to pay its one-time fee before DOE began acceptance of its SNF and/or HLW. Accordingly, Consumers' obligations in paying its fee for pre-April 7, 1983 SNF "were clearly intended to be performed prior to [DOE's] obligation to" accept Consumers' SNF. Lester, 994 F.2d at 1254. Consumers elected not to pay its one-time fee in 1985, which it could have done, but instead elected to defer its one-time fee payment, in

[2] Although Professor Corbin uses the term "condition precedent," the American Law Institute ("ALI"), because of the confusion sometimes engendered by the distinctions between conditions subsequent and conditions precedent, prefers the more generic term "conditions." Restatement (Second) of Contracts, Ch. 9, Topic 5, Conditions and Similar Events, at 159 (1981). ALI defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Id. § 224, at 160.

accordance with Option 2, and to satisfy that financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. 10 C.F.R. § 961.11, Art. VIII.B.2(b). Because Consumers' first scheduled "delivery" of SNF to DOE was in 1999, Consumers was required to make its Option 2 fee payment no later than the date by which it wanted DOE to begin acceptance of its SNF. Until that payment is made, DOE has no obligation to accept Consumers' SNF. Because Consumers has, to date, failed to make that payment, Consumers has failed to perform its Option 2 fee payment obligation. Consumers' Option 2 fee payment obligation is a condition to DOE's contractual duty to accept SNF under Consumers' Standard Contract. Accordingly, DOE's duty to accept SNF under Consumers' Standard Contract has yet to arise. See Landmark, 256 F.3d at 1376. Because DOE's duty to perform has not arisen, no cause of action for breach of this duty can have accrued to Consumers under its Standard Contract.

B. Consumers Cannot Claim Damages For A *Partial* Breach Of Contract Before It Satisfies Its Condition To DOE's Obligation To Accept Its SNF

It appears that Consumers may attempt to avoid its obligation to satisfy its condition precedent to DOE's obligation to begin acceptance of Consumers' SNF by asserting that, once DOE announced that it would not be able to begin SNF acceptance from the industry as a whole beginning in 1998, Consumers was no longer required to pay its one-time fee until some unidentified date in the future. However, until Consumers actually pays its one-time fee, DOE will not be under an obligation to begin accepting Consumers' SNF. Although Consumers might be able to avoid paying its one-time fee in response to DOE's announcement had it viewed DOE's announcement as a total breach of the Standard Contract, Consumers has not claimed a total

breach of contract in this case. To the contrary, Consumers is seeking damages in this litigation only for a partial breach of contract. The distinctions between a total breach claim and a partial breach claim are essential to a determination of Consumers' rights and continuing obligations under the Standard Contract.

"When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). "He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." Id. That is, a claim for partial breach is one for damages based upon "only part of the injured party's remaining rights to performance," while a claim for damages for total breach is "one for damages based on all of the injured party's remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citations omitted), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). Consequently, the damages recoverable for a partial breach of contract are necessarily less than those recoverable for a total breach. See Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 279 (7th Cir. 1996) (concluding that the jury's determination that damages for partial breach of contract exceeded those for total breach was "obviously irrational"). In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). The distinction between partial and total breach "is particularly important in executory contracts." Id. at 586.

Aside from the different measure of damages applicable to a partial and total breach, these claims can also be distinguished based upon the remedies that they provide to an injured

party. Indeed, a plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). A "total breach justifies termination of the contract and damages for complete failure of performance," but a "partial breach does not." Lovink, 878 F.2d at 587; see Pinewood Realty Ltd. P'ship v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211, 215 (1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"); Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004). As the Court held in Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306 (1976), a contractor must make an election in response to an anticipatory breach either to view the contract as concluded or to continue contract performance:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Id. at 234, 543 F.2d at 1313; accord Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 323 (2002), aff'd in relevant part, 366 F.3d 1360 (Fed. Cir. 2004).

Here, Consumers' decision to continue the contract and insist upon the Government's performance of its obligations after DOE announced that it could not begin SNF acceptance in 1998 has three consequences. First, because the Government's contractual obligations were not discharged as a result of Consumers' suit for partial breach, it did not discharge the Government's ultimate obligation to accept and dispose of Consumers' SNF. Second, it obligated Consumers to continue to pay its fees into the Nuclear Waste Fund ("NWF"). Third, it limited the recovery of Consumers' damages to those for partial breach.

