IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSUMERS ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-1894C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO CONSUMER ENERGY COMPANY'S
MOTION FOR SUMMARY JUDGMENT ON CONTRACT LIABILITY

Pursuant to Rule 56 of the Rules of this Court ("RCFC"), defendant, the United States, respectfully files this response to "Consumer Energy Company's Motion For Summary Judgment On Contract Liability," dated October 18, 2004, and further requests that Court deny Consumers' motion. In support of our response, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

## STATEMENT OF THE ISSUE

Whether Consumers has any basis upon which to seek a liability ruling for breach of contract damages that pre-date the Government's actual partial breach of any obligations running directly to Consumers and without any showing of resultant injury.

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

Consumers alleges in its complaint and its motion for summary judgment that the Department of Energy ("DOE") partially breached its Standard Contract on January 31, 1998, when it failed to begin acceptance of spent nuclear fuel ("SNF") and/or high-level radioactive

waste on that date. As an initial matter, and as we have explained in our motion for summary judgment filed with the Court on July 9, 2004, Consumers has failed to pay its one-time fee to DOE, which was and is a condition to DOE's obligation to accept any SNF from Consumers. Because Consumers would have been obligated to pay that fee before DOE ever accepted any of Consumers' SNF, Consumers, having failed to pay that fee, cannot establish that DOE was required to begin accepting its SNF by January 31, 1998, or breached any obligation to do so. Upon this basis alone, Consumers' motion for summary judgment on liability should be denied.

Further, even if Consumers' non-payment of its one-time fee does not preclude DOE's liability for a partial breach of contract, Consumers' motion incorrectly equates the existence of a partial breach of contract with an automatic entitlement to a liability ruling. Yet, a contract breach is only one element of liability, and Consumers' motion is devoid of any discussion of resultant injury. DOE was not obligated under the terms of the Standard Contract to accept SNF from every Standard Contract holder by January 31, 1998. Instead, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. In accordance with the Standard Contract's contractual mechanism for creating these specific acceptance obligations, Consumers would have submitted delivery commitment schedules ("DCSs") to DOE no later than 1992, if it had SNF to be accepted by DOE in January 1998. Yet, Consumers did not submit a DCS to DOE until 1993, seeking approval of DCSs through which DOE would begin accepting some SNF from Consumers in 1999. Consumers' actions were consistent with the terms of the Standard Contract, which requires DOE to accept SNF from the nuclear utility contract holders in the order in which it was generated, on an "oldest

fuel first" basis developed by comparing the age of SNF across the nuclear industry. Because Consumers' first allocations under an "oldest fuel first" basis within the nuclear industry did not provide it with any acceptance allocations until 1999, the earliest obligation that DOE could be found to have with regard to a right to SNF acceptance would be 1999. Although Consumers could have submitted DCSs to DOE seeking to obtain DOE's agreement to accept Consumers' SNF outside of an "oldest fuel first" acceptance queue and to have it accepted earlier than 1999, Consumers made no effort to do so. To the extent that Consumers' failure to pay its one-time fee does not preclude any liability in this case, the Court should base any liability ruling upon DOE's failure to satisfy its obligation to accept some of Consumers' SNF in 1999, rather than by reference to the January 31, 1998 date.

## ARGUMENT

### I. THE STANDARD OF REVIEW

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c).

## II. BECAUSE CONSUMERS HAS FAILED TO SATISFY A CONDITION PRECEDENT TO DOE'S OBLIGATION TO ACCEPT ANY OF CONSUMERS' SNF, CONSUMERS HAS NO BASIS FOR OBTAINING A FINDING OF LIABILITY AGAINST DOE

