Portland General Electric

Mr. Robert Morgan
March 4, 1983
Page Nine

Although DOE commits in this contract to provide the purchaser in the future with canisters, many purchasers have already or will shortly be committing to buying canisters from private sources. To prevent purchasers from buying canisters which do not meet DOE specifications, DOE should, at its earliest opportunity, release to purchasers the dimensional envelope and material specifications acceptable and compatible with DOE's proposed repository cask and fuel-handling systems.

Comment 23: Appendix H.4 (emphasis)

For legal as well as audit purposes, both parties of the contract will undoubtedly maintain indefinitely all fuel transfer records. PGE, however, agrees with EEI's recommendation that for all other records, indefinite retention should be reduced to a reasonable period - perhaps five years.

Comment 24: Method of Payment (Emphasis)

Article VIII.B.3(a) requires all payments to be made by wire transfer. This appears to be very restrictive and provides a much weaker audit trail for utilities than payment by check. Therefore, PGE recommends that payment be allowed by either check or wire transfer.

Comment 25: Interest on Late Fees (Emphasis)

In Article VIII.C, DOE proposes to levy interest on upaid/underpaid amounts due at a rate equal to the Quarterly Treasury Bill rate plus six percent, over the relevant period where fractions of a month are to be rounded up to a whole month. This rate appears to be punitive. PGE proposes that DOE should eliminate this six percent penalty adder and not round up fractions of a month to whole month(s).

Hopefully, you will find these comments helpful in developing a final contract for the disposal of spent nuclear fuel and/or high-level radioactive waste. We appreciate the opportunity to provide these comments to you.

Sincerely,

J. T. Owens
Manager
Fuel Operations Department

JTO/ML/2ksw7A12

83-1-55

Wayne H. Jens
Vice President
Nuclear Operations

Detroit Edison

2000 Second Avenue
Detroit, Michigan 48226
(313) 237-8612

March 3, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue S.W.
Room 7B-084
Washington, DC 20585

Dear Mr. Morgan:

The Detroit Edison Company, which is in the process of obtaining an operating license for its Enrico Fermi Power Plant Unit 2, submits the following comments on the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste as requested in the Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983; 48FR5458:

Detroit Edison has participated in the development of the comments and proposed changes to be submitted by EEI/UNWMG/ANEC. We believe they are reasonable, fair to all parties concerned and we urge they be adopted. Additionally, we request that the non-fuel components as recommended by EEI/UNWMG/ANEC to be included for disposal under the contract be expanded to specifically include BWR fuel channels and control blades.

As a general but important comment, the Company would like to see provisions included in the contract which would give the owners of spent fuel real assurance that the waste disposal facility mandated by the Act will, in fact, be constructed and in operation in accordance with the time schedule specified in the Act. Failure to incorporate language in the proposed contract which demonstrates the government's unequivocal commitment to completing the disposal facility in a timely manner, in light of the recent history surrounding this issue, could call into question the Department's resolve and intentions to fully and timely satisfy its mandated obligations. This failure in turn leads to a need on the part of the owners of spent fuel to monitor and could conceivably confuse and lead to interferences with the management responsibilities clearly given to the Department of Energy to be ready to dispose of all spent fuel in 1998.

Your thoughtful consideration of these comments will be greatly appreciated and their adoption will expedite our acceptance of the contract and would more adequately protect the interest of our customers in Southeastern Michigan.

Sincerely,

Wayne H. Jens

WHJ:mb

VPNO-83-55

cc: Honorable John Dingell

8·1·40

P.O. BOX 529100 MIAMI, FL 33152

FPL

FLORIDA POWER & LIGHT COMPANY

March 7, 1983

r. Robert Morgan
roject Director,
uclear Waste Policy Act Project Office
epartment of Energy
000 Independence Ave., SW
oom 70-084
ashington, DC 20505

ubject: Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10CFR PART 961)

ear Mr. Morgan:

n February 4, 1983, the Department of Energy published a notice of proposed ule making concerning the Standard Contract for Disposal of Spent Nuclear Fuel nd/or High Level Radioactive Waste (48 Federal Register 5458) and requested omments by this date. Florida Power and Light Company (FPL) owner and perator of Turkey Point Units 3 and 4, St. Lucie Unit 1 and majority owner and perator of St. Lucie Unit 2 is pleased to comment on this contract and intends ontinue negotiations with the Department of Energy for a disposal act covering the above nuclear facilities that were initiated on January , 1983.

