## Big Rock Point Decommissioning

Plant & Facilities News Media Contacts



August 29, 1997, was the last day that Consumers Energy's Big Rock Point nuclear plant generated electricity. The plant's 35 years of operation made Big Rock Point the longest-running nuclear power plant in the United States.

Consumers Energy closed Big Rock simply due to economics. In a deregulated utility environment, the small size of the plant was likely to make continued operation uneconomical.

Consumers Energy is taking the plant through a complex process called decommissioning and site restoration. The goal is to return the site to a natural, green state.

### Facts About Big Rock



Big Rock Point is near Charlevoix, Michigan on a 580-acre site bordering Lake Michigan. The plant began generating electricity on December 8, 1962, making it the world's first high-power-density boiling water reactor and the fifth commercial nuclear power plant in the U.S. Due to its many contributions to the nuclear and medical communities, the plant was named a Nuclear Historical Landmark in 1991.

Back to Top

### Big Rock: Vital Statistics

- Reactor Type: Boiling Water
- Capacity: 67 megawatts
- Reactor Weight: 120 tons
- Reactor Height: 30 feet
- Reactor Width: 9 feet
- Construction: Steel walls five and a half inches thick
- Fuel Core: 84 bundles containing more than 10 tons of slightly enriched uranium oxide pellets. Each bundle contained 117 fuel rods. (*A fuel rod is a long tube holding a six-foot stack of uranium oxide pellets which is the fuel for the nuclear reactor. Fuel rods are assembled into bundles called fuel elements or fuel assemblies, which are loaded individually into the reactor.)*

**A single load of fuel at Big Rock Point could generate the same amount of electricity as burning 260,000 tons of coal!**

---

### The Decommissioning Plan for Big Rock Point

In September 1993, Consumers Energy formed a 12-member team with the year-long task of compiling a decommissioning plan. This plan contained an estimate of decommissioning costs and helped determine future plans for the employees and facility.

As part of the plan, the company conducted a number of studies that included focus on the environment, spent fuel storage, and low-level radioactive waste disposal. These actions were completed and the plan was submitted to the U.S. Nuclear Regulatory Commission (NRC).

**What does decommissioning a nuclear power plant mean?**
Consumers Energy has chosen the decommissioning option of immediate dismantlement. Under this option, the plant will be taken apart and all low-level radioactive components shipped to a nuclear waste disposal site over the next six years.

**The Economics**
The Michigan Public Service Commission (MPSC) has approved a small surcharge from Consumers Energy customers to pay for decommissioning and site restoration. These funds, plus the ensuing growth of investment funds, should be sufficient to complete the decommissioning of the plant. Periodic updates will be submitted to the MPSC for their review and approval.

Back to Top

**Yucca Mountain**

The Nuclear Waste Policy Act of 1982 requires the U.S. Department of Energy (DOE) to provide a central storage facility for used fuel from the nation's nuclear power plants. In fact, commercial nuclear plants in the United States are required by law to contract with the federal government for the disposal of used nuclear fuel. Congressional approval of Yucca Mountain, Nev., as the site of a permanent repository was signed into law by President George W. Bush on July 23, 2002, but the facility is not expected to be ready until 2010 at the earliest. Because the DOE missed its first deadline of opening a storage site by Jan. 31, 1998, Big Rock Point opted for dry fuel storage at the site.

**Dry Fuel Storage**

Dry fuel storage involves removing used fuel from a temporary storage pool — where water acts as a natural coolant, absorbing heat from the rods — and placing it inside specially designed storage containers. The spent fuel is hermetically sealed within each container's internal steel canister. Wrapped around the canister is a 32.5-inch thick steel and concrete jacket.

No water is involved in this process, and there are no pumps, valves or other moving parts. The fuel is naturally cooled by air flowing through vents in the container's outermost layer. The air never comes into contact with the fuel. The container's robust design protects against radiation leakage and extreme conditions, including floods, fires and tornadoes with winds up to 360 miles per hour.

Employees loaded the first fuel bundle into dry storage in November 2002. The last fuel bundle was loaded into container number 7 on March 4, 2003.

Employees then began the painstaking task of moving empty fuel racks and other equipment to search the spent fuel pool for any loose fuel pellets. None were found, and the pool was officially declared fuel free on March 21. The project was completed May 2 after employees moved container number 8, loaded with non-fuel items, to the storage pad.

The eight containers stand in a secure, fenced and monitored location on the plant site awaiting eventual removal to a permanent federal storage facility.

