IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSUMERS ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1894C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO THE COURT'S ORDER DATED FEBRUARY 8, 2008

Defendant, the United States, respectfully submits this response to the Court's order for supplemental briefing, dated February 8, 2008. The Court requested that the parties respond to two questions concerning the takings claim that plaintiff, Consumers Energy Company ("Consumers"), included in its December 13, 2002 complaint, which is the subject of the Government's August 9, 2007 renewed motion to dismiss Count III of that complaint.[1]

DISCUSSION

**Question No. 1: "To what extent do the provisions of the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. §§ 10101-10270, regulating nuclear utilities' ability to independently dispose of spent nuclear fuel and high-level radioactive waste ("SNF") amount to a taking given how the Act conditions the issuance or renewal of such utilities' licenses under 42 U.S.C. §§ 2133-2134 on entry into the Standard Contract or a similar agreement?"**

A. Any Takings Claim Based Upon Restrictions That The NWPA, Enacted In 1983, Placed Upon Consumers' "Right" To An Unrestricted Operating License Are Time-Barred

The Court's first question relates to the manner in which the provisions of the Nuclear Waste Policy Act ("NWPA") themselves, to the extent that they "regulat[e] nuclear utilities'

1/ Despite the Court's admonition that it "will not consider arguments based on matters outside the pleadings," Order, at 2 (Feb. 8, 2008), Consumers' supplemental brief is replete with references to matters outside the pleadings, including references to the substance of an expert witness report. Reliance on matters outside the pleadings is improper pursuant to RCFC 12(b)(6) and should be disregarded.

ability to independently dispose of spent nuclear fuel and high-level radioactive waste," amount to a taking of Consumers' property, given "how the Act conditions the issuance or renewal of such utilities' licenses under 42 U.S.C. §§ 2133-2134 on entry into the Standard Contract or a similar agreement." This question presupposes that, prior to the enactment of the NWPA, nuclear utility license holders had a right to obtain or retain a license for nuclear power generation and, without restriction, to dispose of spent nuclear fuel ("SNF") in the manner in which they believed appropriate.

We note that Consumers has not raised any such allegation in support of its takings claim. In its supplemental brief, Consumers alleges only that "[e]ntry into the Standard Contract was mandatory." Pl. Response at 2. However, Consumers entered that contract in 1983, almost 20 years before Consumers filed a complaint in this Court alleging a taking. To the extent that Consumers is now alleging that the allegedly "mandatory" entry of a contract constituted a taking, its allegation falls far outside the six-year statute of limitations applicable to takings claims, barring this Court's jurisdiction to entertain it. See 28 U.S.C. § 2501; Seldovia Native Ass'n, Inc. v. United States, 144 F.3d 769, 774 (Fed. Cir. 1998). Further, given that it was the nuclear utility industry that pushed for, lobbied for, and supported enactment of the NWPA, as evidenced by the legislative history associated with the NWPA, see, e.g., App. 1-13,[2] it is strange

---

2/ "[A] district court may take judicial notice of public records or indisputably authentic documents on a 12(b) motion without converting even a 12(b)(6) motion into one for summary judgment." Branch v. Federal Deposit Ins. Corp., 825 F. Supp. 384, 397, 398 n.8 (D. Mass. 1993); see Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994) (court "'may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment").

indeed that nuclear utilities would now claim that the NWPA "forced" them involuntarily to comply with its terms.

Even if Consumers had raised the allegations that the Court identified in its February 8, 2008 order, any takings claim based upon an allegation that the NWPA "took" Consumers' right to maintain a license without the restrictions of the Standard Contract or to dispose of its SNF in some manner other than that controlled by the Standard Contract would similarly be time-barred. "A claim first accrues for purposes of 28 U.S.C. § 2501 'when all events which fix the government's alleged liability have occurred and the plaintiff is or should have been aware of their existence.'" Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988) (quoting Oceanic Steamship Co. v. United States, 165 Ct. Cl. 217 (1964)). Here, Congress enacted the NWPA in January 1983. Consumers plainly knew at that time that the provisions of the NWPA required it to enter into a contract with the Department of Energy ("DOE") to the extent that it wanted to renew its existing operating license, see 42 U.S.C. § 10222(b), and any rights that it had to obtain an operating license renewal without such restrictions ended at that time. Consumers did not file its lawsuit here until December 2002, almost 20 years later. Any claim that the Government "took" Consumers' right to a license without the restrictions imposed by the NWPA, or to dispose of SNF without the restrictions imposed by the NWPA, are time-barred.

B. Even If Not Time-Barred, The NWPA Did Not Preclude Consumers From Finding Alternative Disposal Options For Its SNF

Although the Court suggests in its order that the NWPA somehow "regulat[ed] nuclear utilities' ability to independently dispose of" SNF, nothing in either the NWPA or the Standard Contract supports that statement. Certainly, there are Nuclear Regulatory Commission ("NRC") requirements, which existed prior to 1983 and have existed since 1983, regulating the disposal or

storage of SNF. However, those requirements exist independently of the NWPA. To the extent that Consumers can comply with those requirements, it and other utilities were and remain free to deal with their SNF in a manner other than through the Standard Contract.[3] Consumers has not identified a single provision in the NWPA that "took" those alternatives away from Consumers.