The only basis upon which Consumers could attempt to excuse its failure to pay its one-time fee would be its reliance upon DOE's announcement in 1996 that it would not be able to begin SNF acceptance in 1998, viewing DOE's 1996 announcement as some type of anticipatory repudiation of the Standard Contract. An anticipatory repudiation is a "renunciation of a contractual duty *before* the time fixed in the contract for performance." Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (emphasis in original). It "entails a statement or voluntary affirmative act indicating that the promisor will commit a breach when performance becomes due." Id.; see Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) ("[a]t common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract"); Tretchick v. Department of Transportation, 109 F.3d 749, 752 (Fed. Cir. 1997) (anticipatory repudiation "must be a distinct unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made").

An anticipatory repudiation of a contract is, in and of itself, a breach of contract that "generally gives rise to a claim for damages for total breach even though it is not accompanied or

preceded by a breach by non-performance." Restatement (Second) of Contracts § 253(1) cmt. a; see Wisconsin Power & Light Co. v. Century Indem. Co., 130 F.3d 787, 793 (7th Cir.1997) ("[t]he disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived"). However, an anticipatory repudiation of a contract constitutes a total breach "only if the promisee 'elects to treat it as such.'" Franconia Assocs., 536 U.S. at 143 (emphasis added) (citing Roehm v. Horst, 178 U.S. 13 (1900)). Repudiation "gives the promisee the right of electing either to treat the declaration as *brutum fulmen*, and, holding fast to the contract, to wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm, 178 U.S. at 13. Therefore, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia Assocs., 536 U.S. at 143; see United States v. Dekonty Corp., 109 F.3d 749, 752 (Fed. Cir. 1991) (injured party who elects to sue for anticipatory breach of contract must "treat th[e] refusal [to perform] as a breach and commence an action at once therefor").

Unfortunately for Consumers, "a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts § 253 cmt. b (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Further, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see Indiana Michigan Power Co. v.

United States, 60 Fed. Cl. 639, 648 (2004) (in spent nuclear fuel case, "[a]nticipatory repudiation does not apply in a partial breach situation"); 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations.

The Court of Appeals for the Second Circuit's decision in Lucente v. IBM Corp., 310 F.3d 243 (2d Cir. 2002), is instructive on the effect of a partial breach theory on damages. In Lucente, a former executive of IBM had entered into a "letter agreement" with IBM that prohibited him from working for a competitor and provided for cancellation of his stock options in the event of his violation of the agreement. Id. at 249. Two years later, in 1993, Lucente became an executive of Digital Equipment Corporation ("Digital"), a competitor of IBM, and IBM sent a cancellation letter to Lucente informing him that his restricted stock and stock options at IBM were now cancelled as a result of his employment with Digital. Id. at 250. From 1993 to 1999, the value of IBM stock significantly rose. In 1999, Lucente filed a suit against IBM, arguing that IBM's 1993 cancellation letter was an anticipatory repudiation that he elected to ignore while awaiting IBM's future performance. Id. at 251. In 2001, Lucente attempted to exercise his options by tendering $1.89 million to IBM. IBM rejected Lucente's purported exercise of his options and returned Lucente's check. Subsequently, the district court granted Lucente leave to amend his complaint to treat IBM's cancellation letter as an anticipatory repudiation with respect to his stock options. Id. at 252. Lucente's amended complaint also alleged that IBM's cancellation letter was a breach for the purposes of Lucente's restricted stock.

Id. The district court awarded Lucente $4.8 million, concluding that Lucente had properly exercised his stock options.

The Court of Appeals for the Second Circuit reversed, finding that Lucente could not treat IBM's 1993 cancellation letter as both a breach and an anticipatory repudiation that he chose to ignore. The court stated that, "[a]part from allowing Lucente to have his cake and eat it too, such a result is antithetical to the common law percepts of anticipatory repudiation and the election of remedies doctrine." Id. at 258. The court explained that, when confronted with a anticipatory repudiation, the non-breaching party must make a choice:

> When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.

Id. (citations omitted). "The non-repudiating party must, however, make an affirmative election" and "'cannot at the same time treat the contract as broken and subsisting,' for '[o]ne course of action excludes the other.'" Id. (citations omitted). Indeed, "[t]he law simply does not . . . permit a party to exercise two alternative or inconsistent . . . remedies." Id. (quoting Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969)). "Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed." Id. at 258-59.

The court further recognized that, under an anticipatory repudiation theory, a contract holder who elects to treat a repudiated contract as binding and valid waives any action against the

repudiating party until an actual breach occurs and can recover damages only for the actual breach:

> Under an anticipatory repudiation theory, a plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs. Since it is undisputed that Lucente failed to take action to exercise any of his stock options before filing this suit, Lucente had no claim for breach against IBM under the theory of anticipatory repudiation. Therefore, the only claim that Lucente could possibly have asserted in 1999 was that IBM breached its contractual obligations by cancelling his restricted stock and stock options in April 1993.