As we established in our motion for summary judgment filed with the Court on July 9, 2004, Consumers has failed to satisfy a condition to DOE's obligation to accept any of Consumers' SNF. As explained in that motion for summary judgment, Consumers' payment of its one-time fee, as required by Article VIII.B.2 of the Standard Contract, 10 C.F.R. § 961.11, Art. VIII.B.2, is a condition precedent to DOE's obligation to accept Consumers' SNF. Because Consumers has failed to satisfy that condition, DOE does not yet have any obligation to begin accepting Consumers' SNF. See 3A A. Corbin, Corbin on Contracts § 628, at 16 (1960); see also Landmark Land Co. v. United States, 256 F.3d 1365, 1376 (Fed. Cir. 2001). Accordingly, this Court should deny Consumers' request for a ruling on liability in its favor and find that DOE is not yet liable for failing to begin accepting Consumers' SNF.

## III. IF CONSUMERS' FAILURE TO PAY ITS ONE-TIME FEE DOES NOT PRECLUDE DOE'S LIABILITY FOR NOT ACCEPTING CONSUMERS' SNF, DOE WAS NOT REQUIRED TO BEGIN ACCEPTING CONSUMERS' SNF IN 1998, PRECLUDING THE LIABILITY RULING THAT CONSUMERS HAS REQUESTED

### A. A Primary Requirement Of The Standard Contract Is That Oldest Fuel Generated In The Industry Receives Priority For Acceptance And That Acceptance Rights Be Defined In Delivery Commitment Schedules

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in

paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis

added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; Def. App. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").[1]

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year.

---

[1] "Def. App. ___" refers to the appendix to this response brief. "Pl. Br. __" refers to plaintiff's motion for summary judgment on contract liability, dated October 18, 2004.

Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. Absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during

the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[2] Id.

B. Under The "Oldest Fuel First" Allocation System, And Based Upon Consumers' Submission Of A DCS For Acceptance Of SNF In 1999, DOE Was Not Obligated To Begin Accepting Consumers' SNF, Assuming Its Fees Were Timely Paid, Before 1999

One of the stated objectives of the Standard Contract was to dispose of SNF in the order that it is discharged from reactors. To achieve that goal, the Standard Contract specifically provided for SNF acceptance priority among contract holders upon an "oldest fuel first" basis. 10 C.F.R. § 961.11, Art. VI.B.1. The Standard Contract provided for the issuance of an acceptance priority ranking, based on the oldest fuel first principle, beginning in April 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

In compliance with the NWPA and the language of the Standard Contract, DOE issued the 1991 Acceptance Priority Ranking in December 1991, which provides as follows:

> The 1991 APR will be the basis for the annual allocation of waste acceptance capacity to the Purchasers in the 1991 Annual Capacity Report (ACR), to be issued later this year. Purchasers with allocation in the first 10 years following the projected commencement of the Federal waste management facility operations may submit Delivery commitment Schedules (DCS) beginning January 1, 1992. The allocations in the 1991 ACR will be the basis for the DCS submittals.

[2] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

According to that APR, the first SNF discharge dates recorded were in November 1967. However, Consumers' first SNF was generated after that date. Given the age of Consumers' oldest SNF, it did not have an allocation, based upon the acceptance criteria in the Standard Contract, until 1999. See Def. App. 296 (1995 APR/ACR, Table 2, p. 6). Further, Consumers never submitted any DCSs to DOE to indicate that it had any expectation that DOE was obligated to accept its fuel in January 1998 or at any other time prior to 1999.

C. Consumers' Assertion That It Is Entitled To A Liability Ruling On Summary Judgment, Establishing Liability On January 31, 1998, Conflicts With Consumers' Past Conduct, The Language Of The Standard Contract, And The Elements Necessary For Establishing Liability

In its motion for summary judgment, Consumers appears to argue that it is automatically entitled to a liability ruling because DOE did not begin accepting other nuclear utilities' SNF by January 31, 1998. See Pl. Br. 11 (arguing that breach exists and that, therefore, it is entitled to liability ruling). Assuming that DOE's failure to begin SNF acceptance from other contract holders by January 31, 1998 constituted a partial breach of every Standard Contract, the existence of a breach of contract is but one component of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) (plaintiff "requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue (whether there was a breach)" (italics in original)); see also Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). The Court of Claims has recognized that, before a contractor is entitled to judgment as to entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of that particular breach:

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . .

Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). "A wrong done, but from which no loss or damage results, . . . will not sustain an action." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469 n.3, 451 F.2d 602, 605 n.3 (1971) (quoting Black's Law Dictionary (4th ed.)). Here, Consumers has not provided either argument or evidence to establish that it was caused damage by DOE's failure to begin accepting SNF from other utilities by January 31, 1998. Consumers' damages must be determined by reference to DOE's failure to satisfy its obligations to accept Consumers' SNF. Its assertion that the existence of a partial breach automatically entitles it to a liability ruling conflicts with established case precedent.

Further, Consumers cannot establish as a matter of law that it is entitled under the terms of the Standard Contract to SNF acceptance prior to the date established by its earliest DCs. To avoid the SNF acceptance allocations that DOE identified in the 1991 through 1995 ACRs, Consumers would have to eliminate the "oldest fuel first" acceptance requirement from the Standard Contract, which would conflict with general principles of contract interpretation. Further, Consumers never took any action during the course of contract performance that would have allowed DOE to take any of its SNF by January 31, 1998. Had it wanted DOE to begin acceptance of its SNF by that date, it would have had to have submitted a DCS identifying the SNF that it wanted taken and the time period within which it wanted that SNF taken. Yet, it has never submitted a DCS to DOE for acceptance of SNF in 1998. The first DCS that Consumers submitted to DOE was for acceptance of SNF in 1999. To the extent that Consumers believes that DOE was simply supposed to appear at its site on January 31, 1998, and "begin" to take some undefined amount of its SNF, it has identified no evidence to support that interpretation of

the Standard Contract. Outside the DCS procedures identified in the Standard Contract, there is no other mechanism through which the parties notify each other of the dates upon which DOE will accept specific amounts of SNF from a particular contract holder.

The costs that DOE incurs to prepare to accept SNF from a particular site, including travel and transport, are extensive, and it also takes time for the nuclear utility to prepare to deliver the SNF to DOE. The Standard Contract contains a mechanism for ensuring that, if DOE travels to a site, the contract holder will actually have SNF to deliver to DOE: the delivery commitment schedule and final delivery schedule processes. Given that Consumers has never satisfied the only procedure contained in the Standard Contract for obtaining an acceptance and delivery obligation in 1998, Consumers' assertion that DOE is liable for breaching its Standard Contract and causing it to incur damages outside of the DCS process is wholly unsupported. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1566 (Fed. Cir. 1987). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Clearly, Consumers' conduct in failing to submit any DCSs for acceptance of SNF in 1998 evidences that it did not interpret the Standard Contract as requiring DOE to begin accepting its SNF in 1998. Further, the numerous Annual Capacity Reports ("ACRs") and Acceptance Priority Rankings ("APR") that DOE issued throughout the late 1980s and 1990s, pages from which are included in the Government's

appendix to this brief, evidence that DOE never had any understanding that it was obligated to begin accepting SNF from every Standard Contract holder by that date.

D. Because DOE Was Not Obligated To Accept Consumers' SNF Outside The Context Of Consumers' First Approved DCS, In Accordance With The "Oldest Fuel First" Acceptance Queue, Consumers Cannot Identify Any Breach That Runs Directly To Consumers Prior To The 1999 Acceptance Period

Assuming that Consumers had timely paid its one-time fee, DOE's obligation to accept Consumers' SNF would not have arisen until some date after January 31, 1999. Accordingly, assuming that Consumers' non-payment of its one-time fee does not preclude DOE's liability for failing to accept Consumers' SNF, Consumers' right to SNF acceptance did not accrue under the Standard Contract until that date. Although Consumers could have submitted a DCS to DOE in 1992, seeking to have DOE agree to accept its SNF outside of the "oldest fuel first" allocation queue,[3] Consumers never took any such action. Accordingly, Consumers has identified no injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Any injury that Consumers incurred would result from DOE's failure to accept Consumers' SNF as identified in Consumers' approved DCSs. The first DCS that Consumers submitted was for SNF acceptance sometime on or after January 31, 1999. It is that DCS which must form the basis of any liability ruling in this case.