continue to hold the positions presented in our February 8, 1983, letter you except where they may be modified by the comments presented by the ison Electric Institute/ Utility Nuclear Waste Management Group (EEI/UNWMG) d the additional comments enclosed in Attachment 1. As indicated during our stimony at the Rule Making hearing conducted on March 3, 1983, Florida Power d Light feels that the EEI/UNWMG comments represent a significant consensus utility opinion and should be seriously considered by the DOE in developing e final contract wording.

ease consider these comments to be part of FPL's continuing active, good ith negotiations with DOE towards a contract for disposal services for spent clear fuel and/or high level radioactive waste in accordance with the Nuclear ste Policy Act of 1982. We are prepared to meet with DOE representatives at time to discuss these comments and other aspects of the contract.

ncerely,

*Michael O. Cook* [signature]

hael O. Cook
e-President, Contracts, Fuels and Corporate Development

r. Jeff Hill
ffice of Information and Regulatory Affairs
Office of Management and Budget
Washington, DC 20503

Attachment 1

FPL Comments on the DOE Contract for the Disposal

of Spent Fuel and/or High Level Radioactive Waste

## 1.0 PERFORMANCE STANDARDS

A common feature of all contracts is a description of what is to be done by each party, when the specific activities will be performed, and remedies in the event of nonperformance by a party. The proposed disposal contract is silent or at best vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste in an expeditious manner on a timetable which would relieve the uncertainty associated with the present situation. The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:

> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

The approved 1984 DOE Mission Plan and the annual acceptance ranking for receipt of SNF would provide utilities with a planning base which they can use in committing resources for interim storage, if necessary, in order to meet their projected requirements. Without the proposed provision requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities may be forced into the unenviable position of having to make emergency expenditures for interim storage many years after fuel is consumed, while continuing to pay millions in mandated fees to the Nuclear Waste Disposal Fund. Since utility regulatory commissions generally will have provided for spent fuel disposal costs in prior periods, the utilities may not be able to recover such additional unanticipated costs from their customers. It thus would be more equitable for the DOE to cover all costs incurred because of any DOE schedule slippage, using money in the Nuclear Waste Disposal Funds, and to then replenish the fund if necessary through fee adjustments on future generation as provided in the Act.

## 2.0 FEE FOR SPENT NUCLEAR FUEL DISCHARGED PRIOR TO APRIL 7, 1983

This issue has three aspects.
First, the fee must be fixed as of April 7, 1983, so that utilities in

83-1. 4t

Duquesne Light
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15279

(412) 393-6000

March 4, 1983

Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, DC 20585

Dear Mr. Morgan:

I am pleased to submit to you Duquesne Light Company's comments on the proposed Department of Energy regulations published in the February 4, 1983 Federal Register, including the proposed Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

Duquesne Light Company ("Duquesne") is an electric utility serving approximately 550,000 industrial, commercial and residential customers in the greater Pittsburgh metropolitan area. Duquesne is a participant in the CAPCO (Central Area Power Coordination) arrangements and operates the nuclear Beaver Valley Power Station Unit No. 1, which it jointly owns with two other CAPCO companies. Duquesne is presently constructing, and will operate, the nuclear Beaver Valley Power Station Unit No. 2, which it jointly owns with three other CAPCO companies. In addition, Duquesne owns undivided interests in two other nuclear generating units which are under construction by the CAPCO companies.

Except as set forth in General Comment A.1 and Specific Comment 4 concerning Article VIII, Duquesne supports and adopts the joint comments submitted on behalf of the Edison Electric Institute and the Utility Nuclear Waste Management Group.