**The End Result**

Consumers Energy and Big Rock Point employees have always taken great pride in their environmental awareness. The decommissioning and site restoration of Big Rock Point will reclaim the land once used for a nuclear plant and restore it to a green field.

For more information, contact us at info@consumersenergy.com.

Back to Top

Back to Electric Operations Main Page

American Nuclear Society





A Golden Anniversary
Golden Opportunities



## A

( ba

**Acid rain**
Rain (or snow) that contains an abnormal amount of acid resulting from high atmospheric concentrations of carbon, sulfur, or nitrogen oxides. Acid rain is often attributed to burning of fuels.

**Actinide**
Element with atomic number of 90 through 103; includes uranium and plutonium.

**Activation analysis**
Form of scientific investigation where the chemical makeup of different materials is figured ou bombarding them with neutrons or other types of radiation. This produces radioactive atoms off specific types of radiation, and this radiation reveals what types of elements (qualitative) a quantity are in the samples.

**AESJ**
Atomic Energy Society of Japan.

**Alpha particle**
Positively charged particle emitted in radioactive decay of unstable atoms. An alpha is made two neutrons and two protons (a helium atom nucleus) and is thus heavier and slower movin other decay emissions. Alpha particles can be stopped quite easily. They cannot penetrate a paper or the dead outer layer of our skin.

**ANS**
American Nuclear Society.

**Atom**
Basic component of matter. An atom is the smallest part of an element having all the chemic properties of that element. An atom consists of a nucleus (that contains protons and neutron surrounding electrons.

**Atoms for peace**
An initiative signed by President Eisenhower in 1954 to allow the peaceful uses of atomic en be available to other nations.

## B

( ba

**Backup safety system**
Safety system that will go into operation if the first-line safety system fails.

**Baffles**
Tiles inside the cooling tower of a nuclear power plant that slow the rate of water flow and pr area for cooling.

**Becquerel (Bq)**
Measure of the rate of decay of a radioactive substance. One Bq is 1 disintegration per seco human body has thousands of disintegrations from the presence of potassium-40.

**Beta particle**
Negatively charged particle (an electron) emitted in radioactive decay of unstable atoms. A b moves faster than an alpha and can be stopped by a thin piece of aluminum or a short span

**Biomass**
Organic substances that can be turned into energy producing fuel, such as trees, plants, othe and organic wastes.

**Biosphere**
Portion of the earth's surface and atmosphere that supports life.

**Radioactivity**
Spontaneous emission of radiation from the unstable nucleus of an atom.

**Radiography**
Use of ionizing radiation to produce shadow images on a photographic film. Some of the gam X-rays pass through an item being evaluated while others are partially or completely absorbe more opaque parts of the item and cast a shadow on the photographic film.

**Radioisotope - Radioactive Isotope**

**Radionuclide**
Any species of an atom that is radioactive. A generic word used to replace radioisotope, whic limited to one element.

**Radiotoxicity**
The toxicity to human cells caused by absorption of high doses of radioactive substances. M chemicals are toxic or poisons at high doses.

**Radium**
Radioactive metallic element, discovered by Pierre and Madame Curie in 1898, with an atom number of 88 and atomic weight of 226. Its symbol is Ra.

**Radon**
Heavy, natural, radioactive gas formed by the radioactive decay of radium, a decay product o uranium. Its atomic number is 86 and its atomic weight is 222. Its symbol is Rn.

**rad**
Basic unit of absorbed dose of ionizing radiation.

**RCA**
Regional Cooperative Agreement for research, development, and training; sponsored by IAE

**Reactor**
Part of a nuclear power plant where neutrons produce a fission chain reaction.

**Reclamation**
Restoration to a useful condition.

**Recycling**
A term made popular in the environmental movement to reuse materials that otherwise would discarded as waste. Within the nuclear industry, it is a synonym for reprocessing spent (used

**Regulate**
Change or adjust to agree with a standard or rule.

**Regulation**
Maintenance of standards of performance through rules.

**rem**
(Roentgen equivalent man), a unit used in radiation protection to measure the amount of dam human tissue from a dose of ionizing radiation. An average American receives about 0.360 r radiation per year.

**Renewable**
Able to be replaced. The Sun's energy is a renewable energy source.

**Repository**
Storage facility for high-level nuclear waste.

**Reprocessing**
The mechanical and chemical processing of spent nuclear fuel to separate useable products uranium and plutonium) from waste material (i.e., fission products). As time progresses, muc is currently defined as "waste" will likely find commercial applications.