C. Consumers Cannot Distinguish Its Contract-Based Claims From Its Takings Claims

Consumers appears to focus almost the entirety of its supplemental brief upon an argument that "[t]he Standard Contract itself is properly viewed as a regulation," which, for some reason, should be viewed separate and apart from its contract claims. Pl. Response at 3. However, the regulation in which the terms of the Standard Contract were published, see 10 C.F.R. § 961.11, creates no rights in and has no effect upon Consumers. It is only when an entity enters into a contract containing the terms identified in 10 C.F.R. § 961.11 that any rights or

---

3/ Consumers misleadingly cites to 10 C.F.R. Part 50, Appendix F, an NRC regulation which provides that "[d]isposal of high-level radioactive fission product waste will not be permitted" on land not "owned and controlled by the Federal Government." Pl. Response at 3. Appendix F of 10 C.F.R. Part 50, which was first promulgated in 1970, relates to the "Policy Relating To The Siting Of Fuel Reprocessing Plants And Related Waste Management Facilities." 10 C.F.R. Part 50, App. F (emphasis added). As evidenced by Appendix F, the regulation relating to disposal of "high-level radioactive fission product waste" only applies to waste generated during reprocessing, not through the operation of commercial nuclear reactors. See http://www.ans.org/pi/resources/glossary/ (American Nuclear Society website, defining "high level waste" as "[h]ighly radioactive solid material that results from chemical reprocessing of spent fuel from a nuclear fission reactor" (emphasis added)). Reprocessing involves taking the spent nuclear fuel already generated during the production of nuclear power and reprocessing it into other forms. Id. (defining SNF as follows: "Nuclear fuel elements removed from a nuclear reactor after they have been used to produce power. Spent fuel has great potential for use as a fuel after reprocessing; thus 'used fuel' is a more accurate term."). The requirements of 10 C.F.R. Part 50, Appendix F, do not apply to SNF, only to "high-level radioactive fission product waste." Further, these restrictions have existed since 1970, well before the NWPA was enacted.

obligations regarding SNF acceptance from that entity are created.[4] However, those rights are created pursuant to the contract that is executed. Absent the contract, DOE has no obligation, either under the NWPA or under any other statute or regulation, to accept Consumers' SNF. Consumers cannot somehow claim contract damages for a breach of its own Standard Contract and, at the same time, claim that the regulation that creates its contract terms created some harm that is separate and distinct from its rights under its contract.

As we have discussed in prior briefing, absent its execution of the Standard Contract, Consumers would be wholly responsible for the storage and disposal of its SNF. See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003) ("prior to the Standard Contract DOE did not have an obligation to accept or dispose of plaintiff's SNF"). Consumers asserts that it is the passage of NWPA that represents the Government's acceptance of responsibility for the disposal of SNF. Compl. ¶ 9. However, pursuant to the NWPA, DOE's obligation to dispose of a generator's or owner's SNF was conditioned upon the existence of a contract between the generator (or owner) and DOE. 42 U.S.C. § 10222(a).

Where a party's rights are created by contract with the Government, a party cannot state a takings claim against the Government founded upon a breach of that contract unless the Government has somehow impinged upon the contract holder's original range of contract

---

4/ Consumers appears to confuse case law regarding the manner in which contract terms that were generated through notice-and-comment rulemaking should be interpreted, which should be interpreted in accordance with the rules applicable to interpreting regulations, see Santa Fe Eng'rs, Inc. v. United States, 801 F.2d 379, 381 (Fed. Cir. 1986), with whether the Standard Contract that it actually executed is a "regulation." To the extent that Consumers' contract with DOE is a regulation, Consumers' contract claims against the United States should immediately be dismissed.

remedies. Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); see Def. Renewed Motion at 7-9. This Court repeatedly has rejected takings claims in the SNF cases because they are, in reality, disguised contract claims. Northern States Power Co. v. United States, 78 Fed. Cl. 449, 472 (2007); Pacific Gas & Elec. v. United States , 70 Fed. Cl. 766, 778 (2006); Canal Electric Co. v. United States, 65 Fed. Cl. 650, 656 (2005); Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2002).

In its brief, Consumers fails to identify a single case supporting the proposition that a takings claim can arise from a breach of contract. Instead, Consumers attempts to analogize its cause of action to takings claims arising from physical occupations of property by the Government, such as Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), in which the Supreme Court found that the permanent physical occupation of plaintiff's property through the installation of cable cross-over wires constituted a taking. Id. at 427, 434-35. However, Consumers does not allege that DOE's breach of the Standard Contract resulted in a physical occupation of the Big Rock Point or Palisades sites.[5] To the contrary, until the date of the sale to Entergy, Consumers owned the SNF at its facilities, given that title to the SNF does not transfer until DOE accepts the SNF, Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996), precluding a "physical invasion" argument. See The

---

5/ Consumers incorrectly appears to suggest that there has been some type of physical invasion of its former property, stating that the Government's delay in SNF has somehow created a "constructive" physical taking. Consumers has provided no support for this proposition, and we are unaware of any legal authority for a "constructive" physical invasion takings theory. Further, the SNF on Consumers' site belongs to Consumers, not the Government. No third-party "physical invasion" has occurred.

Stearns Co. Ltd. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005) (rejecting claim for physical invasion takings claim unless "the government itself occupies the property or 'requires the landowner to submit to physical occupation of its land'" (citations omitted)).[6] The cases upon which Consumers relies are far afield from the claims that it is pursuing here. This Court should look instead to the cases cited in the Government's renewed motion to dismiss for guidance as to the viability of Consumers' contract-based takings claim.