Id. at 259. The court further held that "damages for breach of contract are to be measured *from the date of the breach*." Id. at 262 (emphasis added).

Here, Consumers' decision to proceed under a partial breach theory following DOE's failure to begin accepting Consumers' SNF at the contractually required time, and not to declare the Standard Contract at an end following some earlier alleged anticipatory repudiation, clearly indicates that Consumers elected to waive any anticipatory repudiation theory. Had Consumers elected to proceed based upon anticipatory repudiation at an appropriate time before DOE was obligated to begin accepting Consumers' SNF and sought to recover damages accruing from the date of the repudiation, Consumers would have had to file its suit at that time and, further, would have to have elected to consider the Standard Contract at an end, eliminating both parties' further performance obligations. However, Consumers has sued only for partial breach, presumably because it does not want to discharge DOE's obligation to accept Consumers' SNF. Having made this election, Consumers then is obligated to continue its own performance under the Standard Contract and cannot attempt to claim damages both for a partial breach of contract, based upon DOE's failure to begin accepting Consumers' SNF, and for an anticipatory total breach of

contract at some point earlier than the date upon which DOE was otherwise obligated to begin accepting Consumers' SNF, while at the same time seeking to enforce DOE's continuing performance obligations under the Standard Contract without paying its mandatory contract fees.

Because Consumers has elected to pursue a partial breach theory in its suit, Consumers cannot claim that it is entitled to avoid or defer (to some future unidentified date) paying fees that it would otherwise have to pay before DOE's obligation to begin SNF acceptance would arise. See Franconia Associates, 536 U.S. at 143 (party treats an anticipatory repudiation as a present breach "by filing suit prior to the date indicated for performance," but, otherwise, "breach would occur when . . . [the repudiating party's] responsive performance become[s] due"). Absent an anticipatory breach or repudiation of the Standard Contract, Consumers would have no basis for delaying its payment of its one-time fee until after DOE began accepting its SNF. To the contrary, Consumers was obligated under the terms of the Standard Contract to pay its one-time fee before DOE was obligated to accept any of Consumers' SNF. Because it cannot rely upon the doctrine of anticipatory repudiation if it has elected to pursue only a partial breach claim, it cannot rely upon DOE's actions preceding its failure to begin accepting Consumers' SNF to justify non-payment of its one-time fee. In fact, if this Court were to award damages to Consumers now, but Consumers were later to refuse to pay its one-time fee when DOE eventually comes to accept Consumers' SNF, it is not clear how DOE would recoup the damages that this Court awarded for DOE's prior "failure" to conduct activities that are typically conditioned upon pre-payment of that fee. Because the rules typically applicable to partial breach of contract claims preclude an award of damages before conditions precedent to the

alleged breaching party's breach have been satisfied, the Court should find that, in fact, Consumers has not yet suffered a partial breach.

## IV. TO THE EXTENT THAT THE COURT DOES NOT DISMISS PLAINTIFF'S COMPLAINT AND AWARDS PLAINTIFF DAMAGES FOR PARTIAL BREACH, DEFENDANT IS ENTITLED TO RECOVER THE UNPAID ONE-TIME FEE, PLUS ACCRUED INTEREST

"One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir.1997)). "Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Id. (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). "[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

As demonstrated above, before DOE ever began accepting Consumers' SNF, Consumers would have been required to have paid its one-time fee pursuant to Article VIII.B.2(b) of the Standard Contract. The amount of that fee was originally $44,286,408.32, see App. 30, but, with interest calculated in accordance with the terms of Article VIII(B)(2), now exceeds approximately $139,445,944. App. 30. Had DOE begun accepting Consumers' SNF in 1999, in accordance with Consumers' approved DCSs, or at any other time that Consumers alleges, Consumers first would have had to pay the entirety of its one-time fee. Because Consumers now seeks damages for DOE's failure to begin accepting its SNF and seeks to be placed in the

financial position in which it would have been had DOE timely begun SNF acceptance, and to the extent that the Court determines that Consumers is entitled to damages for a partial breach of the Standard Contract, DOE should be entitled to recover the amount of Consumers' unpaid one-time fee (plus the interest calculated from April 7, 1983, as identified in Article VIII.B.2(b) of the Standard Contract) before the Court requires DOE to pay any damages for DOE's delay in performance – that is, the Court should require the satisfaction of the condition to DOE's obligation to accept Consumers' SNF before awarding Consumers damages. If the Court were to require DOE to pay damages for failing to begin acceptance of Consumers' SNF, but failed to allow DOE to recover the monies that it would have received had it timely begun SNF acceptance, the Court would place Consumers in a better position than it would have been in had there been no breach. See Bluebonnet Savings Bank, 339 F.3d at 1345.