---

[3] We are not suggesting that Consumers' effort would have been successful. For DOE to have agreed to have accepted Consumers' SNF outside of the "oldest fuel first" allocation system required by the Standard Contract, Consumers would have had to have identified a reason under the "Priority for Shutdown Reactors" or the "Emergency Deliveries" provisions of the Standard Contract for DOE to accept Consumers' SNF earlier than it would under an "oldest fuel first" allocation. 10 C.F.R. § 961.11, Art. VI.B.1.b & VI.B.1.d. We are aware of no basis upon which Consumers could have made such a request. In any event, Consumers actually submitted a DCS to DOE, conflicting with its assertion that DOE would have been required to come to accept Consumers' SNF in 1998.

E. Consumers Has No Basis At This Time For Seeking A Liability Ruling Prior To At Least 1999

Generally, "breach of contract damages are measured from the date of the breach." Lucente v. International Bus. Machines Corp., 310 F.3d 243, 262 (2d Cir. 2002) (applying New York law) (emphasis added); see Reynolds v. United States, 141 Ct. Cl. 211, 220, 158 F. Supp. 719, 725 (1958) ("[t]he time when performance should have taken place is the time as of which damages are measured"). Yet, Consumers is claiming that its damages preceded DOE's obligation to begin acceptance of Consumers' SNF. To the extent that Consumers is asserting that its contract breach damages actually preceded DOE's breach of its obligation to begin accepting Consumers' SNF, Consumers' assertion would conflict with the type of breach upon which it is maintaining an action in this case.

Here, Consumers is not seeking damages for a total breach of contract, but instead is asserting only a partial breach.[4] In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach."

[4] If Consumers were to assert a claim based upon a total breach of contract, that would conflict with the complaint that it filed. When a total breach of contract occurs, the contract is deemed to be at an end, and, although the non-breaching party may recover damages for the total breach from the breaching party, neither party has any further obligations to continue performance under the totally breached contract. See Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976); Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002), vacated in part on other grounds, 367 F.3d 1297 (Fed. Cir. 2004). Had Consumers pursued and prevailed upon such a theory, the Department of Energy would have had no further obligation to perform the Standard Contract or to accept the SNF generated under Consumers' Standard Contract, although DOE would potentially have been liable to Consumers in damages for its total breach. Only under a partial breach of contract theory may Consumers recover some damages for DOE's alleged breach of contract and, at the same time, insist on continuing contract performance obligations. See Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989).

Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). To recover damages preceding the actual performance date in a contract, the non-breaching party must establish that the other party anticipatorily repudiated the contract prior to the scheduled contract performance date. Yet, "a breach by repudiation alone can only give rise to a claim for total breach . . .," Restatement (Second) of Contracts § 253 cmt. b (emphasis added), and "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004) (in spent nuclear fuel case, "[a]nticipatory repudiation does not apply in a partial breach situation"), appeal pending, No. 04-5122 (Fed. Cir.); 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). Accordingly, because Consumers cannot claim the existence of an anticipatory repudiation of the Standard Contract, it cannot recover damages that precede the actual partial breach of contract. Because DOE's obligations to begin accepting Consumers' SNF arose, at the earliest, sometime after January 1999, Consumers has no basis for seeking a ruling that liability existed prior to 1999. Consumers' attempts to have this Court issue a liability ruling based upon a January 31, 1998 acceptance date should be rejected.

F. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce

As the Court is aware, this Court has issued two published decisions and two unpublished decisions resolving motions regarding the effect of the DCSs in the cases in which they were issued. In those cases, the Court has either determined that the DCSs are meaningless or have

reserved the issue for trial. However, with all due respect, the Court's decisions in those cases do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract.

The Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), the rationale of which the Court adopted by unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.), and Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. April 7, 2004) (Merow, S.J.), rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court did not explain – from a practical standpoint – the manner in which SNF acceptance would, could, or will work absent reference to that schedule mechanism. Finding that the delivery commitment schedule ("DCS") process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify the Department of Energy ("DOE") of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the

procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court failed to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform. As previously discussed, the Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in these cases.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), appeal pending, No. 04-5122 (Fed. Cir.), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented in Indiana Michigan required a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the

collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation. In fact, as discussed in our motion, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis and, in any event, cannot be done in a summary judgment proceeding. Not only does it ignore the DCS process and the agreements that DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

In fact, the trial court's decisions in all four cases eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence,

the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd, Indiana, and Yankee cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there

can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif Assocs. v. United States, 226 Ct. Cl. 372, 376, 644 F.2d 4, 7 (1981). However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term

that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the Government's arguments that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what a reasonable schedule term should be. A rejection of the Government's schedule arguments would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[5]

---

[5] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract

As established above, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The parties followed that mechanism for a significant period of time. Further, DOE published its Acceptance Priority Ranking and Annual Capacity Report, which identified the acceptance schedule for the first ten years of contract performance. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis for the Court to impose its own schedule into this contract. It is beyond dispute that DOE was not obligated to accept SNF from every Standard Contract holder by January 31, 1998. Other than through the DCS process, Consumers cannot identify any specific acceptance obligation, with identification of a specific date by which DOE had to begin acceptance of Consumers' SNF, that ran directly to Consumers. Because DOE had no obligation to accept Consumers' SNF prior to the SNF acceptance period defined in the 1999 DCSs, the entry of an order finding DOE liable to Consumers effective January 30, 1998 is inappropriate. Rather, based upon the approved DCS in this case, DOE should not be deemed liable to Consumers for a partial breach prior to the last date within the period within which DOE could accept SNF from Consumers pursuant to a 1999 DCS.

## IV. TO THE EXTENT THAT THE COURT WOULD OTHERWISE GRANT THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, THE COURT SHOULD GRANT THE UNITED STATES DISCOVERY PURSUANT TO RULE 56(f) BEFORE DECIDING THAT MOTION

In the event that the Court finds that there is not ample evidence to rebut Consumers' allegations regarding a liability ruling, the Government respectfully requests that it be permitted to take limited discovery on the relevant issues, pursuant to RCFC 56(f), to further support this

for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

motion. See, e.g., Dombrovskis v. Esperdy, 185 F. Supp. 478,484 (S.D.N.Y. 1960); Michael Rose Productions, Inc. v. Loew's Inc., 141 F. Supp. 257, 263 (S.D.N.Y. 1956). Specifically, we have found no evidence in the Government's files to support any argument that Consumers understood at any time prior to this litigation that it was entitled to acceptance of its own SNF in 1998, in an acceptance queue developed outside of the "oldest fuel first" requirement of the Standard Contract, or in any manner other than through a schedule established through approved DCSs. As previously discussed, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni, 41 Fed. Cl. at 591. "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin, 816 F.2d at 1566. "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's, 697 F.2d at 1058.

Here, although we were able to serve extremely limited document production requests upon some third parties in the coordinated discovery proceedings that preceded Consumers' complaint in this case, that discovery was not as thorough as that to which we ordinarily would be entitled against a party in litigation. To the extent that the Court finds insufficient information in the Government's arguments and appendix to rebut Consumers' entitlement to a ruling on liability, we respectfully request that, pursuant to RCFC 56(f), we be granted a right to conduct discovery against Consumers upon these issues.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court deny Consumers' motion for summary judgment on contract liability.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

December 20, 2004

Attorneys for Defendant

# APPENDIX