Article IV - Delivery of SNF and/or HLW

Some consideration must be given in "ranking priority" to accepting fuel in such a manner as to prevent utilities from being required to increase on-site storage capacity by permitting some trading of allocations.

Article V - Responsibilities of Parties

The proposed form does not accomplish the intent of Article V.A.1 (a). The appendix D form designated "Annual Forecast" should be discarded and replaced with the type of information most recently supplied, at DOE request, to Battelle Northwest. Such forms, to be used for DOE planning purposes, would simply present a projection of each of the next ten (10) years and would provide such information as estimated refueling shutdown data, metric tons of uranium to be discharged, etc. Such reporting would then meet what is intended by this contract provision.

Article VIII - Fees and Terms of Payment

1. We respectfully request a meaningful time period be established prior to designating an option payment plan. Inasmuch as the required payments will involve substantial amounts of money, utilities should have time to consider and review possible tax aspects and PUC rate implications identified with such payments.

2. We are concerned with how payments/charges are to be made on spent fuel (definition in question) scheduled for re-insertion.

3. We are unable to conclude from the present contract version whether the fee suggested in VIII A. 2 is fixed or subject to adjustment since both Option 1 and 2 describe a rate in effect at date of payment. While the options for payment may be appropriate, the fee should be fixed as of April 7.

4. We support and recommend the adoption the formula specified under the Proposed Rule section of 10 CFR Part 961 for the calculation of fees to be paid by the Purchaser under this contract. The actual fuel burn-up data is used to determine the dollar per kilogram of heavy metal equivalent to (1) mil/kilowatt hour with all calculations done on an individual assembly basis. We view the establishment of costs in this manner to be fair and equitable.

We trust that the Department will consider these comments and Duquesne's efforts to resolve the matters discussed herein to be part of Duquesne's active and good-faith effort to negotiate a contract with the Department for the disposal of spent nuclear fuel.

Please contact me at 412/787-5720 if I can provide any further information concerning our comments. Thank you very much.

Very truly yours,

R. D. Scherer
Nuclear Fuel
Management Coordinator

RDS:smb

83-1-57

# Comments Regarding The Proposed Contract For Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste and Related Regulations

(10 CFR Part 961)

Submitted By

Pacific Gas and Electric Company

March 4, 1983

sentence of Article II should be deleted. Provision for disposal by DOE not later than January 31, 1998, will be covered by additional language suggested below.

ARTICLE III - TERM

1. As written, Article III is ambiguous in that it may be interpreted to mean that the term of the contract continues only until DOE first accepts SNF and/or HLW from the reactor of a Purchaser. To make the contract consistent with the intent of the Agency as set out on page 5459 of the above-referenced Federal Register and Article II, the word "all" should be included and the provision in the contract be modified to read:

> The term of the contract shall be from the date of execution until such time as DOE has accepted and transported from Purchaser's site all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A."

ARTICLE IV - DELIVERY OF SNF AND/OR HLW

1. Article IV.B. Delivery Commitment Schedule. Under Article IV.B, if DOE disapproves a delivery commitment schedule, Purchaser shall resubmit a revised schedule within 30 days. No time limit is provided for DOE's response to the resubmitted schedule. Presumably a period of not more than 30 days would be adequate. If DOE were also to

disapprove the resubmitted schedule, it should propose an alternate schedule. If Purchaser does not accept DOE's alternate, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. Appropriate language should be inserted before the last sentence in the first paragraph of Section IV.B as follows:

> DOE shall approve or disapprove such revised schedule(s) within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

A similar comment applies to the Final Delivery Schedule provision (Article IV.C).

2. Article IV.B. The second paragraph of Article IV.B allows the Purchaser to "change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract." The relationship between this provision and the acceptance priority ranking (Article VI.B.3) is unclear. Since the acceptance priority ranking does not appear to be part of the "acceptance criteria of the contract," the paragraph could mean that Purchaser, having been

necessary to monitor the administration of the waste disposal program established pursuant to the Nuclear Waste Policy Act of 1982. DOE shall furnish Purchaser annually a report including, but not limited to, kilowatt hours generated and sold for each reactor under contract with DOE pursuant to the requirements of such Act.