**Risk assessment**
Science of studying the amount of risk associated with doing something.

**Roentgen**
Unit of exposure to ionizing radiation.

**Rubidium**
Soft, silver-white, metallic element. Its atomic number is 37 and its atomic weight is 85.47. Its is Rb.

**S** ( ba

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

Case Nos.: 98-126C, 98-154C, 98-474C

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042



APPEARANCES CONTINUED:
ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **



P R O C E E D I N G S

MR. STOUCK: Your Honor.

THE COURT: Yes.

MR. STOUCK: Good morning.

THE COURT: Good morning.

MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.

THE COURT: Sure.

MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.

THE COURT: Oh, fine.

MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.

So if I could just address our position on this --

THE COURT: Sure.

10

Page 3450

A Yes, they do.
Q And what do those reports represent?
A They represent the views and positions of the M&O contractor on those issues.
Q Are these reports deliverables under their contract?
A Yes, they are.
Q Does DOE accept these reports as deliverables?
A Yes, we accept them as deliverables if they -- if we believe that they appropriately addressed the statement of work and the intention of the report, yes.
Q Are those reports the statements of DOE?
A No, they are not.
Q By accepting the report, does DOE accept the conclusions stated in the report?
A No.
Q When would these reports become the reports or statements of DOE?
A When DOE either issued a document under its own letterhead, it would have an RW number, radioactive waste number on it. Or if there was some policy statement made by the Department in some mechanism either through correspondence or other

Page 3451

areas.
Q Thank you. Mr. Kouts, are you familiar with the term receipt rate?
A Yes, I am.
Q What is the receipt rate?
A The receipt rate, as we use it in the program, is the technical capability of our facilities to receive materials and process them through the system.
Q Are you familiar with the term acceptance rate?
A Yes, I am.
Q What is the acceptance rate?
A The acceptance rate is the contractual rate at which the Department has committed to receive materials from the contract holders.
Q Where is the acceptance rate set forth?
A The acceptance rate is set forth in the acceptance priority ranking and the Annual Capacity Report.
Q Could the receipt rate and the acceptance rate be different?
A Yes, they could.
Q Why?
A Essentially, the Department can determine

Page 3452

from a business standpoint as a business judgment that it does not want to commit to accept materials at the amount of the maximum capability, if you will, of our ability to receive those materials. So, depending on how the Department views how it wants to operate the program from a business perspective, if you will, it could be different than what the total receipt rate and the total capability of the receipt rate would be of our facilities.
Q Could there be other constraints on the acceptance rate?
A Potentially there could be issues associated with how we want to deploy facilities and how we want to essentially process the fuel.
Q Are you familiar with the term ramp-up rate?
A Yes, I am.
Q What is ramp-up rate?
A It's standard practice, when you're going to start up any kind of facility, including nuclear facility, and I would say especially a nuclear facility, that you don't want to start out at a maximum rate. You don't want to tax your facilities to their maximum rate until you had a learning curve, if you will. So the ramp-up rate that we typically had in

Page 3453

our technical baseline documents is a step-by-step approach to try to work us up to our maximum rate that would allow us the ability to learn as we go and to bring on capability -- additional capability in a measured fashion as opposed to trying to do a maximum amount on day one.
Q Thank you. Mr. Kouts, are you familiar with the MRS that DOE was designing to be able to accept waste in 1998?
A I'm familiar with the various designs that were being considered for that, yes.
Q What type of facility did DOE plan to build?
A That was a bare fuel handling storage only facility that could receive materials from transportation casks, if you will, from utilities and from utility sites, and store it on site by removing materials out of those casks, out of those transportation casks and putting them into various storage devices.
Q And do you know what the estimated cost for that facility was?
A Depending on the type of storage technology to be used, the life cycle cost we looked at somewhere between 1.7 and $2.7 billion.
Q Thank you. Can we have Plaintiffs' Exhibit

11

Page 3454

254?

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Sure. Yes.

MS. SULLIVAN: Your Honor, would you like a copy?

THE COURT: I can use this.

MS. SULLIVAN: Okay.

BY MS. SULLIVAN:

Q Mr. Kouts, what's been put up on the screen and I provided you a paper copy of has been marked as Plaintiffs' Exhibit 254. Do you recognize this document?

A Yes, I do.

Q Would you explain to the Court what this document is.

A This is a, I believe, revision 5 of our parent or our main technical requirements document. It's typically a document that the director of the program owns, and it lays out the technical requirements for the program to implement.