Consumers also failed to articulate any viable regulatory taking of its property. Before the Court analyzes whether Government action constituted a regulatory taking, the plaintiff must identify whether a protected property interest exists, apart from the context of its contract. See Def. Renewed Motion at 14-18. Consumers has not identified any regulation by the Government that allegedly took its property. To the extent that Consumers attempts to identify the NWPA as the basis for a regulatory taking, this claim fails as a matter of law. Statutes like the NWPA generally may not form the basis of a protected property interest for purposes of a takings claim. Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 421 F.3d 1323, 1334 (Fed. Cir. 2005); see Def. Renewed Mot. at 16-17.[7] Rather than identify any regulation that has "taken" Consumers' right to SNF disposal, the true "taking" that Consumers has alleged is the

---

6/ Similarly, Consumers' reliance upon Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 162 (1980), is equally misplaced. Webb's involved the State of Florida's attempt permanently to appropriate interest earned upon a private account at the clerk's office. Here, there has been no appropriation of property. Rather, Consumers has alleged precisely the opposite – the failure of the Government to accept Consumers' SNF.

7/ Even if the NWPA could, as a matter of law, create a protected property interest that is compensable under the Fifth Amendment, Consumers has failed to cite any specific provision of the NWPA that would confer such a protected property interest.

Government's failure to begin accepting SNF beginning on January 31, 1998 – the date contained in the Standard Contract.

Nor does the Supreme Court's decision in Nollan v. California Coastal Commission, 483 U.S.825 (1987), change the result in this case. In Nollan, homeowners challenged the coastal commission's conditioning of its grant of permission to rebuild their house on their transfer to the public of an easement across their beachfront property. Id. at 827. The Supreme Court held that the conditioning of a permit upon the granting of an easement constituted a compensable takings under the Fifth Amendment. Id. at 841-42. Consumers acknowledges in its supplemental brief that there "is some difficulty in applying the concepts of Nollan to the present case since Nollan involves land use restrictions which are not directly analogous to the present facts." Pl. Response at 8. As the United States Court of Appeals for the Federal Circuit recognized in another case interpreting Nollan, the fact that "[n]o such physical intrusion – by government or the public – occurred here" renders Nollan inapplicable. Norman v. United States, 429 F.3d 1081, 1089 (Fed. Cir. 2005). We agree that Nollan, by its very terms, has no application to the facts in this case. Regardless of whatever conditions may have been placed upon entry into the Standard Contract, the fact remains that there is a contract between the Government and Consumers, and Consumers has not alleged that the decision to enter into the Standard Contract somehow constitutes a takings, a claim that, if made, would be time-barred.

**Question No. 2. "To what extent would a claim for damages stemming from Plaintiff's allegation of a taking of real property overlap with the currently pending claim for damages in regard to Defendant's liability for partial breach of the Standard Contract?"**

Consumers' takings and breach of contract claims overlap identically. Consumers acknowledges that the Government's performance obligations is contained exclusively in the

Standard Contract. Despite its protestations to the contrary, Consumers' response makes evident that its takings claim is predicated upon the Standard Contract. Indeed, it frames the issues in this case as "[w]hether Defendant DOE's failure to begin accepting, transporting, and disposing of spent nuclear fuel . . . states a causation of action for a taking" of its real property and its "vested contract rights." Pl. Response at 2 (emphasis added). Yet, as we explained in our renewed motion to dismiss, and which Consumers does not dispute, the only basis for Consumers' claimed obligation on the part of the Government to accept, transport, and dispose of Consumers' SNF derives from the Standard Contract. A plaintiff's failure to recover under a cognizable breach of contract claim does not convert that failed claim into, or otherwise create, a constitutional taking of property, and a plaintiff cannot plead a takings claim in an attempt to recover damages that are otherwise unrecoverable under a breach of contract theory. See Home Sav. of Am., F.S.B. v. United States, 51 Fed. Cl. 487, 495-96 (2002). Consequently, if the contract claim is rejected, either in whole or in part, a party cannot simply make up the difference with a takings claim.

Nor may Consumers retain its takings claim as an "alternative" to its breach of contract claim. The Federal Circuit's decisions in cases such as Castle and LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004), plainly establish that Consumers's takings claim here is not viable, making resolution of this motion appropriate. Further, this Court in Klamath Irrigation District v. United States, 67 Fed. Cl. 504 (2005), rejected the notion of "alternative" breach of contract and takings claims, explaining that it is inconsistent with the nature of rights created by a contract with the Government. Id. at 532 n.46. In this case, where there is no allegation that

the Government has taken Consumers' contract remedies, Consumers may not, as a matter of law, maintain a takings claim – whether as an alternative to its breach claim or otherwise.

Consumers relies upon the Court's decision denying the Government's motion for summary judgment in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), for the proposition that there exists a factual dispute regarding a takings claim that somehow justifies denial of the Government's motion to dismiss. Pl. Response at 18. As we explained in our motion, the Court in Boston Edison concluded that a factual dispute existed as to the origin of plaintiff's rights. Boston Edison, 64 Fed. Cl. at 187. However, in a decision by the Federal Circuit issued shortly after the Court's decision in Boston Edison, the Federal Circuit reaffirmed that the nature of a plaintiff's property interest is a question of law rather than a question of fact. Texas State Bank v. United States, 423 F.3d 1370, 1379 (Fed. Cir. 2005). As the Court explained in Canal in dismissing another SNF's plaintiff's takings claim as a matter of law, "[r]uling that the parties should conduct discovery on investment-backed expectations or other factual issues as plaintiff has urged would only create delay and waste resources." Canal, 65 Fed. Cl. at 656. In light of the facially deficient nature of Consumers' takings claim as a matter of law, no "factual development" would improve the viability of Consumers' claim. Consequently, dismissal under the circumstances is appropriate.