Even if the Court did not allow the Government to force satisfaction of the condition precedent in its entirety prior to awarding damages to Consumers, the Court should allow DOE to recoup the amount of the one-time fee against any judgment in Consumers' favor. The Supreme Court and the Federal Circuit have long recognized the Government's common law right to offset or recoup debts owed to the Government against contract payments and damages due to the debtor. The right of offset was first recognized by the Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947), in which the Court held that the "government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." Consistent with the Supreme Court's decision in Munsey Trust, the Court of Claims similarly recognized the Government's right of offset in Madden v. United States, 178 Ct. Cl. 121, 371 F.2d 469, 473 (1967), in which

the Court held that the Government's right to offset debts owed to it against damages awarded to the debtor for an equitable adjustment of contract was superior to an attorney's lien.

Since the invocation of the common law doctrine of offset in Munsey Trust and Madden, the Government's right to offset or recoup contractual debts owed to it has been sustained in numerous decisions. See, e.g., First Federal Savings & Loan Assoc. v. United States, 58 Fed. Cl. 139, 165 (2003) (Government's right to offset damages can be raised as a "defense or argument in mitigation" during the damages phase of proceedings); Cecile Industries, Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) (Debt Collection Act of 1982, 31 U.S.C. § 3716, does not abrogate or constrict "the Government's long-standing common law right to offset contract debts against contract payments"); Project Map, Inc. v. United States, 203 Ct. Cl. 52, 486 F.2d 1375, 1376 (1973) (Government could withhold amounts owed to a contractor under a contract when the contracting officer had found that plaintiff was overpaid on two other contracts, even though the determination of overpayment was on appeal before the Board of Contract Appeals); Sinclair Oil Corp. v. United States, 291 F.3d 822, 828 (Fed. Cir. 2002) (proceeds received by a purchaser of gasoline from its settlement with a refiner would offset the gasoline purchaser's asserted refund from a DOE fund).[3]

---

[3] Offsets are permissible whether the Government is seeking to recoup or to setoff contractor debts. "Recoupment" is "a demand asserted [by a defendant] to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim," while a "setoff" "arises out of a transaction extrinsic to the plaintiff's claim." In re Gober, 100 F.3d 1195, 1207 (5th Cir. 1996) (emphasis added); see REW Enters., Inc. v. Premier Bank, N.A., 49 F.3d 163, 170 (5th Cir. 1995) (recoupment involves recovery of "part of a claim upon which one is sued" by means of a "counterclaim arising out of the same transaction"); Vari-Build, Inc. v. City of Reno, 622 F. Supp. 97, 99 (D. Nev. 1985) ("claim in recoupment must concern matters arising out of the same transaction that is the basis for the plaintiff's claim for relief"); Black's Law Dictionary 1275 (6th ed. 1990) ("[r]ecoupment is a purely defensive matter growing out of transaction constituting plaintiff's cause of action and is available only to reduce or satisfy

The Government's common law right to offset contractual debts owed to the Government against contract payments due to the debtor (and damages awarded to a plaintiff) is consistent with the contractual principle that damages for breach of contract cannot place the plaintiff in a better position than it would have been in had there been no breach. The offset doctrine thus mandates that damages for breach of contract be reduced by the amount of contractual debts owed by a plaintiff to the Government to prevent unjust enrichment. "To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet, 339 F.3d at 1345 (emphasis added). Accord LaSalle Talman Bank v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003) ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach").

In this case, to the extent that the Court awards any damages to Consumers, Consumers' damages should be reduced by the amount of its unpaid one-time fee (plus interest calculated in accordance with Article VIII.B.2(b)) pursuant to the Government's common law right of offset. See Munsey Trust Co., 332 U.S. at 239; Cecile Indus., 995 F.2d at 1054-55; Sinclair Oil, 291 F.3d at 828. If the Court did not require recoupment of this unpaid fee, it would place Consumers in a better position than it would have been in had DOE performed the Standard Contract, contrary to established precedent.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant summary judgment in the Government's favor and dismiss Consumers' breach of contract claims, as set forth in

---

plaintiff's claim . . .").

Counts I and II of its complaint. In the alternative, we respectfully request that the Court grant summary judgment in our favor regarding the Government's right to recover onsumers' one-time fee or to offset it against any judgment in Consumers' favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

July 9, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 9th day of June 2004, a copy of foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.