ARTICLE IX - DELAYS

1. Since waste disposal is a cooperative effort which is funded by a common fund, there should be no monetary liability of damages for delay either by a Purchaser or DOE. Should delay be caused by DOE, it most likely would result from an insufficient number of casks or cannisters or transportation equipment. The remedy for such would be to increase the amount of equipment for use, the cost of which would be an increased cost to the fund. If a Purchaser were to delay, the remedy is not monetary damages but rather loss of scheduled delivery date if such delay would cause another Purchaser, not a party to this particular contract, to miss its scheduled delivery date. And if a Purchaser could trade delivery dates with other Purchaser or make arrangements with the Purchaser next in line, so that DOE's services are efficiently utilized, then there should be no loss of scheduled priority for Purchaser. Accordingly,

both Article IX.A and Article IX.B should be deleted and the following Article IX should be substituted:

> In the event of any delay in the delivery of casks or cannisters by DOE, or in the acceptance, transportation or disposal of SNF and/or HLW by DOE, Purchaser shall not lose its priority for its scheduled delivery of SNF and/or HLW. In the event that delay in delivery of scheduled SNF and/or HLW is caused by Purchaser, except as provided in Article X, Purchaser will not lose its scheduled delivery priority, unless its delay will, in turn, delay the scheduled delivery of another Purchaser which is not party to this contract; provided, however Purchaser, by negotiation may obtain and utilize the delivery schedule rights of such other Purchaser or any other purchaser as provided in Article IV.E. Should Purchaser lose its delivery priority, the parties by mutual agreement will reschedule the delivery as expeditiously as possible.

ARTICLE X - SUSPENSION

1. The proposed suspension of the contract for the failure of a Purchaser to perform contract preconditions is a remedy which is more severe than necessary and could be contrary to the interest of the Government. Purchaser has obligations under the contract other than payment of fees such as notification requirements, reporting requirements, or preparation of SNF and/or HLW requirements. If the entire contract

83-1-6

CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL
AND/OR HIGH-LEVEL RADIOACTIVE WASTE

Comments on Nuclear Waste Policy Act of 1982 (Act)

General Comments

1. It is unclear what DOE's intentions are regarding the number of contracts. Will each Purchaser enter into one contract, one contract for each reactor plant site, or one contract for each reactor unit? TVA believes a separate contract should be made for each reactor unit. However, if this is not done, each reactor unit under a multiunit contract should be treated as a separate entity for the purpose of exercising rights under the contract, such as with respect to payment options. This flexibility is necessary because some nuclear plant owners, including TVA, have fuel supply contracts under which Contractors have responsibility for spent fuel. Owners operating several nuclear plants should have no less flexibility than owners of only one plant.

2. TVA recommends that the contract provide the flexibility in DOE to allow appropriate credits for actions taken by the Purchaser which reduce DOE's costs of transportation or disposal of SNF and/or HLW. This is believed to be a very important concept in reducing the overall costs of SNF transportation and disposal. Without such credits, Purchasers will have less incentive (and may not have the ability) to take such actions. Such actions may include reprocessing, utilization of Purchaser-owned shipping casks, fuel rod consolidation, certain cask storage arrangements, use of high burnup fuel, and other actions which DOE determines to be advantageous.

7. Article V, "Responsibilities of the Parties" - Section B

Section 302(a)(5) of the Act requires that the contracts include certain specific items. For example, the contract must provide for the disposal of SNF and/or HLW beginning not later than January 31, 1998, but the draft contract does not specifically include this requirement. The Act also sets specific limitations on the allowable costs to be paid out of the Purchaser's fees, but the draft contract does not contain these limitations. DOE's obligations under the Act should be part of the contract. Accordingly, we suggest the following be added:

- DOE shall carry out all other responsibilities relating to the disposal of SNF and/or HLW as may be set forth in the Nuclear Waste Policy Act of 1982.

In addition, a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industrywide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V:

- DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts with DOE for disposal of SNF and/or HLW.

- After January 31, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for Purchaser's nuclear power plants specified in appendix A.