Q And does this document contain information with regard to the design requirements of the repository?

A Yes, it does.

Q Okay. How is this document used by your

Page 3455

office in its waste acceptance function?

A Essentially, it gives us guidance to -- in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.

Q Is your office responsible for the preparation of this document?

A I -- yes. I manage changes to this. And I basically do that for the director of the program.

Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?

A Yes, I am.

Q How are you familiar with that facility?

A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.

Q What type of facility did DOE plan to build as the centralized interim storage facility?

A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in -- in table 3 here.

Q Okay. And the rates in table 3, do you have

Page 3456

an understanding as to what the source of those rates was?

A Yes.

MR. STOUCK: Your Honor, can I interpose an objection for the record here. I don't mean to interrupt unduly. But Mr. Kouts was disclosed in the government's witness list to testify about two topics. And I just want to make a record on that. And we can deal with the consequences later. The first one, DOE's plans to begin waste acceptance in 2010. The second was the fact that the Yucca Mountain repository is not being designed to accept GTCC waste. So I just wanted to have that on the record. And, again, we can deal with questions about whether this is beyond that once we see if it ties up.

MS. SULLIVAN: Would you like me to address that, Your Honor?

THE COURT: If you wish.

MS. SULLIVAN: Or shall I just continue? Your Honor, the tables specifically in this chart are the ones that Dr. Graves or Mr. Graves relied upon. Mr. Kouts has some testimony we believe is important. So I believe it was raised in Plaintiffs' case. And also, further questions will make clear it's tied in part to the 2010 date.

Page 3457

THE COURT: Okay. Go forward.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q Mr. Kouts, what was -- do you have an understanding what the source of the rates were for the facilities that were set forth in this document?

A Yes.

Q And what was your understanding?

A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes. These ramp-up rates were basically rates that were contained in those bills.

Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?

A Bills pending in Congress.

Q And did you have an understanding as to what the legislation called for, generally?

A The -- the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a -- an interim storage facility or centralized interim

12

Page 3458

storage facility at, potentially in Nevada, next to where the Yucca Mountain site is right now. And there were also other options in terms of where that facility could be deployed.

Q How was the centralized interim storage facility different from the MRS designed by DOE in the early '80s – in the 1980s and early '90s?

A In the mid-'80s, we were looking at a facility that had a great deal more capability. It was one that basically had packaging capability that would essentially do some of the packaging that a repository typically would have done.

It also had rod consolidation. It also had the flexibility to develop disposal-ready canisters for any of the three sites that we were considering at that time, which were the basalt site in Hanford, Washington, the tuff site, t-u-f-f, volcanic tuff site in Nevada, and also the Deaf Smith bedded salt site in Texas.

Q Was the facility, the centralized interim storage facility set forth on this page ever constructed?

A No, it was not.

Q Why not?

A The legislation was never passed and the

Page 3459

Department never received any authorizations to proceed on it.

Q Could there be a similar congressional initiative today that would allow or mandate acceptance of spent nuclear fuel prior to 2010?

A If Congress passed that legislation, then the Department would be authorized to implement it, yes.

Q Are you aware of the spent nuclear fuel storage issue that arose in connection with the NRC's budget last year?

A Yes, I am.

Q And what was the initiative discussed in that budget submission?

A I believe there was a set amount of funds that was supposed to be distributed from the Nuclear Regulatory Commission budget to the National Academy of Sciences, where they were to undertake a study to look at the – the safety, if you will, of fuel that's currently stored in spent fuel pools, at reactors, and also that's in dry storage at reactor sites, and to provide the Academy's views on the safety of both types of storage mechanisms.

Q Do you have an understanding as to what initiatives could result from this study?

Page 3460

A There have been various considerations on Capitol Hill as to initiatives that would use Homeland Security funds to essentially fund the reactors to put their – the pool – the materials that they're now managing in the pools, the high-level waste materials, the spent fuel into dry storage casks, and undertake that initiative.

Q Mr. Kouts, are you familiar with the material known as Greater Than Class C radioactive waste?

A Yes.

Q Do you understand that GTCC radioactive waste is generated by commercial nuclear utilities?

A Yes.

Q Is GTCC radioactive waste one of the waste materials that DOE will accept pursuant to the standard contract?

A No.

Q Is DOE designing the repository to accept GTCC radioactive waste generated by commercial nuclear facilities?

A No, it is not.

Q Could DOE accept GTCC radioactive waste at the repository?