## CONCLUSION

The Government respectfully requests that the Court grant the Government's renewed motion to dismiss Count III of Consumers' complaint.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Scott R. Damelin by s/ Harold D. Lester, Jr.
SCOTT R. DAMELIN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-2312
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

STEPHEN FINN
JOSHUA E. GARDNER
Trial Attorneys
Department of Justice
Washington, D.C. 20530

March 7, 2008

# ATTACHMENT

# H.R. 5016

# NUCLEAR WASTE MANAGEMENT COMPREHENSIVE LEGISLATION—BOUQUARD/LUJAN PROPOSAL

## HEARINGS

BEFORE THE

## SUBCOMMITTEE ON ENERGY RESEARCH AND PRODUCTION

OF THE

## COMMITTEE ON SCIENCE AND TECHNOLOGY U.S. HOUSE OF REPRESENTATIVES

NINETY-SEVENTH CONGRESS

FIRST SESSION

JUNE 17, 18; OCTOBER 5, 7, 1981

[No. 66]

Printed for the use of the
Committee on Science and Technology

U.S. GOVERNMENT PRINTING OFFICE
89-339 O WASHINGTON : 1982

H701-37

## COMMITTEE ON SCIENCE AND TECHNOLOGY

DON FUQUA, Florida, *Chairman*

ROBERT A. ROE, New Jersey
GEORGE E. BROWN, JR., California
JAMES H. SCHEUER, New York
RICHARD L. OTTINGER, New York
TOM HARKIN, Iowa
MARILYN LLOYD BOUQUARD, Tennessee
JAMES J. BLANCHARD, Michigan
TIMOTHY E. WIRTH, Colorado*
DOUG WALGREN, Pennsylvania
RONNIE G. FLIPPO, Alabama
DAN GLICKMAN, Kansas
ALBERT GORE, JR., Tennessee
ROBERT A. YOUNG, Missouri
RICHARD C. WHITE, Texas
HAROLD L. VOLKMER, Missouri
HOWARD WOLPE, Michigan
BILL NELSON, Florida
BERYL ANTHONY, JR., Arkansas*
STANLEY N. LUNDINE, New York
ALLEN E. ERTEL, Pennsylvania
BOB SHAMANSKY, Ohio
RALPH M. HALL, Texas
DAVE McCURDY, Oklahoma
MERVYN M. DYMALLY, California

LARRY WINN, JR., Kansas
BARRY M. GOLDWATER, JR., California
HAMILTON FISH, JR., New York
MANUEL LUJAN, New Mexico
HAROLD C. HOLLENBECK, New Jersey
ROBERT S. WALKER, Pennsylvania
EDWIN B. FORSYTHE, New Jersey
WILLIAM CARNEY, New York
MARGARET M. HECKLER, Massachusetts
F. JAMES SENSENBRENNER, JR., Wisconsin
VIN WEBER, Minnesota
JUDD GREGG, New Hampshire
RAYMOND J. McGRATH, New York
JOE SKEEN, New Mexico
CLAUDINE SCHNEIDER, Rhode Island
JIM DUNN, Michigan
BILL LOWERY, California

HAROLD P. HANSON, *Executive Director*
PHILIP B. YEAGER, *General Counsel*
JACK DUGAN, *Staff Director*
GERALD E. JENKS, *Minority Staff Director*

---

### SUBCOMMITTEE ON ENERGY RESEARCH AND PRODUCTION

MARILYN LLOYD BOUQUARD, Tennessee, *Chairman*

ROBERT A. ROE, New Jersey
RICHARD L. OTTINGER, New York
ROBERT A. YOUNG, Missouri
STANLEY N. LUNDINE, New York
RONNIE G. FLIPPO, Alabama
HAROLD L. VOLKMER, Missouri
HOWARD WOLPE, Michigan

MANUEL LUJAN, JR., New Mexico
EDWIN B. FORSYTHE, New Jersey
BILL LOWERY, California
BARRY M. GOLDWATER, JR., California
HAROLD C. HOLLENBECK, New Jersey

*On assignment to Budget Committee for 97th Congress.

# CONTENTS

## WITNESSES

June 17, 1981: Page
William W. Hambleton, director, Kansas Geological Society, University of Kansas, Lawrence, Kans .......... 13
E. Linn Draper, Jr., vice president, nuclear technology, Gulf States Utilities Co., Beaumont, Tex.; accompanied by Joseph A. Lieberman, Nuclear Safety Associates, Inc .......... 44
David Berick, Environmental Policy Center, Washington, D.C .......... 53
Holmes Brown, National Governors' Association, Washington, D.C .......... 67
Additional questions for the record .......... 92
Additional statements for the record .......... 103
Bill H.R. 1909 .......... 120
June 18, 1981:
Sheldon Meyers, Deputy Assistant Secretary for Nuclear Waste Management, U.S. Department of Energy, Dr. Thomas Cotton, Office of Technology Assessment, and John B. Martin, Director, Division of Waste Management, U.S. Nuclear Regulatory Commission .......... 132
Additional questions for the record .......... 177
October 5, 1981:
Dr. Shelby Brewer, Assistant Secretary for Nuclear Energy, U.S. Department of Energy, accompanied by Sheldon Meyers, Acting Deputy Assistant Secretary for Nuclear Waste Management, Jack Thereault, Deputy Assistant Secretary, Policy and Planning; and Kermit Laughon, Acting Deputy Director, Nuclear Power .......... 208
Dr. Thomas Cotton, Senior Analyst, Office of Technology Assessment, Washington, D.C .......... 229
E. Linn Draper, Jr., vice president, Gulf States Utilities Co., appearing on behalf of Edison Electric Institute, utility nuclear waste management group and the American Nuclear Energy Council; accompanied by R. G. Snipes, Duke Power Co., and R. R. Calabro, Northeast Utilities .......... 307
Bill H.R. 1993 .......... 339
Bouquard/Lujan proposal .......... 385
Additional statements for the record .......... 432
October 7, 1981:
Holmes Brown, associate director, National Governors' Association, on behalf of Gov. John V. Evans, chairman, Subcommittee on Nuclear Power .......... 561
Brooks Yeager, Washington representative, Sierra Club .......... 577
Dan Metlay, professor of political science, Indiana University at Bloomington .......... 605