A Theoretically it could. It would require, I

Page 3461

believe, a change in legislation to allow less than high-level waste materials to go into the repository. In addition to that, we would have to perform a variety of technical analyses and supplement our analyses that we are currently planning for the Nuclear Regulatory Commission as to how we would dispose of those materials within Yucca Mountain. In addition to that, we would have to develop some kind of fee structure to pay for the additional costs associated with those materials.

Q Are there space limitation issues that DOE would have to analyze if GTCC were to go to the repository?

A Yes. Potentially there are.

Q And are there issues concerning the current design of the surface facilities at Yucca Mountain that would have to be analyzed?

A Yes. Right now, our facilities are designed to deal with high-level waste materials, spent fuel, bare spent fuel, if you will. If we were going to handle Greater Than Class C waste, we would have to figure out how it would be packaged, where it would be packaged, and probably require separate service facilities over and above what we have now, since our current facilities are designed only to handle the

13

Page 3462

materials, the high-level waste materials.
And as such, we would not want to reduce the capacities of those facilities in order to deal with other waste materials.
Q Could DOE place GTCC in the backfill spaces of the repository?
MR. STOUCK: Can we watch the leading questions here on this, Your Honor? There have been a series of leading questions about this GTCC issue, and I object on that basis.
THE COURT: Well, you could rephrase.
MS. SULLIVAN: Okay.
BY MS. SULLIVAN:
Q Mr. Kouts, when I use the term backfill spaces, do you know what I'm talking about?
A Yes.
Q Could those backfill spaces --
MS. SULLIVAN: I don't understand quite how this is leading. This is a direct question, whether or not they could place GTCC in the backfill spaces. Would you like me to try to rephrase, Your Honor?
MR. STOUCK: I can explain why it's leading, Your Honor. She asked if they could put GTCC in the repository. And he said no. That would have been the place to mention why not, rather than have counsel

Page 3463

lead him to the explanation.
MS. SULLIVAN: He's provided some reasons. I think there are some other reasons, and I'm helping him --
THE COURT: The record reflects that -- you may answer the question. I'll overrule the objection.
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Okay. As simplistically -- my sense is, from my understanding of what's in Greater Than Class C low-level waste, I don't think we could just simply put these materials in backfill or in various spaces in the drifts, if you will, the underground tunnels, if you will, in the repository, without some kind of packaging and assurance that these materials would not get out so that it would affect our ability to meet the very stringent EPA standards.
So what I alluded to earlier was the fact that we do have to do a variety of analytical work to determine how best these materials would have to -- would be placed in the repository, what they would be placed in, what kind of canisters, what type of waste packages they would be in. And without that additional detail work, it's difficult at this time to say whether or not they could go in backfill, if you

Page 3464

will, of the repository.
Let me also add we're in the planning on backfilling the repository. Essentially what we're doing is placing the waste packages. We're not filling up the repository with any kind of materials. It's been theorized in the past we would take pulverized tuff or volcanic materials and backfill it. We're not planning on doing that. That's not part of the current plan to demonstrate to the Nuclear Regulatory Commission that this site can isolate material.
So there isn't a lot of space in the drifts to add additional materials. So my sense is what would have to happen is there would be additional drifts or tunnels that would have to be drilled out where these materials would be placed.
THE COURT: What if you would package the GTCC in exactly the same type of container that the fuel assemblies are put in?
THE WITNESS: We could do that. I would also indicate that each of the waste packages costs roughly about half a million dollars. That's a very expensive package for low-level waste materials. There might be more efficient, more effective ways to do that. But I think when we analyze this in our

Page 3465

environmental impact statements, as we had to look at reasonably foreseeable alternatives, what we did analyze and essentially take these materials and put them in these packages and evaluate them as part of the EIS process.
That was the option we took because it was expedient, and we didn't want to expend any additional analytical work. It was kind of an outer bound of what we might do.
THE COURT: Would that solve the fee problem too, because you could charge the same fee as SNF?
THE WITNESS: That might help with the fee. We would have to look at, you know, what amount of new drifts, if you will, new tunnels would be caused by this. There were -- in the EIS, as I remember, there were roughly 2,000 cubic meters of these materials that were identified in the EIS. You translate that to cubic yards. That's roughly about 2600 cubic yards. So that's going to be quite a few waste packages and quite a few drifts that you would have to develop, if you will, in order to put these materials in there.
THE COURT: Okay. Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.