## APPENDIX

Written testimony provided for the record by Dr. Kai N. Lee .......... 616
NRC comments .......... 634
OTA staff comments .......... 648

Our next witness is Dr. Linn Draper. We certainly welcome you to our subcommittee this afternoon. We are looking forward to your testimony as well. Dr. Draper, would you identify your associates.

**TESTIMONY OF E. LINN DRAPER, JR., VICE PRESIDENT, GULF STATES UTILITIES CO., APPEARING ON BEHALF OF EDISON ELECTRIC INSTITUTE, UTILITY NUCLEAR WASTE MANAGEMENT GROUP AND THE AMERICAN NUCLEAR ENERGY COUNCIL, ACCOMPANIED BY R. G. SNIPES, DUKE POWER CO., AND R. R. CALABRO, NORTHEAST UTILITIES**

Dr. DRAPER. Yes, I will, Madam Chairman. I have prepared a moderately lengthy statement that has been presented to the secretary, which I would ask be placed in the record.

Mrs. BOUQUARD. Without objection, it will be made part of the record. You may proceed as you wish.

Dr. DRAPER. Thank you. My name is E. Linn Draper, Jr. I am vice president of Gulf States Utility Co., and chairman of the Utilities Nuclear Waste Management Group, and a member of the Edison Electric Institute's Nuclear Power Executive Advisory Committee. As I believe you are aware, the UNWMG is a group of 39 publicly owned and investor-owned electric utilities, which is concerned with matters related to nuclear waste management.

I am also appearing on behalf of the Edison Electric Institute, the association of the Nation's investor-owned utilities, whose members generate more than 78 percent of all the electricity in the country and serves 67 million ultimate customers in the United States; and on behalf of the American Nuclear Energy Council, which represents more than 100 organizations having interest in nuclear power, including private, public, and cooperatively owned utilities, manufacturers, architect-engineers, and various firms in the nuclear fuel cycle.

Accompanying me today are Mr. R. G. Snipes of Duke Power Co. and Mr. R. R. Calabro of Northeast Utilities. Mr. Snipes and Mr. Calabro are leaders of the UNWMG working groups for high-level waste and spent fuels storage, respectively.

As you are aware, testimony on H.R. 1909 was presented to the subcommittee last February by Mr. Snipes. At that time, Mr. Snipes discussed some of the history of the Federal nuclear waste management and details of the bill. I also testified on H.R. 1909 on June 17 of this year. Although we are discussing a different bill today, I think some of the points made in this earlier testimony are pertinent.

The Federal Government's program for managing high-level waste and spent nuclear fuel over the past 4 years has amounted basically to an effort to study a broad range of parameters related to high-level waste disposal rather than aimed at placing a waste repository into operation in a timely fashion. Literally hundreds of millions of dollars have been spent on a seemingly endless array of studies on different components and other aspects of a repository system.

Further, although the Federal program has involved the efforts of a battallion of scientists and engineers, there has been little indi-

as a precedent, but rather an innovative mechanism for ensuring the financial viability of a successful long-term Federal waste management program.

In considering the financing of the waste management program, we are certainly aware of the commendable fiscal restraint being exercised by the Congress in all areas of government spending. Again we must emphasize that the full payment for reasonable costs of storage and disposal of commercial spent fuel and radioactive wastes will be paid by the utilities and will be included as part of the cost of the nuclear fuel. To alleviate near-term budgetary impacts, the utilities may be willing to make a substantial commitment upon signing a contract with the Federal Government for spent fuel storage at interim facilities and to commit to ship sufficient spent fuel to an interim facility to ensure all Government costs are recovered.

The Federal Government should be required to enter into contracts with persons licensed under the Atomic Energy Act of 1954, as amended, for the interim storage and disposal of waste or spent fuel. The contract should specify the basis for the payments to be made under each contract and must include a specific date upon which the Federal Government would take title and possession of waste or spent fuel as well as the criteria for such title transfer.

CONCLUSION

In conclusion, we would like to emphasize the need for action by Congress this year in implementing a federal waste management program. Interim spent fuel storage capability should be provided as soon as possible. The site selections for proposed geologic repositories, and a test and evaluation facility at one of

the proposed locations, should proceed on an expedited program. The desirability of long-term retrievable spent fuel storage capacity must be recognized in light of the energy values contained therein. A definite schedule for progress such as that laid out in the Discussion Draft would help in ensuring that present action be taken quickly and that future action not be delayed. A "schedule of events" is needed to ease a federal waste management policy into reality.

It is essential that legislation be enacted to ensure that a comprehensive nuclear waste disposal program is established. Without such legislation, the issue of state participation in the selection and operation of facilities will remain unresolved. Furthermore, without legislation on the subject clarifying when NEPA is appropriately applied, any program undertaken by the Federal Government could be challenged ad infinitum on NEPA grounds. These issues must be confronted, and a program implemented.