14

108TH CONGRESS 1st Session } HOUSE OF REPRESENTATIVES { REPORT 108–212

# ENERGY AND WATER DEVELOPMENT APPROPRIATIONS BILL, 2004

JULY 16, 2003.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HOBSON, from the Committee on Appropriations, submitted the following

## REPORT

[To accompany H.R. 2754]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for energy and water development for the fiscal year ending September 30, 2004, and for other purposes.

INDEX TO BILL AND REPORT



| | Page Number Bill | Report |
|---|---|---|
| Introduction | ....... | 4 |
| I. Department of Defense—Civil: | | |
| Corps of Engineers—Civil: | | |
| Introduction | ....... | 7 |
| General investigations | 2 | 9 |
| Construction, general | 3 | 36 |
| Flood control, Mississippi River and Tributaries | 4 | 55 |
| Operation and maintenance, general | 5 | 59 |
| Regulatory program | 6 | 80 |
| Formerly Utilized Sites Remedial Action Program | 6 | 81 |
| Flood control and coastal emergencies | 6 | 81 |
| General expenses | 6 | 82 |
| Administrative provisions | 7 | ......... |
| General provisions | 7 | 82 |
| II. Department of the Interior: | | |
| Central Utah Project completion account | 9 | 85 |
| Bureau of Reclamation: | | |
| Water and related resources | 9 | 87 |
| Bureau of Reclamation loan program account | 11 | 104 |
| California Bay-Delta ecosystem restoration | ....... | 105 |
| Central Valley Project restoration fund | 11 | 105 |



★88–360

PLAINTIFF'S EXHIBIT
P1889
~~Yankee Atomic Elec. Co. et al.~~
v. US, 98-126C, 98-154C, 98-474C

18

DOE headquarters, $7,774,000 for Technical Information Management; and $1,020,000 for Energy Research Analyses. The request for program direction for field offices was reduced by $3,720,000 and the amount transferred to the Safeguards and Security line. The control level for fiscal year 2004 is at the program account level of Science Program Direction.

FUNDING ADJUSTMENTS

The Committee recommendation includes an offset of $4,383,000 for the safeguards and security charge for reimbursable work, as proposed in the budget request. A general reduction of $1,000,000 has been applied to the Science account.

NUCLEAR WASTE DISPOSAL

| | |
|---|---|
| Appropriation, 2003 | $144,058,000 |
| Budget Estimate, 2004 | 161,000,000 |
| Recommended, 2004 | 335,000,000 |
| Comparison: | |
| Appropriation, 2003 | +190,942,000 |
| Budget Estimate, 2004 | +174,000,000 |

The Federal government has a clear statutory responsibility, assigned by Congress in the Nuclear Waste Policy Act of 1982, as amended, to provide for the permanent disposal of spent nuclear fuel and high-level radioactive waste. The Department of Energy was required by statute to accept commercial spent nuclear fuel for disposal beginning on January 31, 1998, and entered into legally enforceable contracts with utilities to execute that obligation. Unfortunately, the Department has been unable to meet that deadline, resulting in a number of lawsuits over the Department's failure to meet its statutory and contractual obligation and a growing financial liability over that failure. The Court of Federal Claims has found the Department to be in breach of its contractual obligations and is proceeding to determine the extent of damages.

The primary consequence of the Department's failure to begin accepting spent nuclear fuel is not, however, the existence of lawsuits and damage claims; it is that vast quantities of commercial spent nuclear fuel remain in temporary storage at reactor sites scattered around the country, many located near major population centers. The Committee is not questioning the current safety and security of spent nuclear fuel stored at commercial sites in accordance with Nuclear Regulatory Commission criteria. The Committee does, however, believe that the safety and security of these materials will be enhanced the sooner they are placed in the underground repository at Yucca Mountain. After the events of September 11, 2001, the Committee believes it is more essential than ever to move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date.

Chronic funding shortfalls, however, have starved the program of the resources necessary to keep the repository program on schedule. The Department's latest schedule calls for opening the repository and beginning to accept spent fuel in 2010 at the earliest, over 12 years behind schedule. Most recently, the Department requested a total of $591,000,000 for the nuclear waste disposal program in fiscal year 2003, yet received only $457,000,000, a funding shortfall

CERTIFICATE OF FILING

I hereby certify that on this 20th day of December 2004, a copy of foregoing "DEFENDANT'S RESPONSE TO CONSUMER ENERGY COMPANY'S MOTION FOR SUMMARY JUDGMENT ON CONTRACT LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.