Mrs. BOUQUARD. Thank you very much, Dr. Draper, for your very positive statement.

On page 3 of your testimony, you say that to insure the implementation of a national waste management strategy, a single lead agency is needed for the national program. Are you referring to DOE? Or do you have another lead agency in mind?

Dr. DRAPER. We are referring to the Department of Energy. We believe the existing institutions are adequate; however, were a separate agency to be established to manage radioactive waste, we would certainly support that sort of activity as well.

Mrs. BOUQUARD. You refer to changes in administration that might result in changes of direction. Do you think we can sufficiently address this concern to DOE?

Dr. DRAPER. I think it's possible that that could be done. If the Department of Energy were given a firm schedule and were given adequate funding to support the program over an extended period of time, I believe the existing institutions could, in fact, do the job. One of the deficiencies in the past has been the lack of a firm schedule, to which the Department of Energy was charged to work, and the lack of an established program for the financing of that activity.

Mrs. BOUQUARD. Do you think that the NRC should be involved in the program from the very inception of the schedule?

Dr. DRAPER. I do. I think it would be very useful to have the NRC involved from the outset, so that those issues that were likely to occur in licensing hearings and other proceedings would be addressed early on and could be worked out in a cooperative way.

# NUCLEAR WASTE DISPOSAL

## JOINT HEARINGS

BEFORE THE

## COMMITTEE ON ENERGY AND NATURAL RESOURCES

AND THE

## SUBCOMMITTEE ON NUCLEAR REGULATION

OF THE

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS UNITED STATES SENATE

NINETY-SEVENTH CONGRESS

FIRST SESSION

ON

## S. 637

A BILL TO ESTABLISH A PROGRAM FOR FEDERAL STORAGE OF SPENT FUEL FROM CIVILIAN NUCLEAR POWERPLANTS, TO SET FORTH A FEDERAL POLICY AND INITIATE A PROGRAM FOR THE DISPOSAL OF NUCLEAR WASTE FROM CIVILIAN ACTIVITIES, AND FOR OTHER PURPOSES

## S. 1662

A BILL TO ESTABLISH A LIMITED PROGRAM FOR FEDERAL STORAGE OF SPENT FUEL FROM CIVILIAN NUCLEAR POWERPLANTS, TO SET FORTH A FEDERAL POLICY, INITIATE A PROGRAM, AND ESTABLISH A NATIONAL SCHEDULE FOR THE DISPOSAL OF NUCLEAR WASTE FROM CIVILIAN ACTIVITIES, AND FOR OTHER PURPOSES

OCTOBER 5 AND 6, 1981

**Energy Committee Publication No. 97-62**

**Environment Committee Publication No. 97-H40**

Printed for the use of the Committees on the Energy and Natural Resources and Environment and Public Works

U.S. GOVERNMENT PRINTING OFFICE

90-812 O WASHINGTON : 1982

5321-15

5311-22

COMMITTEE ON ENERGY AND NATURAL RESOURCES

JAMES A. McCLURE, Idaho, *Chairman*

| | |
|---|---|
| MARK O. HATFIELD, Oregon | HENRY M. JACKSON, Washington |
| LOWELL P. WEICKER, JR., Connecticut | J. BENNETT JOHNSTON, Louisiana |
| PETE V. DOMENICI, New Mexico | DALE BUMPERS, Arkansas |
| MALCOLM WALLOP, Wyoming | WENDELL H. FORD, Kentucky |
| JOHN W. WARNER, Virginia | HOWARD M. METZENBAUM, Ohio |
| GORDON J. HUMPHREY, New Hampshire | SPARK M. MATSUNAGA, Hawaii |
| FRANK H. MURKOWSKI, Alaska | JOHN MELCHER, Montana |
| DON NICKLES, Oklahoma | PAUL E. TSONGAS, Massachusetts |
| JOHN P. EAST, North Carolina | BILL BRADLEY, New Jersey |
| JOHN HEINZ, Pennsylvania | |

MICHAEL D. HATHAWAY, *Staff Director*
CHARLES A. TRABANDT, *Chief Counsel*
D. MICHAEL HARVEY, *Chief Counsel for the Minority*

---

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

ROBERT T. STAFFORD, Vermont, *Chairman*

| | |
|---|---|
| HOWARD H. BAKER, JR., Tennessee | JENNINGS RANDOLPH, West Virginia |
| PETE V. DOMENICI, New Mexico | LLOYD BENTSEN, Texas |
| JOHN H. CHAFEE, Rhode Island | QUENTIN N. BURDICK, North Dakota |
| ALAN K. SIMPSON, Wyoming | GARY HART, Colorado |
| JAMES ABDNOR, South Dakota | DANIEL PATRICK MOYNIHAN, New York |
| STEVE SYMMS, Idaho | GEORGE J. MITCHELL, Maine |
| SLADE GORTON, Washington | MAX BAUCUS, Montana |
| FRANK H. MURKOWSKI, Alaska | |

BAILEY GUARD, *Staff Director*
JOHN W. YAGO, Jr., *Minority Staff Director*

---

SUBCOMMITTEE ON NUCLEAR REGULATION

ALAN K. SIMPSON, Wyoming, *Chairman*

| | |
|---|---|
| HOWARD H. BAKER, JR., Tennessee | GARY HART, Colorado |
| PETE V. DOMENICI, New Mexico | GEORGE J. MITCHELL, Maine |
| STEVE SYMMS, Idaho | MAX BAUCUS, Montana |

(II)

# CONTENTS


| | Page |
|---|---|
| Hearings: | |
| October 5, 1981 | 1 |
| October 6, 1981 | 209 |
| S. 1662 | 6 |
| S. 637 | 59 |

MONDAY, OCTOBER 5, 1981

STATEMENTS

Brown, Holmes, associate director, Committee on Energy and Environment, National Governors' Association, on behalf of Gov. John V. Evans of Idaho ..... 96, 99
Domenici, Hon. Pete V., a U.S. Senator from the State of New Mexico ..... 95
Helminski, Edward L., on behalf of the State Planning Council on Radioactive Waste Management ..... 105, 109
Jim, Russell, on behalf of the Council of Energy Resource Tribes ..... 117
Johnston, Hon. J. Bennett, a U.S. Senator from the State of Louisiana ..... 93
McClure, Hon. James A., a U.S. Senator from the State of Idaho ..... 1
Simpson, Hon. Alan K., a U.S. Senator from the State of Wyoming ..... 92

TUESDAY, OCTOBER 6, 1981

STATEMENTS

Berick, David, Washington representative, Environmental Policy Center ..... 373, 376
Brewer, Dr. Shelby T., Assistant Secretary for Nuclear Energy, Department of Energy, accompanied by Sheldon Meyers, Deputy Assistant Secretary for Waste Management; Jack Thereault, Director, Office of Plans and Evaluation; and Kermit Laughon ..... 210, 212
Cotton, Thomas A., Office of Technology Assessment ..... 259, 264
Devine, James F., Assistant Director for Engineering Geology, U.S. Geological Survey ..... 320, 321
Hernandez, John, Deputy Administrator, Environmental Protection Agency ..... 257
McClure, Hon. James A., a U.S. Senator from the State of Idaho ..... 209
Palladino, Hon. Nunzio J., Chairman, Nuclear Regulatory Commission, accompanied by Commissioner John F. Ahearne; Commissioner Victor Gilinsky; Commissioner Thomas M. Roberts; and William Dircks, Executive Director for Operations ..... 236, 239
Smith, Sherwood H., Jr., chairman and chief executive officer, Carolina Power & Light Co ..... 329, 332, 344
Symms, Hon. Steven D., a U.S. Senator from the State of Idaho ..... 217
Van Loon, Eric E., executive director, Union of Concerned Scientists ..... 390, 394
Wiggin, Edwin A., executive vice president, Atomic Industrial Forum ..... 402, 404

APPENDIXES

APPENDIX I

Reports submitted for the record by Edward L. Helminski ..... 415

APPENDIX II

Report submitted for the record by Senator J. Bennett Johnston ..... 519

work the way you thought they would at which point it may be too late to readily make changes in the design, if you wait until 1988.

Senator SIMPSON. I appreciate that. I have some other questions and I will present those in writing to you.

One of the witnesses in the next panel has a time problem with a flight schedule and there is another rollcall vote.

I thank you all. There will be questions submitted by Senator Johnston and I believe by Senator Hart. The minority have indicated they have additional questions they wish to have answered.

Thank you very much.

We will take the panel consisting of Mr. Sherwood H. Smith, Jr., chief executive officer and president of Carolina Power & Light Co., representing the American Nuclear Energy Council, Edison Electric Institute, and Utility Nuclear Waste Management Group; Mr. David Berick, Washington representative, Environmental Policy Center; Eric Van Loon, executive director for Union of Concerned Scientists; and Mr. Edwin A. Wiggin, executive vice president, Atomic Industrial Forum.

Mr. Smith, I am going to have you testify so you can get on your flight.

## STATEMENT OF SHERWOOD H. SMITH, JR., CHAIRMAN AND CHIEF EXECUTIVE OFFICER, CAROLINA POWER & LIGHT CO.

Mr. SMITH. Thank you, Senator Simpson. I am Sherwood Smith, chairman of the board and chief executive officer of Carolina Power & Light Co.

My company provides electric service in a 30,000 square mile area with a population of about 3.5 million people in North and South Carolina.

I am very pleased to be here to discuss S. 637 and S. 1662. I testify today on behalf of the American Nuclear Energy Council of which I serve as chairman of the board; the Edison Electric Institute of which I am chairman of the Policy Committee on Governmental Affairs and the Utility Nuclear Waste Management Group, a group of 39 electric utilities of which Carolina Power & Light is a member.

With respect to the amendment which has been submitted for consideration by Senator McClure earlier today, perhaps I should make a comment at the outset. We certainly appreciate the interest and the depth of study I am personally aware of that Senator McClure has given to this subject. I think the interest he has shown is very positive and commendable from the standpoint of our industry.

I think the importance may be in getting the question out on the table initially so a decision can be made as to whether or not reprocessing should be included in the legislation now before the committee and which we would hope the Senate and hopefully the Congress would enact.

I would like to make these observations with respect to reprocessing. Over the past 10 to 15 years, Government policy, actions and often inactions have prevented reprocessing from becoming available.

establishment of an expedited waste management program, to take title to the radioactive waste or spent fuel for disposal. However, we also believe that a one-time fee should be paid into the waste management fund at the time of delivery of spent fuel or radioactive waste from spent fuel removed from reactor cores prior to enactment of this Act, otherwise, future customers utilizing nuclear generated electricity would pay for disposal of spent fuel from which they have received no benefit. Most utilities have taken into account the need to make such a future payment on spent fuel already removed from the reactor of their operating nuclear plants. Thus to the maximum extent practical, the actual beneficiaries of nuclear fuel would pay for the disposal costs.

We firmly believe that the legislation should authorize and direct the Secretary of Energy to enter into contracts with all nuclear power plant operators by which the Government agrees to take title to and responsibility for radioactive wastes or spent fuel, in return for the commitment of the utility to collect from its customers and pay to the Treasury a fee of one mil per kilowatt-hour of nuclear generated electricity for all nuclear fuel removed from nuclear reactors after the enactment of this bill. The contract should require a fee, generally equivalent to an average one mil per kilowatt-hour charge, to be paid by the owners of spent fuel removed from nuclear reactors prior to enactment of this bill.

Senator SIMPSON. The hearing will come to order.

Mr. Smith, you expressed somewhat reluctant support for the funding mechanism in S. 1662. If the bill also included a direction that DOE enter into contracts with utilities to accept their spent fuel for long-term storage or alternate disposal in return for the mandatory fee arrangement that is proposed in the bill, would that at least relieve some of your concern?

Mr. SMITH. Yes, it certainly would. I believe that on balance the utility industry would accept the proposal of the 1 mill charge for funding the facility and its operation if as you say there were contracts that specifically spelled out such things as the date when the Government would take title and possession of the fuel; exactly what the fee was supposed to cover, what services were included and if it were clearly understood as I gather is the intent of this legislation, that there would be an one time payment, that there would not be an open door with the possibility of retrospective charges at some indefinite time to the future.

Senator SIMPSON. What are your views on the procedures to expedite the approval of additional onsite spent fuel capacity? Are these procedures necessary if utilities are to meet the policies under the bill that they have the primary responsibility for interim spent fuel storage?

Mr. SMITH. I think the expedited procedure is necessary for those utilities that have sought amendments to their licenses in order to expand the capacity of their existing storage rights. If you look at what has already happened, you will see—and this is in accordance with a recent survey done for the Department of Energy by DuPont Co.—that out of 67 utilities surveyed, 62 with operating reactors have sought amendments to increase their existing onsite storage capacity.

What has happened is the length of time it has taken to get those license amendments approved has gradually been extended and it has gotten longer and longer.

We would favor the expedited proceeding as described in this bill for license amendments and from the standpoint of making it perfectly clear exactly under what circumstances the Secretary would receive fuel from an existing unit at which it was not practical to wait to seek to add additional onsite storage and the criteria now spelled out under section 311 be included in the determination of practicality under section 303 where it is clear that economic considerations are a part of the criteria.

What one sees is today and in our case, we will run out of full core discharge capability in 1986 and it would probably take about 8 years to build a new pool on the existing land we have at our Robinson site. I think you would be unwise if you planned for anything less than 4 years for licensing and about 4 years for construction.

I think it should not be required in every case, that the utility go out and try to build another pool and another pool at their existing locations.

Senator SIMPSON. At your Robinson Plant, you have no way to obtain additional expanded storage capacity in time to meet that 1986 deadline?

Mr. SMITH. That is our problem. On the DOE list of plants and this is in their report, on page 11 of that report there are probably 20 some units listed. We have the first two listed that run out of spent fuel storage capability onsite. Both our Robinson No. 2 and our Brunswick No. 1 are scheduled to run out of full core discharge capability in 1986.

We have done everything that could be done. We have reracked those pools twice. We are the only company I know of that has been able to ship spent fuel from one State to another, from one plant to another.

Senator SIMPSON. Would the mandatory fee that is proposed under this legislation be automatically recoverable from your ratepayer?

Mr. SMITH. If it is mandated from Congress, yes. The situation today is, some companies are collecting a fee which is based on current DOE estimates for the cost of spent fuel storage and permanent disposal. Others have not allowed—our position is unique whereby in one jurisdiction we have been allowed to collect the fee but last week the Federal Energy Regulatory Commission denied us the right to collect that fee.

If it is mandated by Congress it would flow through in all jurisdictions.

Senator SIMPSON. It is good to know you have a basic satisfaction with the provisions of the bill in that respect.

Do you support the Federal away-from-reactor provisions in this bill?

Mr. SMITH. I do, Senator Simpson.

Senator SIMPSON. I thank you, Mr. Smith. You may leave as you desire. I would ask the remaining members of the panel to go in order so next would be Mr. David Berick.

## STATEMENT OF DAVID BERICK, WASHINGTON REPRESENTATIVE, ENVIRONMENTAL POLICY CENTER

Mr. BERICK. I want to thank you and Senator McClure for the opportunity to testify this afternoon. With the understanding my testimony is entered in the record, I will try to summarize briefly.

After watching this debate on Capitol Hill on nuclear waste legislation for about the last 3½ years, it has become sort of obvious to me that we are really trying to tackle two separate nuclear waste problems.

The first which was brought into focus with the California moratorium in 1976 is that the failure to close the back end of the fuel cycle has cast a political cloud over the future development of nuclear power. Efforts to disperse that cloud have traditionally been proposed since 1976 for fairly expeditious treatment of the waste problem.

On the other hand we have a very real technical problem of how to physically develop licenses and construct geologic repositories within the time frame of the license period of nuclear powerplants which is something which has been explored at some length in the waste conference proceeding before the NRC.

What I would like to explore are the tradeoffs between efforts to get something as early as possible in an attempt to solve the politi-

CERTIFICATE OF FILING

I hereby certify that on this 7th day of March, 2008, a copy of foregoing "DEFENDANT'S RESPONSE TO THE COURT'S ORDER DATED FEBRUARY 8, 2008" BRIEFING" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.