**No. 02-1894C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CONSUMERS ENERGY COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JOINDER OF ENTERGY NUCLEAR PALISADES, LLC, OR, IN THE ALTERNATIVE, FOR ISSUANCE OF BINDING NOTICE PURSUANT TO RCFC 14(b) AND CONTRACT SETTLEMENT ACT, § 14(b), 41 U.S.C. § 114(b)

---

**GREGORY G. KATSAS**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**SCOTT R. DAMELIN**
**Commercial Litigation Branch**
**U.S. Department of Justice**
**Attn: Classification Unit,**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 305-2312**
**Fax: (202) 307-2503**

**OF COUNSEL:**
**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**MARIAN E. SULLIVAN**
**Senior Trial Counsel**

**JOSEPH E. ASHMAN**
**STEPHEN FINN**
**SHARON SNYDER**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**

**August 29, 2008**

**Attorneys for Defendant**

TABLE OF CONTENTS

PAGE


TABLE OF AUTHORITIES. . . . . . . . . . . ii

INDEX TO APPENDIX. . . . . . . . . . . iv

SUMMARY OF ARGUMENT. . . . . . . . . . . 1

DISCUSSION. . . . . . . . . . . 2

I. CONSUMERS DID NOT DEFEAT THE GOVERNMENT'S ARGUMENT THAT ENP CLAIMS AN INTEREST IN THE PRESENT CASE AND THAT THE FAILURE TO JOIN ENP WOULD CAUSE SUBSTANTIAL RISK TO THE GOVERNMENT OF DUPLICATIVE DAMAGES OR INCONSISTENT OBLIGATIONS OR THAT, IN THE ALTERNATIVE, BINDING NOTICE IS APPROPRIATE IN THIS CASE. . . . . . . . . . . 2

A. Pursuant To RCFC 19, ENP Claims An Interest Related To the Subject Matter Of This Case. . . . . . . . . . . 2

B. ENP's Interests Related To The Subject Matter Of This Case Meet The Requirement For Binding Notice. . . . . . . . . . . 8

C. The Asset Sale Agreement Does Not Protect The Government From Duplicative Or Inconsistent Obligations. . . . . . . . . . . 9

II. THE ACTIVITIES IN RELATED SNF CASES SUPPORTS THE GOVERNMENTS ARGUMENT FOR JOINDER IN THIS CASE. . . . . . . . . . . 10

III. JOINDER OR BINDING NOTICE WOULD NOT CAUSE CONSUMERS TO BE "SEVERELY PREJUDICED". . . . . . . . . . . 12

CONCLUSION. . . . . . . . . . . 13

# TABLE OF AUTHORITIES

CASES PAGE(S)

Angst v. Royal Maccabees Life Ins. Co.,
77 F.3d 701 (3d Cir. 1996)........................................................ 11

Boston Edison Co. v. United States,
67 Fed. Cl. 63 (2005). ........................................................ passim

Consumers Energy Co. v. United States,
65 Fed. Cl. 364 (2005). ........................................................ 4

Entergy Nuclear Indian Point 2, LLC v. United States,
64 Fed. Cl. 798 (2005). ........................................................ 11

Lowry Economic Redevolopment Authority v. United States,
71 Fed. Cl. 549 (2006). ........................................................ 12

Marrero Enterprises of Palm Beach Inc. v. Estefan Enterprises, Inc.,
2007 WL 4218990 (S.D. Fla. 2007)........................................................ 12

Martin v. Wilks,
490 U.S. 755 (1989)........................................................ 10

Pacific Gas & Electric Co. v. United States,
2008 WL 3089272 (Fed. Cir. August 7, 2008). ........................................................ 10

Rochester Gas and Elec. Corp. v. United States,
65 Fed. Cl. 431 (2005). ........................................................ 4, 6

Sacramento Municipal Utility District v. United States,
2008 WL 3539880 (Fed. Cir. August 7, 2008). ........................................................ 11

Thunder Basin Coal Co. v. Southwestern Public Service Co.,
104 F.3d 1205 (10th Cir. 1997). ........................................................ 9

United Keetoowah Band of Cherokee Indians of Okla. v. United States,
480 F.3d 1318 (Fed. Cir. 2007)........................................................ 3, 6

Vermont Yankee Nuclear Power Corp. v. United States,
73 Fed. Cl. 236 (2006). ........................................................ 4

Yankee Atomic Elec. Co. v. United States,
2008 WL 3089032 (Fed. Cir. Aug. 7, 2008)........................................................ 3

TABLE OF AUTHORITIES (Cont'd)

STATUTES/RULES PAGE(S)

41 U.S.C. § 114(b). .......... passim

10 C.F.R. § 961.11. .......... 3, 5

48 Fed. Reg. 5457. .......... 5

Fed. R. Civ. P. 14. .......... 9

Fed R. Civ. P. 19. .......... 9

R. Ct. Fed. Cl. 14. .......... passim

R. Ct. Fed. Cl. 19. .......... passim

R. Ct. Fed. Cl. 20. .......... 6

R. Ct. Fed. Cl. 25. .......... 6

MISCELLANEOUS

22 A.L.R. Fed. 765 (1975). .......... 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONSUMERS ENERGY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 02-1894C<br>(Chief Judge Damich) |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JOINDER OF ENTERGY NUCLEAR PALISADES, LLC, OR, IN THE ALTERNATIVE, FOR ISSUANCE OF BINDING NOTICE PURSUANT TO RCFC 14(b) AND CONTRACT SETTLEMENT ACT, § 14(b), 41 U.S.C. § 114(b)

Defendant, the United States, respectfully submits this reply to the response submitted by plaintiff, Consumers Energy Company ("Consumers"), dated July 31, 2008, to the Government's motion to join Entergy Nuclear Palisades, LLC ("ENP"), as a party in this case or, in the alternative, to issue ENP binding notice pursuant to RCFC 14(b) and Contract Settlement Act § 14(b), 41 U.S.C. § 114(b).

SUMMARY OF ARGUMENT

In its response to the Government's motion for joinder or, in the alternative, binding notice pursuant to RCFC 14(b) and 41 U.S.C. § 114(b), Consumers did not overcome the Government's showing that ENP has an interest related to the subject matter of this case. ENP is the present holder of the Standard Contract at issue in this litigation, which has been partially assigned to ENP by Consumers. The Asset Sale Agreement distributed the rights and duties of the Standard Contract and this litigation between Consumers and ENP, including payment of the one-time fee and a $30 million payment to ENP for "post-Closing damages" that ENP claims as present damages in this litigation. Therefore, ENP has an interest in the subject matter of this

litigation sufficient to meet the requirements of RCFC 19(a)(2) for joinder and RCFC 14(b) and 41 U.S.C. § 114(b) for issuance of binding notice.

Consumers also failed to defeat the Government's argument that failure to join ENP would leave the Government at substantial risk of duplicative or inconsistent obligations. Although, Consumers argues that the Asset Sales Agreement protects the Government, it does not explain or demonstrate how the Government is protected and how ENP would be bound in future litigation if ENP is not joined to this case.

Finally, Consumers' reliance on decisions regarding consolidation in other SNF cases fails because, in those cases, either the Court has since granted joinder, the cases were consolidated because of the same or similar concerns that the Government set forth in its motion for joinder here, and joinder is mandatory while consolidation is only discretionary.

## DISCUSSION

## I. CONSUMERS DID NOT DEFEAT THE GOVERNMENT'S ARGUMENT THAT ENP CLAIMS AN INTEREST IN THE PRESENT CASE AND THAT THE FAILURE TO JOIN ENP WOULD CAUSE SUBSTANTIAL RISK TO THE GOVERNMENT OF DUPLICATIVE DAMAGES OR INCONSISTENT OBLIGATIONS OR THAT, IN THE ALTERNATIVE, BINDING NOTICE IS APPROPRIATE IN THIS CASE

### A. Pursuant To RCFC 19, ENP Claims An Interest Related To the Subject Matter Of This Case

Throughout its response brief, Consumers argues that ENP does not claim an interest relating to the subject matter of this action. However, Article 6.14 of the Asset Sale Agreement, "Standard Spent Fuel Disposal Contract; *Spent Nuclear Fuel Litigation*" (emphasis added), and Consumers' claim evidence ENP's interest in the present litigation sufficient to meet the

requirement of RCFC 19(a)(2). A. 6-7, 93-95.[1] The requirement under RCFC 19 that a party must "claim an interest" is not limited, as Consumers argues, to affirmative pronouncements before this Court:

> The courts generally construe "claims an interest" as though it read "has an interest," without discussion of the difference, if any. Since an absentee obviously cannot make "claims" in the action itself, the word no doubt refers to the claims he might make on the basis of the actual interests he has, within the knowledge of the parties before the court, which suggests to them or to the court the possibility of prejudice to him or them. It thus appears that the absentee must be one who "has an interest," before he can be considered one who "claims and interest," which would require a determination as to the necessity of his joinder within the Rule.

J. Rydstrom, Annotation, Who must be joined in action as person "needed for just adjudication" under Rule 19(a), Federal Rules of Civil Procedure, 22 A.L.R. Fed. 765, 794 (1975); see also United Keetoowah Band of Cherokee Indians of Okla. v. United States, 480 F.3d 1318, 1326 (Fed. Cir. 2007) ("Thus, the proper analysis to determine whether an absent party *has an 'interest'* under Rule 19(a)(2) . . . must begin by correctly characterizing the pending action[.]") (emphasis added).

ENP has three interests in the present litigation. First, ENP has an interest in the determinations of this Court related to assignment of the Standard Contract and the obligation under the Standard Contract to pay the one-time fee.[2] 10 C.F.R. § 961.11, Art. VIII.A.2; A. 93

---

1/ "A. ___" is a reference to the appendix attached to the Government's motion for joinder or, in the alternative, for issuance of binding notice dated June 25, 2008.

2/ The Government is aware that the United States Court of Appeals for the Federal Circuit recently addressed the related issue as to whether a utility must pay the one-time fee in light of the Government's delay in the acceptance of SNF. Yankee Atomic Elec. Co. v. United States, 2008 WL 3089032 (Fed. Cir. Aug. 7, 2008). Notwithstanding the fact that the Yankee Atomic decision is not final and is subject to resolution of any petitions for rehearing or other requests for

(Asset Sale Agreement Art. 6.13). Second, ENP has an interest in Consumers' claim for the $30 million Big Rock ISFSI payment, described in the Asset Sale Agreement as "post-Closing *damages*." A. 94 (Asset Sale Agreement, Art. 6.14(d) (emphasis added)). Third, ENP has an interest in the Court's interpretation of the *sole* Standard Contract at issue in this case because, assuming the validity of the assignment, it is now in privity with the Government as the present holder of the same contract.

The validity of the assignment of the Standard Contract from Consumers to ENP and the effect of that assignment on the obligation to pay the one-time fee are interests of ENP because ENP will "gain or lose" by the direct legal effect of the Court's determination on those issues. Unlike the assignments in Rochester Gas and Elec. Corp. v. United States, 65 Fed. Cl. 431 (2005), and Vermont Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236 (2006), DOE affirmatively objected to the assignment of the Standard Contract from Consumers to ENP. A. 103-04. DOE specifically objected that the assignment "must be an assignment of all outstanding rights and duties under the contract" and that the obligation to pay the one-time fee must be transferred. Id. (emphasis in the original). DOE's interpretation of the intent of the assignments provision of the Standard Contract is supported by documents produced by Consumers in this litigation from the time of contract formation. In internal correspondence dated February 23, 1983, related to the proposed Standard Contract, a Consumers employee

---

further review, the Federal Circuit did not address the one-time fee issue under the circumstances presented in this case where the one-time fee was retained by the seller when it assigned the Standard Contract, an assignment to which the Department of Energy objected. A. 105-04. Further, the Government is currently evaluating the effect of the decision in Yankee Atomic on this Court's April 29, 2005 opinion, Consumers Energy Co. v. United States, 65 Fed. Cl. 364, 373 (2005).

noted that "Article XV appears to permit assignment of contract rights and duties only when title to all of the SNF and HLW covered by the agreement is transferred with notice to DOE. *I suspect that it was intended to permit (require?) all of the Purchaser's rights and duties under the contract respecting any or all of the SNF and/or HLW covered by the contract to be transferred with title to the particular SNF and/or HLW in question.*"[3] Supp. A. 18 [4] (Internal Consumers Power Company corresponded from JLBacon to ERVanHoof dated February 23, 1983).

Consumers also argues that, because its claim is temporally distinct from ENP's, the partial assignment and one-time fee are irrelevant. Pl. Resp. 8, 10-12. To the contrary, because of Consumers' partial assignment of the Standard Contract to ENP (and assuming its validity), the Government presently would be subject to suits by both Consumers and ENP. ENP's right to future performance by DOE is conditioned by Consumers' retention of the presently unfulfilled obligation to pay the one-time fee. Consumers' argument regarding a clean temporal break

---

3/ The assignments provisions of the proposed Standard Contract and final Standard Contract are substantially the same. Article XV, Assignments, of the proposed Standard Contract reads:

> The rights and duties of a party to this contract may be assignable with transfer of title to the SNF and/or HLW involved; *provided, however*, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

Supp. A. 9 (Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 5457, 5465 (Feb. 4, 1983) (emphasis in the original)). The only modification in the final Standard Contract was the substitution of "the Purchaser" for "a party to this contract." 10 C.F.R. § 961.11, Art. XIV.

4/ "Supp. A. ___" is a reference to the attached supplemental appendix.

related to damages is at odds with how the Asset Sale Agreement interweaves the rights and obligations of the Standard Contract between Consumers and ENP.

Consumers' reliance on Rochester Gas and Elec. Corp. to support its argument that the partial assignment is irrelevant is severely undermined by the fact that the Court joined the assignee, Ginna, LLC, and assignor, Rochester Gas and Electric, under RCFC 20(a) and 25(a).[5] Rochester Gas and Elec. Corp., 65 Fed. Cl. at 442-43. Because the validity of the partial assignment of the Standard Contract and the obligation to pay the one-time fee are within the subject matter of this action, ENP has an interest because it will "gain or lose by the direct legal operation and effect" of this Court's decision on the validity of the assignment and its effect on damages claimed in this case. United Keetoowah Band, 480 F.3d at 1324.

The $30 million payment is another interest of ENP's related to the subject matter of this action. Contrary to plaintiff's assertions that the $30 million payment is a claim for past damages and that its claim is, therefore, temporally distinct from ENP's, Pl. Resp. 9, 13, the Asset Sale Agreement states that the $30 million payment is for "*post-Closing damages*." A. 94 (Asset Sale Agreement, Art. 6.14(d) (emphasis added)). Therefore, Consumers' assertion is directly contradicted by the terms of the Asset Sale Agreement. Further, Mr. Stephen Wawro, Consumers' leader of the sale team for Palisades and Big Rock Point, admitted that the costs underlying the $30 million dollar payment were "for future costs that Entergy would be incurring . . . on a daily basis after closing." Supp. A. 25 (Deposition of Mr. Stephen Wawro at 104:5-

---

5/ In addition, the Court has partially consolidated Vermont Yankee Nuclear Power Corp. and Entergy Nuclear Vermont Yankee. Supp. A. 55-56 (Vermont Yankee Nuclear Power Corp. v. United States, No. 02-898C (Fed. Cl.) and Entergy Nuclear Vermont Yankee, LLC, et at., v. United States, No. 03-2663 (Fed. Cl.) Consolidation Order dated 16, 2006).

105:17). Mr. John Reed, the financial advisor and auction manger for the Palisades and Big Rock Point sale, testified that the $30 million payment was for "the costs the new owner of Big Rock Point would get–would incur to maintain and operate the ISFSI." He also testified that the calculation of the $30 million amount for purposes of ENP's damages was not resolved by the Asset Sale Agreement:

> Q. And how is that amount in excess of the Big Rock amount to be determined?
>
> A. I think that's a question of how one calculates damages going down the road, whether you use a present value determination or whether you use a nominal dollar determination. And we didn't want to constrain Entergy and their approach to quantifying and pressing for damages – so we left that issue just as drafted.

Supp. A. 35-36 (Deposition of Mr. John Reed at 78:12-19; 175:22-8). Therefore, not only does the Asset Sale Agreement and testimony of Consumers' witnesses demonstrate that ENP has an interest in the subject matter of this action, Mr. Reed admitted that the point at which the $30 million payment ends and ENP's claim begins was left intentionally undefined at the time of sale. As a result, ENP stands to gain by legal operation of a judgment in this case that may award Consumers $30 million in "post-Closing damages," yet does not define when ENP's right to damages begins, creating a substantial risk of duplicative or inconsistent obligations for the Government.

Finally, ENP also has an interest in this Court's interpretation and determinations related to the Standard Contract for Palisades and Big Rock Point and the partial assignment in the Asset Sale Agreement. ENP is presently in privity with the Government on the Palisades and Big Rock

Point Standard Contract at issue in this case. Because future damages claims by ENP will share some mixed questions of law and fact in common with Consumers' present claim, ENP has an interest in the subject matter of this case. Boston Edison Co. v. United States, 67 Fed. Cl. 63, 66 (2005) (cases likely for consolidation because they share mixed questions of law and fact).

Further, Consumers' unsupported representation that ENP opposes the Government's motion (Pl. Resp. 7) and argument that ENP's failure to intervene (id.) demonstrates that ENP does not claim an interest related to this litigation are irrelevant to the determination of whether ENP has an interest in this case. ENP's absence from this litigation and the fact that it has not yet filed a claim before the Court demonstrate not ENP's lack of interest but, rather, that ENP is electing to protect its own interest by staying absent from this litigation so that it will not be bound by this Court's decision in the present matter, an election that puts the Government at substantial risk of duplicative or inconsistent obligations.

B. ENP's Interests Related To The Subject Matter Of This Case Meet The Requirement For Binding Notice

Consumers repeats its argument that ENP lacks an interest in the subject matter of this action in its argument against binding notice under RCFC 14(b) and 41 U.S.C. § 114(b). However, the interest requirements under RCFC 14 and 41 U.S.C. § 114(b) are comparatively less stringent than RCFC 19(a). RCFC merely requires that a party "appear" to have an interest, and 41 U.S.C. § 114(b) requires that a third party have a "possible interest" in "any suit or proceeding." For the reasons set forth above, the Government has established not only that ENP "claims" an interest under RCFC 19(a)(2), but that ENP also "appears" to have, or "possibly" has, an interest related to the subject matter of this case. Further, the Government's pursuit of its

right to have binding notice issued to ENP does not circumvent joinder, but, rather, supports the Government's argument that ENP is a necessary party. See Thunder Basin Coal Co. v. Southwestern Public Service Co., 104 F.3d 1205, 1212 (10th Cir. 1997) (party that foregoes its right to implead third party under Fed. R. Civ. P. 14 belies its claim of indispensability under Fed. R. Civ. P. 19(a)).

C. The Asset Sale Agreement Does Not Protect The Government From Duplicative Or Inconsistent Obligations

Consumers argues that the Government is not in danger of duplicative or inconsistent obligations, RCFC 19(a)(2)(ii), because the $30 million payment is for past damages and the Asset Sale Agreement protects the Government. Pl. Resp. 12-14. Consumers also asserts, without any support, that the Government may be a third party beneficiary of the Asset Sale Agreement. Pl. Resp. 13 n.3. Consumers further argues against the Government's concerns that the Standard Contract and assignment be construed consistently, citing to Boston Edison Co. v. United States, 67 Fed. Cl. 63, 66 (2005).

As discussed above, Consumers' temporal distinction related to the $30 million payment fails because the Asset Sale Agreement specifically states that the $30 million payment is for "post-Closing damages." Therefore, Consumers' claim includes costs for SNF storage that, by definition, have been, and will be, incurred after the sale of Palisades and Big Rock Point in April 2007.

Regarding the argument that the Government is protected by the Asset Sale Agreement, the Government is not a party to the Asset Sale Agreement. Further, regarding the Asset Sale Agreement as a defense in any future actions brought by ENP, the Government's assertion of a

defense under the Asset Sale Agreement in any future claim brought by ENP would be futile because the decision on damages in the present case would be final and not binding on ENP. Martin v. Wilks, 490 U.S. 755, 762 (1989) ("A judgment . . . to a lawsuit . . . does not conclude rights of strangers to the proceedings"). Indeed, counsel for Entergy Nuclear Indian Point, LLC, recently argued on a similar motion in Consolidated Edison Co. of New York, Inc. v. United States, No. 04-0033C (Fed. Cl.) that "[t]here's another problem . . . and that is absent full joinder, I would respectfully submit that *we would not be bound* by any appeal that's taken in the ConEd case." Supp. A. 48 (Hearing transcript in Consolidated Edison Co. of New York v. United States dated August 22, 2008 at 36:5-8). Entergy's assertions of not being bound by a final judgment in a case to which it has not been joined underscores the hollowness of Consumers' argument on this point.

Finally, Consumers' argument against the need for consistent interpretation of the Standard Contract and its citation to Boston Edison Co. (Pl. Resp. 13-14) ignores the Court's determination in that case to consolidate two SNF cases because it "offers the best prospect of avoiding inconsistent judgments." Boston Edison Co., 67 Fed. Cl. at 67.

## II. THE ACTIVITIES IN RELATED SNF CASES SUPPORT THE GOVERNMENTS ARGUMENT FOR JOINDER IN THIS CASE

Consumers argues that this Court's decisions on the Government's previous motions to coordinate the SNF litigation or consolidate certain SNF cases supports its opposition to the Government's motion for joinder or binding notice in this case.[6] Pl. Resp. 15-17. However, the

[6] On August 21, 2008, pursuant to RCFC 40.2, the Government filed a copy in this case of its motion in Florida Power and Light Co. v. United States, No. 98-483C (Fed. Cl.), for coordinated discovery and development of a litigation plan in light of the United States Court of Appeals for the Federal Circuit's decisions Yankee Atomic Elec. Co., Pacific Gas & Electric Co.

present motion is quite different from the Government's prior motions because, in this case, the Government requests joinder of ENP because of the substantial risk of duplicative or inconsistent obligations if ENP is not bound by the Court's decision in this case. Joinder is distinct from the Government's past requests for coordination and consolidation in that joinder is mandatory if the requirements of RCFC 19 are met, as the Government has demonstrated they are in this case. See Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 706 (3d Cir. 1996).

Additionally, the individual SNF cases upon which Consumers relies do not support its argument. Consumers primarily relies upon this Court's decision in Entergy Nuclear Indian Point 2, LLC v. United States, 62 Fed. Cl. 798 (2004), regarding consolidation. However, on August 22, 2008, this Court joined Entergy Nuclear Indian Point 2, LLC with Consolidated Edison Co. of New York, Inc. v. United States, No. 04-0033C (Fed. Cl.). In granting the Government's motion, the Court stated:

> I do conclude based upon a plain reading of Rule 19 that there is a substantial risk to the Defendant from these claims and possibly being found liable for double or multiple amounts of damages, that would not be proper . . . What makes the current status different from what we've had before in this case is that motions to consolidate, of course are discretionary to the Court, and I believe Rule 19 is mandatory. And having found that there is a substantial risk, I think I have no choice but to join the matters for further proceedings.

---

v. United States, 2008 WL 3089272 (Fed. Cir. Aug. 7, 2008), and Sacramento Municipal Utility District v. United States, 2008 WL 3539880 (Fed. Cir. Aug. 7, 2008). This most recent motion is consistent with the Government's past good faith efforts for efficient and effective resolution of the SNF cases pending before this Court. Further, it should not affect our motion for joinder here given that it relates only to the coordination of discovery and because, since ENP does not presently have a case pending before the Court, the coordinated discovery motion would not affect ENP.

Supp. A. 52 (Hearing transcript in Consolidated Edison Co. of New York v. United States, dated August 22, 2008, at 50:18-51:15). The distinction that joinder is mandatory made by the Court in Consolidated Edison also undermines Consumers' reliance on the Court's order regarding transfer in Constellation Generation Group, LLC, et al. v. United States, No. 04-0068C (Fed. Cl.), and decision regarding consolidation in Boston Edison, 67 Fed. Cl. at 63.

## III. JOINDER OR BINDING NOTICE WOULD NOT CAUSE CONSUMERS TO BE "SEVERELY PREJUDICED"

Consumers failed to provide any substantive justification for its broad claim that it would be "severely prejudiced" by joinder of ENP or issuance of binding notice. Pl. Resp. 14. As an initial matter, there is no "prejudice to the plaintiff" element in evaluating requests under RCFC 19, RCFC 14, or Section 14(b) of the Contract Settlement Act, 41 U.S.C. § 114(b). To the contrary, where only one of the criteria in RCFC 19(a) exists, joinder is mandatory. Additionally, there is no requirement under RCFC 19 that ENP bring its claims if joined. Pl. Resp. 14. "RCFC 19 'does not mandate that all claims relating to an action be resolved in one proceeding.'" Lowry Economic Redevolopment Authority v. United States, 71 Fed. Cl. 549, 550 (2006) (citations omitted). Further, RCFC 19 does not contain a time limitation. Regardless of when a motion for joinder is filed, the Court is obligated under RCFC 19 to consider whether the party to be joined is a necessary party. Marrero Enterprises of Palm Beach Inc. v. Estefan Enterprises, Inc., 2007 WL 4218990 (S.D. Fla. Nov. 29 2007). Finally, Entergy is not a complete newcomer to this case. The Government has deposed six witnesses who are current Entergy employees, and who were represented by Entergy's counsel at the depositions,[7] and the

---

7/ A seventh Entergy employee is currently scheduled to by deposed on September 9, 2008.

Government has subpoenaed from Entergy documents related to the Asset Sale Agreement and sale of Palisades and Big Rock Point. Accordingly, Consumers' claim of prejudice is irrelevant and unsupported.

CONCLUSION

For the reasons outlined above and in our motion, the Government respectfully requests that the Court join ENP to this case or, in the alternative, issue ENP binding notice.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Scott R. Damelin by Stephen Finn
SCOTT R. DAMELIN
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-2312
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

MARIAN E. SULLIVAN
Senior Trial Counsel

JOSEPH E. ASHMAN
STEPHEN FINN
SHARON SNYDER
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

August 29, 2008

# APPENDIX

federal register

Friday
February 4, 1983

## Part IV

# Department of Energy

**Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste**

DEPARTMENT OF ENERGY

10 CFR Part 961

## Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste

AGENCY: Energy.

ACTION: Notice of proposed rulemaking.

SUMMARY: This notice publishes for comment a proposed standard contract to be used by the Department of Energy (DOE) in furnishing disposal services to the owners or generators of spent nuclear fuel and/or high-level radioactive waste and DOE's proposed procedures designed to implement section 302 of the Nuclear Waste Policy Act of 1982. Section 302 generally requires DOE and the owners or generators of spent nuclear fuel and/or high-level radioactive waste to execute, by June 30, 1983, a contract under which DOE will accept and dispose of such material. This rulemaking will have the effect of developing the contractual terms and conditions under which DOE will make available nuclear waste disposal services.

DATES: Written comments must be submitted on or before March 7, 1983. A hearing will be held in Washington, D.C. on March 3, 1983 at 9:30 a.m.

ADDRESS: Written comments and requests to appear at the hearing should be addressed to Robert Morgan, Project Director Nuclear Waste Policy Act Project Office, Department of Energy, 1000 Independence Avenue, S.W., Room 7B-084; Washington, DC 20585, (202) 252-6842.

Comments on the information collection requirements contained in the proposed contract should also be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503, Attention: Mr. Jeff Hill.

The hearing will be held in the Forrestal Building, 1000 Independence Avenue, S.W., Room GE-087, the DOE Auditorium.

FOR FURTHER INFORMATION CONTACT:
Robert Rosselli, Office of Terminal Waste Disposal and Remedial Action, Department of Energy, Room 7B-084, Washington, DC 20585, (202) 252-8728.
James Cavanagh, Office of Policy, MA 931.1, Procurement and Assistance, Management Directorate, Department of Energy, Room 8H-057, Washington, DC 20585, (202) 252-8188.
Elliot Winnick, Office of General Counsel, Department of Energy, Room 6B-190, Washington, DC 20585, (202) 252-1526.

SUPPLEMENTARY INFORMATION:

I. Legislative Background
II. Proposed Rule
III. Comment Procedures
A. Written Comments
B. Public Hearing
IV. Procedural Requirements
A. Executive Order 12291
B. Regulatory Flexibility Act
C. National Environmental Policy Act
D. Paperwork Reduction Act

## I. Legislative Background

The Nuclear Waste Policy Act of 1982 (the "Act", Pub. L. 97-425, 96 Stat. 2201 *et seq.*, to be codified at 42 U.S.C. 10101 *et seq.*, January 7, 1983), provides a comprehensive framework for disposing of spent nuclear fuel (SNF) and high-level radioactive waste (HLW), of domestic origin, generated by civilian nuclear power reactors. In general, the Act establishes procedures for selecting and developing repositories for SNF and HLW, authorizes the establishment of such repositories, provides a mechanism for financing the cost of disposal of such fuel and waste, and sets forth other provisions relating to nuclear waste disposal.

The key concept in the statutory financing mechanism is that owners and generators of SNF and/or HLW are required to bear the full cost of nuclear waste disposal activities by paying fees into the Nuclear Waste Fund established by the act. This fund, which will be administered by the Secretary of the Treasury, will be used to pay for, among other things, selecting, developing, and constructing repositories, transporting the material, and disposing of it.

More specifically, the fees may be used for the following purposes:

(1) The identification, development, licensing, construction, operation, decommissioning, and post-decommissioning maintenance and monitoring of any repository, monitored, retreivable storage facility or test and evaluation facility constructed under the Act;

(2) The conduct of nongeneric research, development, and demonstration activities under the Act;

(3) The administrative cost of the radioactive waste disposal program;

(4) Any costs that may be incurred by DOE in connection with the transportation, treatment, or packaging of spent nuclear fuel or high-level radioactive waste to be disposed of in a repository, to be stored in a monitored, retrievable storage site, or to be used in a test and evaluation facility;

(5) The costs associated with acquisition, design, modification, replacement, operation, and construction of facilities at a repository site, a monitored, retrievable storage site or a test and evaluation facility site and necessary or incident to such repository, monitored, retrievable storage facility or test and evaluation facility; and

(6) The provision of assistance of States, units of general local government, and Indian tribes under sections 116, 118 and 219 of the Act.

To implement section 302 of the Act, this Federal Register notice proposes a new Part 961 to Title 10 of the Code of Federal Regulations. This new part will consist of the terms and conditions of the contracts which are authorized by the Act and the procedures associated with executing such contracts. The proposed standard contract is more fully described in Section II, Proposed Rule, below.

The proposed standard contract would establish the rights and duties of the U.S. Department of Energy (DOE) and the owners and generators of SNF and HLW. The Act authorizes DOE to enter into contracts with owners or generators of SNF and HLW and strongly encourages these owners and generators to enter into such contracts. The proposed contract terms will cover transfer of title to DOE, transportation, and disposal of civilian SNF and HLW of domestic origin and procedures for collection and payment of fees for such services, as provided by the Act. Revenues derived from such activities will be deposited into the Nuclear Waste Fund as provided in the Act. The Act directs DOE to begin repository operations no later than January 31, 1998.

Section 302 of the Act contains two provisions which demonstrate the importance which the Act places on this contract. Section 302(b)(1)(A) provides that the Nuclear Regulatory Commission shall not issue or renew a license to any person to use a utilization or production facility under the authority of section 103 or 104 of the Atomic Energy Act of 1954 (42 U.S.C. 2133, 2134) unless (1) such person has entered into a contract for DOE's disposal services, or (2) the Secretary of Energy affirms in writing that such person is actively and in good faith negotiating with the Secretary for a contract for those services.

Furthermore, section 302(b)(2) of the Act specifies that, "Except as provided in paragraph [302(b)(1)]", no civilian SNF or HLW may be disposed of by DOE in any repository constructed under the Act unless the owner or generator of that material has entered into a contract for disposal with the Secretary by not later than (1) June 30, 1983, or (2) the date on which the owner

or generator takes title to, or begins generation of, such spent fuel or waste, whichever is later. DOE has interpreted the phrase, "except as provided in paragraph 1," to extend to paragraph 2 the provision which allows the Secretary to affirm in writing that an owner or generator is actively negotiating in good faith. Accordingly, while this affirmation is in effect, application of paragraph 2, which precludes disposal of SNF or HLW in the absence of a timely executed contract, is deferred. In other words, DOE is interpreting section 302(b)(2) of the Act to mean that the June 30, 1983 deadline for executing a contract does not apply if the Secretary affirms in writing that the owner or generator is actively and in good faith negotiating a contract for DOE's disposal services.

DOE determined that it would be most appropriate to develop this proposed standard contract through rulemaking because this process presents the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which will be used in DOE's nuclear waste disposal activities. Although DOE recognizes that some situations may require special contractual provisions, DOE intends to develop and use, to the maximum extent practicable, a standard contract to specify the rights and duties of the parties.

## II. Proposed Rule

The purpose of this new Part 961, as indicated in § 961.1, is to establish a standard contract that will be used to provide DOE's nuclear waste disposal services to a Purchaser. The term "Purchaser" is defined in § 961.3.

Proposed § 961.2 relates to applicability and describes who is covered by the part. A critical feature of this section is that to have SNF or HLW disposed of in DOE's repository, an owner or generator of such nuclear fuel or waste must execute a contract with DOE by June 30, 1983, or by the date on which an owner or generator begins generating or takes title to such fuel or waste. In DOE's interpretation, section 302(b)(2) of the Act allows these deadlines to be waived if the Secretary of Energy affirms in writing that the owner or generator is actively and in good faith negotiating for a contract covered by this part.

Proposed § 961.3 sets forth pertinent definitions and incorporates the more extensive list of definitions contained in Article II of the contract which is found in § 961.11.

Proposed § 961.4 provides for deviations from the proposed rule as well as from the contract which is found at § 961.11. DOE has included this provision because special circumstances may exist or arise that would warrant a departure from the rule or standard contract. As mentioned above, however, DOE intends to use the rule and standard contract unless special circumstances are found and the proposed deviation procedures are followed.

Proposed § 961.5 specifies that Federal agencies which require DOE's nuclear waste disposal services shall enter into an interagency agreement which commits those agencies to the terms and conditions, including the fee schedules, contained in the proposed standard contract.

Proposed § 961.11 sets forth the standard contract that DOE and owners and generators of SNF and/or HLW will execute for the disposal of such fuel or waste, as follows:

*Recitals*—Identifies the signatory parties, sets forth the underlying purposes of the contract, and cites the pertinent statutory authorities.

*Article I—Definitions*—Gives definitions for the terms used in the contract. Wherever possible, definitions contained in Section 2 of the Act are used in the contract.

*Article II—Scope*—Provides that the contract is for the sale of disposal services by DOE to a Purchaser. DOE will accept SNF and/or HLW from civilian nuclear power reactors and begin disposing of it before January 31, 1998. In exchange for these services, Purchasers will pay fees established in the contract.

*Article III—Term*—Specifies that the contract will take effect upon execution and will continue until DOE has accepted all SNF and/or HLW from Purchaser.

*Article IV—Delivery of SNF and/or HLW*—Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

*Article V—Responsibilities of the Parties*—Sets forth the Purchaser's obligations, including the furnishing of an annual forecast of delivery, preparation for transportation of the SNF and/or HLW to be delivered; and DOE's obligations including reviewing Purchaser's delivery commitment schedules, providing all necessary transportation of the SNF and/or HLW to the DOE disposal facility, issuing an annual acceptance ranking for receipt of such waste material, and providing pertinent information to Purchaser on DOE's waste disposal program.

*Article VI—Criteria for Disposal*—Sets forth the requirement for accurate and detailed technical descriptions of the fuel to be provided to DOE by the Purchaser. DOE will verify the Purchaser's information prior to acceptance. If DOE determines, either prior to or subsequent to acceptance, that the Purchaser has improperly described spent fuel and waste, the Purchaser is required to take specified corrective measures.

*Article VII—Title*—Title to all SNF and/or HLW will pass to DOE when DOE accepts the spent fuel or waste, in accordance with Article VI, for transportation to DOE's repository. After title passes, the Purchaser has no rights to the spent fuel or waste and no claims against the Government related to it.

*Article VIII—Fees and Terms of Payment*—The fees to be paid by Purchaser are specified, including a fee for electricity generated on or after April 7, 1983 (one mil per kilowatt hour) and a one-time fee for fuel used prior to April 7, 1983. The method of paying fees is described and there are provisions for interest charges on late or unpaid fees.

There are three alternatives for the calculation of the one-time fee for existing spent fuel other than the method provided in Article VIII of the contract. The other three alternatives are as follows:

(1) Determining the average burnup of all discharged fuel prior to April 7, 1983, calculating the dollar per kilogram for that average burnup equivalent to one mil per kilowatt hour, and applying that dollar per kilogram charge to all discharged fuel; or

(2) Using the following formula, calculate the fees to be paid by the Purchaser under this contract:

$$\left(\frac{1 \text{ Mill}}{\text{KW-HR}}\right)\left(\frac{\$1}{1000 \text{ Mills}}\right)\left(\frac{1 \text{ MWe}}{3 \text{ MWth}}\right)\left(\frac{1 \text{ MTU}}{1000 \text{ Kg}}\right)\left(\frac{24 \text{ Hrs}}{1 \text{ Day}}\right)\left(\frac{1000 \text{ KWe}}{1 \text{ MWe}}\right)(X) = \frac{\$}{\text{Kg}}$$

or $.008\,(X) = \$\frac{\quad}{\text{Kg}}$.

where X = the burnup of each assembly in $\frac{\text{MWth Days}}{\text{MTU}}$

a. Fuel Burnup data is used to determine a dollar per kilogram of heavy metal that is equivalent to one (1) mil per Kilowatt-hour.

b. The calculation shall be done on an individual assembly basis.

(3) Categorizing discharged fuel with less than 10,000 MWD/ton burnup as abnormal fuel and subjecting the cost for disposal of that fuel to the 1 mil/kilowatt-hour equivalent charge and subjecting the residual discharged fuel to an average dollar/KG charge such that the total fees collected are equivalent to 1 mil/kilowatt-hour.

*Article IX—Delays*—In the event of unavoidable delays by either party, notice is required; if the delays are avoidable, the party not responsible therefor is compensated by an adjustment to applicable charges and schedules.

*Article X—Suspension*—If the Purchaser fails to fulfill its contractual obligation, DOE may discontinue services, although the fee requirements will continue. If there is a national emergency, the DOE may suspend the waste disposal program, in which event fee payments will be abated or adjusted.

*Article XI—Remedies*—Expressly states that both parties are not precluded from asserting their rights under the contract or at law.

*Article XII—Notices*—Specifies the persons to whom and the manner in which notification required under the contract must be given.

*Article XIII—General Provisions*—Incorporates by reference Appendix H which contains general terms and conditions required in Government contracts.

*Article XIV—Representation Concerning Nuclear Hazards Indemnity*—Provides for indemnity agreements to be issued under the authority of the Atomic Energy Act of 1954, as amended, which will indemnify covered persons, including the Purchaser, against claims for public liability as defined in that Act in the event of nuclear incidents arising during transportation or at the repository site.

*Article XV—Assignment*—Provides, in accordance with the Act, that the Purchaser may assign its rights and duties under the contract, including the payment of fees, upon transfer of title to SNF and/or HLW, subject to notice to DOE.

*Article XVI—Entire Contract*—Identifies the contents of the contract (Articles I through XVI and Appendices "A" through "H"); and specifies that any and all prior contracts and representations with respect to the subject matter covered in the contract are superseded.

## III. Comment Procedures

A. *Written Comments.* Interested persons are invited to participate in this proposed rulemaking by submitting information, views, or proposed changes. Comments should be submitted no later than March 7, 1983 to the address indicated in the "ADDRESS" section of this notice and should be identified on the outside envelope and on the document with the designation: "Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste". Ten copies should be submitted.

All comments received will be available for public inspection in the DOE Reading Room, Room 1E-190, James Forrestal Building, 1000 Independence Avenue, SW., Washington, D.C. 20585, between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, except Federal holidays. Comments on the information collection requirements contained in the proposed contract should also be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503, Attention: Mr. Jeff Hill.

Any information or data considered confidential by the person furnishing it must be so identified and submitted in writing. DOE reserves the right to determine the confidential status of the information or data and to treat the information or data in accordance with its determination.

B. *Public Hearing.* A public hearing will be held on March 3, 1983 at 9:30 a.m. in the DOE Auditorium, Room GE-087, the Forrestal Building, 1000 Independence Avenue, SW., Washington, D.C. 20585. Requests to make an oral presentation at the hearing should be addressed to Robert Morgan, Project Director, Waste Policy Act Project Office, Department of Energy, Room 7B-084, Washington, D.C. 20585, (202) 252-6842, and should include a phone number where the requester may be contacted through the day before the hearing.

DOE reserves the right to limit the number of persons to be heard at the hearing, to schedule their presentations, and to establish the procedures governing the conduct of the hearing. The length of each presentation may be limited, based on the number of persons requesting to be heard.

Persons scheduled to appear at the hearing will be notified by DOE before 4:30 p.m. on February 23, 1983. You should submit 10 copies of your statement to the address given above for requests to speak before 4:30 p.m. on February 25, 1983.

A DOE official will be designated to preside at the hearing, which will not be adjudicative in nature.

Any further procedural rules required for the proper conduct of the hearing will be announced by the presiding officer.

Transcripts of the hearing will be made and the entire record of the hearing, including the transcripts, will be retained and made available for public inspection at the DOE Reading Room, Room 1E-190, Forrestal Building, 1000 Independence Avenue, SW., Washington, DC between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, except Federal holidays. Any person may purchase a copy of the transcript from the reporter.

## IV. Procedural Requirements

A. *Executive Order No. 12291.* Under Executive Order 12291 agencies are required to determine whether proposed rules are major rules as defined in the Order. DOE has reviewed this proposed rule and, after consultation with the Office of Management and Budget, has determined that it is not a major rule

because: it will not have an annual effect on the economy of $100 million or more; it will not result in a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; and it will not have significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises. While the money to be paid by members of the electric utility industry under the contracts that are the subject of this rule will exceed $100 million annually, and may even be considered a major cost to the industry, these costs would not be the result of this rule. The costs are the result of the need to dispose of spent nuclear fuel and/or high-level radioactive waste, a need recognized in the Nuclear Waste Policy Act of 1982. The particular provisions of this rule have little impact on the actual costs of disposal and certainly less than $100 million annually.

B. *Regulatory Flexibility Act.* In accordance with section 605(b) of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*, DOE finds that sections 603 and 604 of the said Act do not apply to this rule because, if promulgated, it will not have a significant economic impact on a substantial number of small entities. This finding is based on the fact that the parties to the contract, who will be owners or generators of spent nuclear fuel or high-level radioactive waste, are not small entities.

C. *National Environmental Policy Act.* Execution of the standard contract proposed in this rulemaking will not commit DOE to any specific activities not already prescribed by the Nuclear Waste Policy Act. Activities allowed under the Act will receive appropriate environmental review at the proper time, i.e., when such activities are proposed in accordance with the process established in the Act. Therefore, DOE has concluded that neither the proposed rulemaking nor the execution of the contracts gives rise to any action not already prescribed by the Act and, thus, is not a proposal for a major Federal action significantly affecting the quality of the human environment. Accordingly, preparation of either an environmental assessment or an environmental impact statement is not required.

D. *Paperwork Reduction Act.* In accordance with Section 3504(h) of the Paperwork Reduction Act of 1980 (Pub. L. 96-511), this proposed rule has been submitted to the Office of Management and Budget (OMB). Comments on the information collection requirements of this proposal should be submitted to both DOE and OMB as indicated in Section III.

**List of Subjects in 10 CFR Part 961**

Government contracts, Nuclear materials, Nuclear power plants and reactors, Radiation protection, Waste treatment and disposal.

For the reasons set out above, a new Part 961 of Chapter III of Title 10, Code of Federal Regulations, is proposed to be established as set forth below.

Issued in Washington, DC, January 31, 1983.

**Hilary J. Rauch,**

*Director, Procurement & Assistance Management Directorate.*

Title 10, Chapter III of the Code of Federal Regulations is proposed to be amended by adding a new Part 961, to read as follows:

## PART 961—STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

**Subpart A—General**

Sec.
961.1 Purpose.
961.2 Applicability.
961.3 Definitions.
961.4 Deviations.
961.5 Federal agencies.
961.6 [Reserved]
961.7 [Reserved]
961.8 [Reserved]
961.9 [Reserved]
961.10 [Reserved]

**Subpart B—Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste**

961.11 Text of the contract.

**Authority:** Section 644, Pub. L. 95-91, 91 Stat. 599 (42 U.S.C. 7254) and Sec. 302, Pub. L. 97-425, 96 Stat. 2257 (to be codified at 42 U.S.C. 10222).

### Subpart A—General

**§ 961.1 Purpose.**

This part establishes the contractual terms and conditions under which the Department of Energy (DOE) will make available nuclear waste disposal services to the owners and generators of spent nuclear fuel (SNF) and high-level radioactive waste (HLW) as provided in Section 302 of the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). Under the contract set forth in § 961.11 of this Part, DOE will take title to, transport, and dispose of spent nuclear fuel and/or high-level radioactive waste delivered to DOE by those owners or generators of such fuel or waste who execute the contract. In addition, the contract will specify the fees owners and generators of SNF and/or HLW will pay for these services. All receipts, proceeds, and revenues realized by DOE under the contract will be deposited in the Nuclear Waste Fund, an account established by the Act in the U.S. Treasury. This fund will pay for DOE's radioactive waste disposal activities, the full costs of which will be borne by the owners and generators under contract with DOE for disposal services.

**§ 961.2 Applicability.**

This part applies to the Secretary of Energy or his designee and any person who owns or generates spent nuclear fuel or high-level radioactive waste, of domestic origin, generated in a civilian nuclear power reactor. If executed in a timely manner, the contract contained in this part will commit DOE to accept title to, transport, and dispose of such spent fuel and waste. In exchange for these services, the owners or generators of such fuel or waste shall pay fees specified in the contract which are intended to recover fully the costs of the disposal services to be furnished by DOE. The contract must be signed by June 30, 1983, or by the date on which such owner or generator commences generation of, or takes title to, such spent fuel or waste, whichever occurs later. These deadlines may be waived if the Secretary of energy affirms in writing, in accordance with section 302(b)(1)(A)(ii) of the Act, before the applicable deadline, that the owner or generator is actively and in good faith negotiating with the Secretary for a contract covered by this part.

**§ 961.3 Definitions.**

For purposes of this part—

"Act" means the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 96 Stat. 2201 *et seq.* (to be codified at 42 U.S.C. 10101 *et seq.*).

"Contract" means the agreement set forth in § 961.11 of this part and any duly executed amendment or modification thereto.

"Generator" means any person who is licensed by the Nuclear Regulatory Commission to use a utilization or production facility under the authority of section 103 or 104 of the Atomic Energy Act of 1954 (42 U.S.C. 2133, 2134).

"Owner" means any person who has title to spent nuclear fuel or high-level radioactive waste.

"Purchaser" means any person, other than a Federal agency, who is licensed by the Nuclear Regulatory Commission to use a utilization or production facility under the authority of section 103 or 104 of the Atomic Energy Act of 1954 (42

HeinOnline -- 48 Fed. Reg. 5461 1983

U.S.C. 2133, 2134) or who has title to spent nuclear fuel or high level radioactive waste and who has executed a contract with DOE.

"Secretary" means the Secretary of Energy or his designee.

Other definitions relating to the subject matter of this rule are set forth in Article II of the contract which is contained in § 961.11, Text of the contract, below.

### § 961.4 Deviations

Requests for authority to deviate from this part shall be submitted in writing to the Contracting Officer, who shall forward the request for approval to the Senior Procurement Official, Headquarters. Each request for deviation shall contain the following information:

(a) A statement of the deviation desired, including identification of the specific paragraph number(s) of the contract;

(b) A description of the intended effect of the deviation;

(c) The reason why the deviation is considered necessary or would be in the best interests of the Government;

(d) The name of the owner or generator seeking the deviation and nuclear power reactor(s) affected;

(e) A statement as to whether the deviation has been requested previously and, if so, circumstances of the previous request;

(f) A statement of the period of time for which the deviation is needed; and

(g) Any pertinent background information will contribute to a full understanding of the desired deviation.

### § 961.5 Federal Agencies

Federal agencies or departments requiring DOE's disposal services for SNF and/or HLW will be accommodated by a suitable interagency agreement reflecting, as appropriate, the terms and conditions set forth in the contract in § 961.11; *provided, however*, that the fees to be paid by Federal agencies will be equivalent to the fees that would be paid under the contract.

### § 961.6 [Reserved]

### § 961.7 [Reserved]

### § 961.8 [Reserved]

### § 961.9 [Reserved]

### § 961.10 [Reserved]

## Subpart B—Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

### § 961.11 Text of the contract.

The text of the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste follows:

U.S. Department of Energy Contract No.

*Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*

THIS CONTRACT, entered into this ——— day of ——— 19 ——, by and between the UNITED STATES OF AMERICA (hereinafter referred to as the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereafter referred to as "DOE") and ———, a corporation organized and existing under the laws of the State of ——— (hereinafter referred to as the "Purchaser").

Witnesseth that:

Whereas, the DOE has the responsibility for the disposal of high-level radioactive waste and spent nuclear fuel of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and

Whereas, the DOE is required to collect a full cost recovery fee from any Purchaser delivering to the DOE any such spent nuclear fuel and/or high level radioactive waste; and

Whereas, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high level radioactive waste of domestic origin in DOE facilities; and

Whereas, the Purchaser desires to obtain disposal services from DOE; and

Whereas, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

Whereas, this contract is made and entered into under the authority of the DOE Organization Act (Pub. L. 95-91, 42 U.S.C. 7101 *et seq.*) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425);

Now, Therefore, the parties hereto do hereby agree as follows:

#### Article I—Definitions

As used throughout this contract, the following terms shall have the meanings set forth below:

1. The term "Assigned Three-Month Period" means the period that each Purchaser will be assigned by DOE for purposes of reporting kilowatt hours generated and sold by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.

2. The term "Cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

3. The term "Civilian Nuclear Power Reactor" means a civilian nuclear powerplant required to be licensed under Sections 103 or 104(b) of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2133, 2134(b)).

4. The term "Commission" means the United States Nuclear Regulatory Commission.

5. The term "Contract" means this agreement and any duly executed amendment or modification thereto.

6. The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

7. The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

8. The term "Delivery" means the transfer of custody of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE.

9. The term "Disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

10. The term "DOE" means the United States Department of Energy or any duly authorized representative thereof, including the Contracting Officer.

11. The term "DOE Facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high level radioactive waste.

12. The term "Full Cost Recovery," means the recoupment by DOE, through Purchaser fees, of all direct costs, indirect costs, and all allocable overhead, consistent with generally accepted accounting principles, of providing disposal services and conducting related activities authorized by the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). As used herein, the term "Cost" includes the application of fees for those uses expressly set forth in section 302(d) of the said Act and all other uses specified in the Act, such as, but not limited to, interest on funds borrowed from the U.S. Treasury and interest on funds appropriated by the Congress.

13. The term "High-Level Radioactive Waste" (HLW) means—(A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

(B) other highly radioactive material that the Commission, consistent with existing law,

determines by rule requires permanent isolation.

14. The term "Kilowatt Hours Generated and Sold" means electricity generated at a civilian nuclear power reactor as measured at the station busbar, net of all station uses, including an equivalent amount of electricity for any process heat generated by the reactor and used other than at the reactor.

15. The term "Purchaser's Site" means the location of Purchaser's civilian nuclear power reactor or such other location as the Purchaser may designate.

16. The term "Quarterly Treasury Rate" means the current value of funds rate as specified by the Treasury Fiscal Requirements Manual, Volume 1, Part 6, section 8020.20. This rate is published quarterly in the Federal Register prior to the beginning of the affected quarter.

17. The term "Shipping Lot" means a specified quantity of spent nuclear fuel or high level waste designated by Purchaser for transportation by DOE on a specified date.

18. The term "Spent Nuclear Fuel" (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing.

19. The term "Spent Nuclear Fuel of Domestic Origin" means irradiated fuel material used in nuclear power reactors located only in the United States.

20. The term "Year" means the period which begins on October 1 and ends on September 30.

#### Article II—Scope

This Contract applies to the acceptance by DOE of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) from civilian nuclear power reactors and, with respect to such material, establishes the fees to be paid by the Purchaser for the services rendered hereunder by DOE. The services provided to the Purchaser by DOE under this contract are related to disposal of SNF and/or HLW of domestic origin from civilian nuclear power reactors. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

#### Article III—Term

The term of this contract shall be from the date of execution until such time as DOE has accepted SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A."

#### Article IV—Delivery of SNF and/or HLW

##### *A. Description of SNF and/or HLW*

The Purchaser shall deliver to DOE and DOE shall, as provided for in this contract, receive the SNF and/or HLW which is described in accordance with Article VI.A of this contract, for disposal thereof.

##### *B. Delivery Commitment Schedule*

Delivery commitment schedule(s), in the form set forth in Appendix *B*, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s)) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or − 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.

In addition, the Purchaser may change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract. These adjustments shall be subject to DOE's prior written approval, which approval shall not be unreasonably withheld.

##### *C. Final Delivery Schedule*

Final delivery schedule(s), in the form set forth in Appendix *C*, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

##### *D. Emergency Deliveries*

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the Delivery Commitment upon written approval by DOE.

#### Article V—Responsibilities of the Parties

##### *A. Purchaser's Responsibilities*

1. *Annual Forecast of Shipments.* (a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next ten (10) years in the form and content set forth in Appendix *D*, annexed hereto and made a part hereof.

(b) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of delivery.

2. *Preparation for Transportation.* (a) The Purchaser shall arrange for all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder. DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix "F", annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled transportation of that shipping lot by DOE.

(c) The Purchaser shall be responsible for maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder.

##### *B. DOE Responsibilities*

1. DOE shall review and approve or disapprove Purchaser's proposed delivery commitment schedule(s), and final delivery schedules within approximately ninety (90) days after receipt thereof;

2. DOE shall arrange for, and provide, all necessary transportation of the SNF and/or HLW to the DOE facility. Unless otherwise agreed to in advance by DOE, DOE shall arrange for a shipping cask to be furnished to the Purchaser sufficiently in advance to accommodate scheduled deliveries. Such casks shall be suitable for use at the Purchaser's site.

3. DOE shall accept at the Purchaser's site SNF and/or HLW. Prior to such acceptance all SNF and/or HLW shall meet the acceptance criteria contained in Article *VI* of this contract.

4. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.

6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article *VI* of this contract.

#### Article VI—Criteria for Disposal

##### *A. General Requirements*

1. Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which has been approved for delivery in advance by DOE

and which meets the General Specifications for such fuel and waste as set forth in Appendix "*E*", annexed hereto and made a part hereof.

2. Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in such form and content as DOE may require as set forth in Appendix "*F*", annexed hereto and made a part hereof. Purchaser shall promptly advise DOE of any changes in said SNF and/or HLW as soon as they are known to the Purchaser.

3. Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs "*B*" and "*C*" of Appendix "*E*".

4. DOE's obligation for disposing of SNF under this contract also extends to other than Standard Fuel; however, for any SNF which has been designated by the Purchaser as other than Standard Fuel, as that term is defined in Appendix "*E*", the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery to DOE by Purchaser. DOE shall advise Purchaser within approximately sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

*B. Acceptance Criteria*

1. *Verification of SNF and/or HLW.* During cask loading and prior to acceptance by DOE for transportation to the DOE facility, the SNF and/or HLW description of the shipping lot will be verified by DOE. To the extent the SNF and/or HLW is consistent with the description submitted and approved, in accordance with Appendices "*E*" and "*F*," DOE agrees to accept such SNF and/or HLW for disposal when DOE has verified the SNF and/or HLW description, determined the material is properly loaded, packaged, marked, labeled and ready for transportation, and has taken custody, as evidenced in writing, of the material at the Purchaser's site, f.o.b. carrier. A properly executed off-site radioactive shipment record describing cask contents must be prepared by the Purchaser along with a signed certification which states: "This is to certify that the above named materials are properly described, classified, packaged, marked and labeled and are in proper condition for transfer according to the applicable regulations of the U.S. Department of Transportation."

2. *Improperly Described SNF and/or HLW.* (a) *Prior to Acceptance*—If SNF and/or HLW is determined by DOE to be improperly described prior to acceptance by DOE at the Purchaser's site, DOE shall promptly notify the Purchaser in writing of such determination. DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HLW until the SNF and/or HLW has been properly described. The Purchaser shall not transfer such SNF and/or HLW to DOE unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties.

(b) *After Acceptance*—If subsequent to its acceptance DOE finds that such SNF and/or HLW is improperly described, DOE shall promptly notify the Purchaser, in writing, of such findings. In the event of such notification, Purchaser shall provide DOE with a proper designation within thirty (30) days.

3. *Acceptance Priority Ranking.* Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

(a) Except as may be provided for in paragraph (2) below, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility;

(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

**Article VII—Title**

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE upon acceptance by DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be solely responsible for control of all material upon assuming title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

**Article VIII—Fees and Terms of Payment**

*A. Fees*

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mil per kilowatt-hour (MKWH) on electricity generated and sold by Purchaser's nuclear power reactors. The said fee shall be paid as specified in Paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying average dollar per kilogram charges to three (3) distinct ranges of fuel burnup reflecting actual disposal costs for those ranges so that the integrated cost across all discharged fuel is equivalent to 1.0 mill per kilowatt hour. The payment of this fee by the Purchaser shall be made to DOE as specified in paragraph B of Article VIII below.

3. DOE will annually review the adequacy of the fees and adjust them, if necessary, in order to assure that all costs to be incurred by the Government shall be recovered. The proposed fee adjustment will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session have elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. The adjustment to the fee will not be retroactive to previously generated electricity.

4. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with paragraph A.2. of this Article VIII. That portion of such fuel unburned as of April 7, 1983 shall be subject to the 1.0 mill per kilowatt hour charge. Adjustment in the calculation for the unburned portion of such fuel can be made until April 7, 1984 without penalty. After April 7, 1984, the provision for late payment of fee shall apply as specified in paragraph C of this Article VIII.

*B. Payment*

1. For electricity generated and sold on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of business on the last business day of the month following the end of each assigned three month period. The first payment shall be due on July 7, 1983. A one-time adjustment period payment shall be due ——. The assigned three month period, for purposes of payment and reporting of kilowatt hours, shall begin ——.

2. For SNF discharged prior to April 7, 1983, the Purchaser shall, at the time of contract execution, select one of the following fee payment options:

(a) *Option 1*—The Purchaser's fee shall be prorated evenly over forty (40) quarters at the fee schedule rate in effect at the date of the first payment and will consist of the SNF fee and interest on the outstanding fee balance at the date of the first payment. The interest is to be calculated at the ten year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE Delivery Commitment Schedule. Payment shall be made concurrently with the assigned three month period payments.

(b) *Option 2*—The Purchaser's fee shall be paid in the form of a single payment, at the fee schedule rate in effect at the time of payment, at any time prior to the first delivery as reflected in the DOE approved Delivery Commitment Schedule.

3. *Method of Payment.* (a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix "G", annexed hereto and made a part hereof and must be received within the time periods specified in paragraph B.1 of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix *G*, for each assigned three month period payment, and mail the remittance advice postmarked no later than the last business day of the month following each assigned three month period to "Department of Energy, Office of CONTROLLER, Cash Management

Division, Box 500, Room D-208, Germantown, Maryland 20874."

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

*C. Interest on Late Fees*

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

$$\text{Interest} = \text{Amount due to DOE for assigned three month period} \times \text{Quarterly Treasury rate plus six percent (6\%)} \times \frac{\text{\#Months late including month of payment (fractions rounded up to whole months)}}{12}$$

2. Interest is payable at anytime prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice for interest payments.

3. Collection, following the assessment of a late fee by DOE, will be applied against accured interest first and the principal thereafter.

*D. Effect of Payment*

Upon payment of all applicable fees and any applicable interest due thereon, the Purchaser shall have no financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

*E. Audit*

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule set forth in Paragraph A, above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative for examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

**Article IX—Delays**

*A. Unavoidable Delays by Purchaser or DOE*

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE—such as acts of God, fire, flood—cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

*B. Avoidable Delays by Purchaser or DOE*

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

**Article X—Suspension**

1. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension hereunder.

2. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "Disputes."

**Article XI—Remedies**

Nothing in this contrct shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

**Article XII—Notices**

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE: ______________________

______________________________

______________________________

To the Purchaser: ______________

______________________________

______________________________

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; *provided, however,* that notice of such changes shall be given by registered mail.

**Article XIII—General Provisions**

The General Terms and Conditions of this contract are set forth in full in Appendix "*H*", annexed hereto and made a part hereof.

**Article XIV—Representation Concerning Nuclear Hazards Indemnity**

DOE represents that it will include in its contract(s) for the transportation of SNF and/or HLW to the DOE facility, and in its contract(s) for the operation of any such facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

**Article XV—Assignment**

The rights and duties of a party to this contract may be assignable with transfer of title to the SNF and/or HLW involved; *provided, however,* that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

**Article XVI—Entire Contract**

This contract, which consists of Articles I through XVI and Appendixes "A" through "*H*", annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. All previous and collateral contracts, representations, warranties, promises and conditions of sale are superseded by this contract. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

In witness whereof, the parties hereto have executed this contract as of the day and year first above written.

*Appendices*

A. Nuclear Power Reactors or Other Facilities Covered
B. Delivery Commitment Schedule
C. Final Delivery Schedule
D. Annual Forecast
E. Acceptance Criteria and General Specifications
F. Description of Purchaser's Fuel
G. Standard Remittance Advice

H. General Terms and Conditions

United States of America, United States Department of Energy

By: (Contracting Officer) ———

Witnesses as to execution on behalf of contractor:

(Name) ———

(Address) ———

(Name) ———

(Address) ———

(Purchaser's company name)

By: ———

Title: ———

I, (name), certify that I am the (title) of the corporation named as Purchaser herein; that (Name) who signed this document on behalf of the Purchaser was then (Title) of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

In witness whereof, I have hereunto affixed my hand and the seal of said corporation this ——— day of ———, 1983.

(Corporate Seal)

(Signature) ———

Appendix "A"

*Nuclear Power Reactor(s) or Other Facilities Covered*

Reactor/Facility Name: ———

Location: ———

Type: ———

Capacity: ———

Date of Commencement of Operation: ———

NRC License No.: ———

Appendix "B"

*Delivery Commitment Schedule*

In accordance with the contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste between ——— (Purchaser) and DOE under Contract No. ——— dated ———, the following Delivery Commitment schedule is submitted by Purchaser to DOE. This Delivery Commitment Schedule shall be submitted by Purchaser and approved sixty-three (63 months) prior to delivery.

Reactor Name: ———

Type Reactor—PWR/BWR ———

Location ———

Shipping Lot No. ———

Discharge Date ———

Metric Tons Uranium ———

Number of Assemblies ———

Commitment Year for Delivery ———

Proposed Shipping Mode (Rail/Truck) ———

A detailed description of the Purchaser fuel will be submitted as set forth in Appendix E of this contract.

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

By Purchaser: ———

Title ———

Date ———

Approved for DOE: ———

(Contracting Officer) ———

Date ———

Appendix "C"

*Final Delivery Schedule*

*(To be submitted by Purchaser not later than twelve (12) months prior to estimated date of first delivery).*

In accordance with the contract for Disposal of Spent Nuclear fuel and/or High-Level Radioactive Waste between ———.(Purchaser) and DOE under Contract No. ——— dated ———, the following Final Delivery schedule is submitted for DOE approval.

Reactor Name: ———

Type Reactor—PWR/BWR ———

Location ———

Shipping Lot No. ———

Discharge Date ———

Metric Tons Uranium ———

Number of Assemblies ———

Estimated Date First Delivery ———

Estimated Date Last Delivery ———

Proposed Shipping Mode (Rail/Truck) ———

Type of Shipping Casks Required ———

Number of Assemblies per Cask ———

Delivery to be made to DOE from Purchaser's site ———

The above data must correspond to the Delivery Commitment Schedule (Appendix B) regrouped for shipping purposes.

Purchaser confirms that no change has taken place in the status of ownership of the SNF and/or HLW schedule hereunder.

NOTE: Contact ———

Title ———

Phone ———

for DOE confirmation on an acceptable delivery date.

By purchaser: ———

Title ———

Date ———

Approved for DOE: ———

(Contracting Officer) ———

Date ———

Appendix "D"

*Annual Forecast*

In accordance with the contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste between ——— (Purchaser) and DOE under Contract No. ——— dated ———, the following Annual Forecast is submitted. This information is to be used for DOE planning purposes and does not represent a firm commitment by Purchaser.

Reactor Name: ———

Type Reactor—PWR/BWR ———

Location ———

Shipping Lot No. ———

Discharge Date ———

Metric Tons Uranium ———

Number of Assemblies ———

Commitment Year for Delivery ———

Proposed Shipping Mode (Rail/Truck) ———

By Purchaser: ———

Title ———

Date ———

(Enclosure 1)

*Actual Discharges*

In accordance with the contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste between ——— (Purchaser) and DOE under Contract No. ——— dated ———, the following Actual Discharge information is submitted.

Reactor Name: ———

Type of Reactor—PWR/BWR ———

Location ———

Shipping Lot No. ———

Discharge Date ———

Metric Tons Uranium ———

Number of Assemblies ———

Commitment Year for Delivery ———

Proposed Shipping Mode (Rail/Truck) ———

By Purchaser: ———

Title ———

Appendix "E"

*Acceptance Criteria and General Specifications*

A. *Fuel category identification.* a. Categories—Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF) prior to delivery to DOE as follows:

a. "Standard Fuel" means SNF that meets all the General Specifications therefor set forth in Paragraph B below;

b. "Nonstandard Fuel" means SNF that does not meet one or more of the General Specifications set forth in Subparagraphs 1 through 4 of Paragraph B below, and which is classified as Nonstandard Fuel Classes NS-1 through NS-4, pursuant to Paragraph B below.

c. *"Failed Fuel"* means SNF that meets the specifications set forth in Subparagraphs 1 through 3 of Paragraph B below and which is classified as Failed Fuel Class F-1 through F-3 pursuant to Subparagraph 5 of Paragraph B below.

d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications.

B. *Fuel description and subclassification—general specifications.* 1. *Maximum nominal physical dimensions.*

| | Boiling water reactor (BWR) | Pressurized waste reactor (PWR) |
|---|---|---|
| Overall Length | 14 feet, 11 inches | 14 feet, 10 inches. |
| Active Fuel Length | 12 feet, 6 inches | 12 feet, 0 inches. |
| Cross Section* | 6 inches x 6 inches. | 9 inches x 9 inches. |

*The cross section of the fuel assembly shall not include the channel.

NOTE.—Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS-1.

2. *Mechanical components.* (a) Cladding shall be Zircaloy 2, Zircaloy 4, stainless steel or such other material as may be approved in writing by DOE.

(b) Any nonfuel components such as control spiders, burnable poison rod assemblies, and control rod elements that are integral with the fuel assembly and do not require special handling may be stored and/or disposed of at no extra charge.

Note.—Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS-2

3. *Cooling.* The minimum cooling time for fuel is five (5) years.

Note.—Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS-3.

4. NON-LWR Fuel—Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel—Class NS-4. Such fuel

may be unique and require special handling, storage and disposal facilities.

5. *Failed fuel.* a. *Visual inspection.* Assemblies shall be visually inspected for evidence of structural deformity of damage to classing or spacers which may require special handling. Assemblies which (i) are structurally deformed or have damaged cladding to the extent that special handling may be required or (ii) for any reason cannot be handled with normal fuel handling equipment shall be classified as FAILED FUEL—F-1.

b. *Radioactivity release test.* Assemblies determined to be structurally sound by meeting the criteria of item a above, shall be tested in water by DOE approved means to determine the radioactive release resulting from (i) cladding leakage and/or (ii) surface deposits. Assemblies found to have such radioactivity release that the radioactivity level in the cask coolant on delivery to DOE would exceed by 15 percent the regulatory limits permitted during transport of Spent Fuel Assemblies shall be classified as Failed Fuel—Class F-2.

For the initial loading of any shipping lot under this contract, the specified percentage shall be as measured by the Purchaser in the cask water at the reactor site prior to delivery to DOE. Such percentage may be subsequently modified based upon operating experience. For any water-cooled shipping lots, such limits shall be based on 10 CFR 71.36 (a) 2; for any gas-cooled shipping lots such limits shall be based on 10 CFR 71.35 (a) 4.

c. *Previously Encapsulated Assemblies.* Assemblies encapsulated by Purchaser prior to calssification hereunder shall be classified as FAILED FUEL—CLASS F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies, in sufficient detail so that DOE may plan for appropriate subsequent handling.

2. *Summary of fuel classifications.* (a) Standard Fuel: (1) Class S-1; PWR. (2) Class S-2; BWR.

(b) Nonstandard Fuel: (1) Class NS-1; physical dimensions. (2) Class NS-2; mechanical components. (3) Class NS-3; short cooled. (4) Class NS-4; non-LWR.

(c) Failed Fuel: Class F-1; visual failure or damage. (2) Class F-2; radioactive "leakage". (3) Class F-3; encapsulated.

C. *High-Level radioactive waste.* The DOE shall accept high level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

## Appendix "F"

### *Detailed Description of Purchaser's Fuel*

Reactor Name ————

Shipping Lot No. ————

Number of Assemblies Herein Described ——

This information shall be provided by Purchaser for each distinct fuel type within a shipping lot. It will accompany the Delivery Commitment Schedule.

The following definitions shall apply to the Spent Nuclear Fuel described in this Exhibit:

"*Fuel Element*" means the smallest integral unit of clad fuel (or blanket) containing Special Nuclear Material (SNM); i.e., a plate, tube, rod, disc, etc.

"*Subassembly*" means a group of elements, combined in a structural unit, which is grouped with other subassemblies to form the larger unit called the assembly.

"*Assembly*" means a group of fuel elements or subassemblies combined in a structural unit. The assembly is usually that fuel structure which is removed from the reactor as an individual unit.

All dimensions must be given in feet and inches and all weights in grams or kilograms.

A. *Form and composition of spent nuclear fuel.* 1. *Drawings Attached.* The following drawing(s) constitute(s) a comprehensive illustration of the fuel elements, subassemblies, and assemblies to be delivered under the Contract:

1.1 Assembly, Dwg. ——, Rev. ——

1.2 Fuel Rod Details, Dwg. ——, Rev. ——

1.3 Upper and Lower End Fittings, Dwg. ——, Rev. ——

1.4 Grid Spacer, Detail, Dwg. ——, Rev. ——

1.5 Poison Members, Dwg. ——, Rev. ——

(May be proprietary information)

2. *Material Description.* The following summarizes the description of fuel elements, subassemblies, assemblies modified after discharge. Where dimensions are required, the nominal dimensions, as they relate to the said reactor, must be used and the best estimates of the maximum change of these dimensions because of irradation must be given. Weights must be dry, unirradiated weights with the expected range of weights also to be included.

(a) *Fuel Element Description.*

(1) Type (plate, disc, rod, tube, etc.) ——

(2) Nominal Dimensions:

Fuel Element Length ——

Active Fuel Element Length ——

(3) Nominal Weight ——

(4) Weight of Special Nuclear Material (SNM) before Irradiation:

Total U ——

235 U ——

(5) Chemical form of SNM ($UO_2$, UC, etc.) —— Weight ——

(6) Fabricated form of SNM (pellets, slugs, ribbons) and loading pattern in element ——

(7) Alloy or dispersing material (Al, SS, etc.) —— Weight ——

(8) Cladding Material (Zr, SSs, etc.) ——

(9) Bonding Material, if any (Na, Al-Si, etc.) ——

(10) Other materials contained in fuel element:

————

————

Any material not covered by the above shall be added to describe the element completely.

————

(b) *Subassembly description*

(1) Number of elements ——

(2) Overall dimensions ——

(3) Total weight ——

(c) *Assembly description.*

(1) Number of elements ——

(2) Overall dimensions: Length ——; Envelope ——

(3) Overall weight ——

(4) Casing Material (Zr, SS, etc.) ——

3. *Identification:* Each separately removable unit in a Shipping Lot must be identified by a durable metal tag or label, or by embossing.

Identification of the units to be delivered under this Delivery Commitment are as follows:

————

————

B. *Fuel classification.* 1. In accordance with provisions of Article VI, "Criteria for Disposal", of this contract, the fuel in the shipping lot is hereby classified as ——.

2. If this fuel has been designated as other than Standard Fuel—"Class S-1" or "Class S-2", the basis for the classification must be listed below.

————

————

C. *Specifications for fuel units that contain breeched cladding or exposed SNM or that are warped.* 1. A fuel element with breeched cladding or exposed SNM shall be canned in a container whose material and design shall be approved by DOE unless DOE determines that such canning is unnecessary.

2. Units distorted beyond specified dimensional limits must be considered on an individual basis. The Purchaser should provide dimensional information for each warped unit below.

————

————

D. *Irradiation history.* Report the irradiation history for each assembly as indicated in the table below:

| Assembly No. | Data set | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | etc. |
| 1. Reactor position | | | | | |
| 2. Startup date | | | | | |
| 3. Average reactor power, MWTh | | | | | |
| 4. Average fuel exposure, MW/MTU | | | | | |
| 5. Cumulative fuel exposure, MWD/MTU | | | | | |
| 6. Shutdown date | | | | | |
| 7. Heat output assembly, watts as of date | | | | | |

## Appendix "G"

### *Standard Remittance of Advice (RA) for Payment of Fees*

Three Month Assigned Period Covered:

From ———— to ————

I. Purchaser (Utility name and address)

A. Contract I.D. ————

II. Charge based upon Spent Nuclear Fuel Fee Schedule/One-Time Fee Payment Agreement $——

A. Fee Schedule Rate ————

B. Date of First/Single Payment ————

C. Unpaid Balance to Date ————

D. Date of Current Fee Payment ————

E. Ten Year Treasury Note Rate ————

III. MKWH Fee (Identify power plant(s) covered by this RA showing on a spearate schedule the beginning meter reading, ending meter reading, difference for each) $——

A. Total Nuclear KWH Generated During Assigned Three Month Period Covered ——
B. Date of Current Fee Payment ——
C. Fee Schedule Rate ——

IV. Underpayment (as notified by DOE), $——
A. Date of Notification ——
B. DOE Invoice Number——
C. Interest Paid ——

V. Late Payments (as notified by DOE), $——
A. Date of Notification ——
B. DOE Invoice Number——

VI. Other Credits Claimed (Explain), $——

*VII. Total Remittance, $——*

Prepared by: ——
Phone Number: ——
Date: ——

For DOE use only below this line

1. Deposit to Account 89-5227 ——
2. Receipt of Payment Verification:
a. Date Payment Received——
b. Verification Performed by——
3. Posted to Cumulative Remitter Ledger:
a. Date Posted ——
b. Posted by ——
4. Late Payments:
a. Calculation of late charge (attach schedule)

——

b. Billing date ——

5. After processing RA furnish a copy to OCRWM.

**Instructions for Completing DOE Remittance Advice**

*Section I*

Name and address self-explanatory.

Contract number will be the identification number assigned by DOE upon execution.

*Section II*

Based upon inventory of spent fuel and HLW amassed prior to April 7, 1983, times the kilogram fee. If the 10-year option is selected, purchaser's liability is fixed at the fee schedule rate and the Ten Year Treasury Note Rate in effect as of the date of the first payment. Payment will be made in quarterly installments concurrently with the normal three month assigned period. If the single payment option is selected, the purchaser will submit payment for the entire unpaid liability at the rate in effect at the date of payment.

a. Fee schedule rate in effect at first/single payment. Complete this section only with first spent fuel fee payment.

b. Self explanatory.

c. Self explanatory.

d. Self explanatory.

e. Ten Year Treasury Note Rate in effect at first/single payment. Complete this section only with first spent fuel fee payment.

$——. Amount paid.

*Section III*

Based upon electricity generated on or after April 7, 1983, times the current fee of 1M/KWH. Schedules should be attached specifying the gross amount of power meter through each plant during the assigned period.

a. Total power generated from attached schedules.

b. Self explanatory.

c. Fee schedule rate in effect at time of payment.

$——. Amount paid.

*Sections IV & V*

(Same instructions) DOE will invoice purchasers, when underpayments or late payments occur, reference a particular payment, and state the reason for the invoice.

A. The date the purchaser received DOE invoice.

B. DOE's invoice #.

C. Interest paid.

D. Self explanatory.

$——. Consists of interest if late payment or fees plus interest if under payment.

*Section VI*

Explanation on an attached sheet of paper if necessary why DOE has been overpaid and the proposed disposition of the payment, e.g., apply credit against this payment or sent refund.

$——. If applied against this payment this number is negative. If refund desired, leave blank and pay gross amount due from sections II through V.

*Section VIII*

The sum of Section II through VI.

*Instruction Guide for Remittance of Nuclear Waste Disposal Fees to Department of Energy Via Wire Transfer*

Payments made to the Department of Energy (DOE) for Nuclear Waste Disposal Fees will be affected by the Purchaser's commerical bank via the Federal Reserve Communications System (also known as Fedwire) to the Department of Treasury. If the Purchaser's commercial bank is not a Federal Reserve member, then the Purchaser's bank will use a correspondent member bank to effect the transfer of funds.

Purchaser must provide specific information to its bank so that the transfer of funds can take place. Failure to correctly provide the information could result in delay crediting of the remittance to DOE and could subject the purchaser to late charges.

A wire transfer of funds message with descriptions of specific date elements is provided in Enclosure A. Enclosure B contains instructions and a sample form of a transfer of funds that shows the specific information to be supplied by the Purchaser when requesting its commercial bank to initiate a transfer of funds.

Enclosure C shows a transfer message form that may be photocopied and used each time a transfer of funds must be made. Constant information has been preprinted on the form. Only that information applicable to that particular monthly remittance (i.e., amount, date, company name) must be filled in prior to submitting the form to your bank.

If additional information is required, contact DOE representatives *Mark Loop* or *Joe Startori* on ((301) 353-4899 or 353-5857).

*Enclosure A—Guide for Funds Transfer Messages to Treasury*

The following instructions provide specific information which is required so that a funds (wire) transfer message can be transmitted to the Department of the Treasury. The funds transfer message format is shown in Exhibit 1. A narrative description of each item on the funds transfer message follows:

*Line 1.* Item 1—Priority Code—The priority code will be provided by the sending bank. (Note: Some Federal Reserve district banks may not require this item.)

*Line 2.* Item 2—Treasury Department Code—The nine-digit identifier "021030004" is the routing symbol of the Treasury. This item is a constant and is required for all funds transfer messages sent to Treasury.

Item 3. *Type Code*—The type code, 10, identifies funds transfer messages. This item is a constant and is required for all funds transfer messages sent to Treasury.

*Line 3.* Item 4—*Sending Bank Code*—This nine-digit identifier will be provided by the sending bank.

Item 5. *Class*—The class field may be used at the option of the sending bank. (Note: Some Federal Reserve Districts prohibit use of this class/field.)

Item 6. *Reference Number*—The reference number will be inserted by the sending bank to identify the transaction.

Item 7. *Amount*—The amount must include the dollar sign and the appropriate punctuation including cents digits. This item will be provided by the Purchaser.

*Line 4.* Item 8—*Sending Bank Name*—The telegraphic abbreviation which corresponds to item 4 will be provided by the sending bank.

*Line 5.* Item 9—*Treasury Department Name*—This item is of critical importance. It must appear on the funds transfer message in the precise manner as stated to allow for the automated processing and classification of the funds transfer message to Treasury for credit to the Department of Energy. This item is comprised of a rigidly formatted, nonvariable sequence of 28 characters as follows: TREAS NYC/(89000003) DOE NWF

EXHIBIT 1




*Line 6, 7, and 8. Payment Identification*—The payment identification should be furnished by the remitter in the following manner:

Item 10—The constant "DOE NUCWASTE FEE" will be inserted.

Item 11—The month and year the fees were incurred (i.e.; May 80) followed by a slash (/).

Item 12—The company name is inserted following the slash.

BILLING CODE 6450-01-M

Case 1:02-cv-01894-EJD Document 133 Filed 08/29/2008 Page 32 of 75



ENCLOSURE B

TRANSFER OF FUNDS MESSAGE FORM
(COMPLETED SAMPLE)

1
2 TO 021030004 TYPE 10
3 FROM REF AMOUNT $1,305,500.00 (A)
ORDERING BANK AND RELATED DATA
4
5 TREAS NYC/(89000003) DOE- NWF
DOE NUCLEAR WASTE FEE
7 (B) MAY 80/ABC PURCHASER (C)
8

The above example is a completed transfer of funds message form detailing those items (A thru C) filled in by the remitting company.

| Item | DESCRIPTION |
|---|---|
| A | Amount-must be properly punctuated to include cents digits. |
| B | Date - month and year followed by a slash(/) |
| C | Company Name. |

BILLING CODE 6450-01-C

ENCLOSURE C

TRANSFER OF FUNDS MESSAGE FORM

1
2 TO 021030004 TYPE 10
3 FROM REF AMOUNT $
ORDERING BANK AND RELATED DATA
4
5 TREAS NYC/(89000003) DOE - NWF
6 DOE
7 /
8

HeinOnline -- 48 Fed. Reg. 5470 1983

**Appendix "H"**

*General Terms and Conditions*

1. *Disputes.* A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within thirty (30) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within 60 days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within 60 days or notify the Purchaser of the date when the decision will be made.

C. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; *provided, however,* that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

2. *Officials not to benefit.* No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

3. *Covenant against contingent fees.* The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

4. *Examination of records.* The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract unless DOE authorizes their prior disposition.

5. *Permits.* The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

6. *Rights in technical data.* (a) Definitions. (1) "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

(2) "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(i) Are not generally known or available from other sources without obligation concerning their confidentiality;

(ii) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(iii) Are not already available to the Government without obligation concerning their confidentiality.

(3) "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

(4) "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

(b) Allocation of rights.

(1) The Government shall have:

(i) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(ii) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(iii) No rights under this contract in any technical data which are not contract data.

(2) The Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend, the terms of which shall be binding on the Government:

**Limited Rights Legend**

This "Proprietary data," furnished under "Contract No. " with the U.S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

[FR Doc. 83-3118 Filed 2-3-83; 8:45 am]
BILLING CODE 6450-01-M

HeinOnline -- 48 Fed. Reg. 5471 1983

| | |
|---|---|
| To | ERVanHoof, P-26-316 |
| From | JLBacon, M-1085A |
| Date | February 23, 1983 |
| Subject | CONTRACTS - US DEPT OF ENERGY - Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste |

MFS File

cc: EMD

**Consumers Power Company**

INTERNAL CORRESPONDENCE

CC

As we discussed this morning, the principal difficulty I have with DOE's proposed standard waste disposal contract (48 FR 5462-5471, 2/4/83) concerns DOE's establishment of acceptance priorities based upon the age of the SNF and HLW, DOE proposing to take the oldest material first. It might make more sense to take material first from the facilities having the least available storage space. My specific comments on the proposed standard contract are as follows:

1. In §1 of Article I, it is not clear whether one three-month period will be assigned covering all of the purchaser's reactors, or whether there will be a separate one for each reactor. The wording of paragraph B of Article VIII, coupled with the fact that Appendix A can cover more than one reactor, indicates that there may be a single period assigned covering all covered reactors. Moreover, since the period will be identified in Article VIII, it would be more suitable to identify that fact in the definition than to state that the period "will be assigned by DOE". Accordingly, I would suggest that Article I, §1 be revised to read "The term 'Assigned Three-Month Period' means the period assigned to the Purchaser in paragraph B of Article VIII below for purposes of reporting Kilowatt Hours Generated and Sold that were generated by the Civilian Nuclear Power Reactors identified in Appendix A and for establishing fees due and payable to DOE." The redraft also takes care of the conceptual problem that a reactor cannot sell electricity and uses the appropriate defined terms.

2. There are two problems with the definition of "Gask" in §2 of Article I. First of all, the contents of the cask should be identified by reference to the defined terms to avoid confusion. Second, the last clause should be moved near the noun that it modifies. Accordingly, I would revise the definition to read "The term 'Cask' means a container which meets all applicable regulatory requirements for shipping SNF and/or HLW."

3. The last sentence of Article II states that DOE's services are to continue until all SNF and/or HLW from the reactors identified in Appendix A have been disposed of. This is not quite accurate. DOE will only accept for disposal under the contract SNF and/or HLW which is approved by DOE for delivery and which meets the general specifications in Appendix E (see Article VI,

Mikelonis EXHIBIT NO. 3 5-9-08 Supp. A/M6 F

01010564

paragraph A) and which is owned by Purchaser (see Appendix E). Big Rock Point fuel transferred to NFS does not meet the latter criterion, and presumably will not be covered by the contract.

4. The comment in item 3 above also applies to Article III, which should be revised to provide that the contract term is from the date of execution until DOE acceptance for disposal of all of the SNF and/or HLW covered by the contract.

5. In light of the foregoing comments, paragraph A of Article IV should probably be revised by adding at the end thereof some sentence such as the following: "Except as DOE may otherwise agree, SNM and/or HLW delivered to DOE hereunder must be owned by the Purchaser and must have been derived from nuclear fuel which was used to produce Kilowatt Hours Generated and Sold from the Civilian Nuclear Power Reactors identified in Appendix A.

6. In the second sentence of §2 of paragraph B of Article V, it is not clear whether the phrase "unless otherwise agreed to in advance by DOE" qualifies DOE's obligation to arrange for a shipping cask, or qualifies the timeliness with which it must be furnished to the Purchaser. This should be clarified.

7. In the same sentence, "shipping cask" should be changed to "Cask" and in the immediately succeeding sentence, "casks" should be changed to "Cask", since "Cask" is a defined term. You should also consider whether the definition of "Cask" together with the statement that it shall be suitable for use at the Purchaser's site (which should probably be changed to "sites") is sufficient to prevent DOE from sending a contaminated cask, and sufficient to accommodate whatever material we wish to deliver to DOE.

8. The notion of acceptance priority on the basis of age of the material is contained in §6 of paragraph B of Article V, and would need to be changed if you agree that FIFO is not the proper criterion.

9. In §1 of paragraph A of Article VI, it is provided that DOE will accept only material it has approved for delivery in advance and which meets the Appendix E specifications. It would be better from the Purchaser's point of view if the provision were restated so that DOE had to accept material it has verified as meeting the Appendix E specifications, the description requirements of Article VI, paragraph A and the acceptance criteria of VI, paragraph B. Also, the phrase "for such fuel and waste" in the second line in the first column on page 5464 should be changed either to "therefor" or to "for such SNF and HLW".

10. In §1 of paragraph B of Article VI, the contract requires a signed certification that the materials have been properly described, packaged, etc, and also requires that DOE shall have verified the matters to which the certificate is addressed. I would think that either the certificate or the verification should be required, but not both.

01010565

11. The age-based acceptance priority idea is also set forth in §3 of paragraph B of Article VI. See prior comments.

12. In §§1 and 2 of paragraph A of Article VIII, reference is made to "electricity generated and sold by Purchaser's nuclear power reactors" and "to generate electricity in a civilian nuclear power reactor", respectively. The term "Kilowatt Hours Generated and Sold" is the proper defined term to be used, and should be substituted. Again, it is not Purchaser's reactors who do the selling. Perhaps this drafting problem could be alleviated by changing the definition of "Kilowatt Hours Generated and Sold" to refer to the Purchaser's civilian nuclear power reactors identified in Appendix A (or add that thought here; cf. item 1 above). Also, the term "high-level radioactive waste" in the first two lines of §2 should be changed to "HLW". Finally, the SNF and HLW referred to should be limited to that which is covered by the contract - in other words, it should be written so as to exclude the Big Rock Point material, title to which has been transferred to NFS.

13. Paragraph E, §3 of Article VIII appears to require the Purchaser to maintain its records relating to the first delivery under the contract until the expiration of three years after delivery of the last material delivered under the contract. This is consistent with §4 of the "General Terms and Conditions" in Appendix H. However, like the latter provision, the audit provision should probably allow for DOE authorization of prior disposition of the records.

14. In Article IX, paragraphs A and B, and in Article X, §1, the terms "beyond the control", "beyond the reasonable control", "within the reasonable control" and, again, "beyond the control" are used. For the sake of parallel construction, the word "control" should probably be modified by "reasonable" in each instance or should be unmodified in each instance.

15. Article XIV contains a DOE representation that it will include indemnity agreements in its transportation and repository operation contracts. It would be better if this were expressed as an obligation to include the indemnity agreement in such contracts. Also, it should be clear that the Purchaser is among the persons indemnified. Therefore, I would suggest that the first line of the Article be changed to read "DOE shall include in its", that a comma be inserted after "facility" in the fifth line, that the first sentence be ended with the word "Purchaser" in line 8, and that the next sentence be revised to begin "Under said agreement, DOE shall agree to indemnify the contractor, the Purchaser and all other persons who may be liable, against claims for public liability . . . ."

16. Article XV appears to permit assignment of contract rights and duties only when title to all of the SNF and HLW covered by the agreement is transferred with notice to DOE. I suspect that it was intended to permit (require?) all of the Purchaser's rights and duties under the contract respecting any or all of the SNF and/or HLW covered by the contract to be transferred with title to the particular SNF and/or HLW in question. Consideration should be given to the question, whether the Purchaser should be able to transfer contract rights and duties without transferring title, and vice versa. And in any event, it should be made clear here, in the title article, or elsewhere that a leasehold interest in the material, or an ownership interest subject to a security interest, is sufficient ownership for purposes of the contract.

17. Consideration should be given to whether the criteria and specifications of Appendix E are sufficiently broad to accommodate "dense-pack" spent fuel - i.e., disassembled assemblies whose rods are closely spaced in canisters. See particularly paragraph B, §1 and §5c.

18. In lines 2 and 3 of the text of §5a of paragraph B of Appendix E, the phrase "of damage to classing" should be changed to "or damage to cladding". Other typos include misspellings of "classification" (Appendix E, paragraph B, §5c, line 3), "irradiation" (Appendix F, paragraph A, §2, line 8), and "breached" (Appendix F, paragraph C, lines 2 and 3).

19. In Appendix H, the word "parties" should be substituted for "Purchaser" four lines up from the end of §1.A.

20. In paragraph B of §1 of Appendix H, the certification called for is required to be executed either by a senior Company official in charge at the plant or by an officer having overall responsibility for the conduct of the Purchaser's affairs. In other words, it can be signed by the plant manager or the President and Chairman of the Board, but by no one in between. It might be more desirable to permit any authorized officer of the Company to execute the certification.

01010567

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONSUMERS ENERGY COMPANY,

Plaintiff, No. 02-1894C

v. (Chief Judge Damich)

THE UNITED STATES,

Defendants.

______________________/

D E P O S I T I O N

DEPONENT: STEPHEN T. WAWRO

DATE: Wednesday, June 25, 2008

TIME: 9:02 a.m.

LOCATION: Loomis, Ewert, Parsley, Davis & Gotting
124 West Allegan Street
Suite 700
Lansing, Michigan 48933

REPORTER: Michele E. French, CSR-3091, RMR, CRR

APPEARANCES:

Appearing on behalf of the Plaintiff:
LOOMIS, EWERT, PARSLEY, DAVIS & GOTTING
BY: JEFFREY S. THEUER, ESQUIRE
124 West Allegan Street
Suite 700
Lansing, Michigan 48933
(517) 482-2400
jstheuer@loomislaw.com

Appearing on behalf of the Defendant:
U.S. DEPARTMENT OF JUSTICE
BY: STEPHEN FINN, ESQUIRE
Civil Division
1100 L Street, N.W.
Room 4052
Washington, D.C. 20530
(202) 616-0466
stephen.finn@usdoj.gov

Also Present:
Arunas T. Udrys
Eric Heintz



TABLE OF CONTENTS


| WITNESS | PAGE |
|---|---|
| STEPHEN T. WAWRO | |
| Examination by Mr. Finn | 6 |
| Recess - at 9:28 a.m. to 9:30 a.m. | 27 |
| Recess - 10:36 a.m. to 10:49 a.m. | 83 |
| Recess - 11:59 a.m. to 12:09 p.m. | 138 |
| Lunch recess - 12:43 p.m. to 1:35 p.m. | 164 |
| Recess - 3:13 p.m. to 3:22 p.m. | 228 |
| Recess - 4:21 p.m. to 4:22 p.m. | 272 |


INDEX OF WAWRO EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 1-2-07 Mason letter to Keisler | 17 |
| 2 | Answers to Defendant's First Set of Interrogatories Relating to Damages | 41 |
| 3 | Contract for Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste | 46 |
| 4 | 1-3-07 Robinson e-mail to Reed, Nolan Subject: Re: DOE litigation | 50 |
| 5 | 11-20-05 Wawro e-mail to Nolan, Reed Subject: FW: Sole Source Approval | 83 |


-- continued --



INDEX OF WAWRO EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 6 | ASSET SALE AGREEMENT by and among CONSUMERS ENERGY COMPANY, as Seller and ENTERGY NUCLEAR PALISADES, LLC, as Buyer. Dated as of July 11, 2006 | 92 |
| 7 | 2-20-07 Butchart e-mail to Wawro... Subject: U-14992 - Discovery Updated | 140 |
| 8 | 8-29-06 Wawro e-mail to Torrey Subject: FINAL 8/31 MPSC Presentation | 154 |
| 9 | 11-28-06 e-mail, Legal-MPSC Filings Subject: Discovery Responses to MEC | 164 |
| 10 | 12-13-06 Wawro e-mail to Robinson... Subject: Draft Palisades MEC Responses | 171 |
| 11 | 4-19-06 Feldman Memo to Wawro | 176 |
| 12 | Big Rock ISFSI Summary of Continuing Cost of Operations | 179 |
| 13 | Palisades Auction Team Status Call Minutes - April 12, 2006 | 205 |
| 14 | 8-8-06 Devereaux e-mail to Robinson | 210 |
| 15 | 8-10-06 Robinson e-mail to Nolan... Subject: Palisades testimony | 213 |
| 16 | Attachment 2.1 Final Bid Submission Form: Pal. Nuclear and Big Rock ISFSI | 217 |


-- continued --



INDEX OF WAWRO EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 17 | 6-29-06 Earley letter to Reed | 218 |
| 18 | 6-29-06 Hay letter to Reed | 221 |
| 19 | Direct Testimony of Michael A. Torrey on Behalf of Consumers Energy Company | 228 |
| 20 | 12-4-06 Wawro letter to Zabransky Subject: Notification of Pending Assignment of Agreement | 241 |
| 21 | 7-17-07 Wawro letter to Zabransky Re: Assignment of DOE Contract... | 247 |
| 22 | 4-5-07 Wawro letter to Zabransky | 250 |
| 23 | Affidavit of Stephen T. Wawro | 253 |
| 24 | 12-20-05 Stanley e-mail to Mrva... Subject: QUESTION 9 RE: Sale Information Request | 256 |
| 25 | 8-12-03 Holthaus e-mail to Wawro... Subject: Palisades SNF Schedule for TLG Study | 265 |

Lansing, Michigan
Wednesday, June 25, 2008
9:02 a.m.
* * * * *
STEPHEN T. WAWRO,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. FINN:
Q Good morning, Mr. Wawro. My name is Steve Finn. I'm with the U.S. Department of Justice. I'm here to take your deposition today.
A **Good morning.**
Q Could you please state your full name and spell it for the record, please.
A **You bet. Stephen, S-t-e-p-h-e-n, middle initial is T., as in Thomas, Wawro, W-a-w-r-o.**
Q And what is your address?
A **My home address?**
Q Why don't you give me your business address.
A **Business address is 1945 Parnall, P-a-r-n-a-l-l, Road, Jackson, Michigan.**



Q And is that the Consumers headquarters?
A **It is one of the Consumers headquarter buildings, yes.**
Q Okay. Have you had your deposition taken before?
A **I have.**
Q And how long ago was that?
A **Approximately ten years ago.**
Q Okay. Have you had your deposition taken more than one time?
A **I have not.**
Q Okay. What was that -- what was the matter that the deposition was taken in?
A **It was a professional matter associated with the Palisades Nuclear Plant, employment issues.**
Q Okay. Because it's been a while, I'm just going to cover basic ground rules for doing a deposition. We need audible responses. The court reporter is here taking down my questions and your responses to those questions. She's capturing that in a transcript that you'll be able to review later on.
In order for her to capture that information, we need to make sure that we talk



clearly so that she can get it. Gestures, hand gestures, nodding of the head, things like that as a response to a question, obviously she can't capture that.
To the extent that we are asking questions and providing answers, I ask that you wait for me to complete my question and then you give your response and I will attempt to not interfere or not interrupt your response so that you can give a full and complete answer.
It's very difficult for the court reporter to capture testimony if we're both talking at the same time; okay?
If I ask you a question and you answer the question, I'm going to assume you understood what I asked you. In other words, sometimes a question could be vague or ambiguous, but if you respond to the question, I'm going to understand -- my assumption is that you understand what I ask you.
During the course of the deposition, counsel may object during -- to one of my questions. Unless counsel directs you not to answer the question, I expect that you will still answer my question.



If during the course of the deposition I ask you a question, an hour later, two hours later, you remember more information that would more accurately answer that question or more completely answer that question, please call my attention to that and we will go back to that issue and get your full response onto the record.
Is there any reason you can't answer my questions accurately and completely today?
A **No.**
Q Are you on any medication that would make it difficult for you to testify today?
A **No.**
Q Okay. And if at any time you need a break, please let me know.
Now, you had mentioned earlier that you had given a deposition earlier. Have you ever testified in an administrative or other legal proceeding?
A **Yes.**
Q And when was that?
A **I've testified many times to the Michigan Public Service Commission on rate case issues.**
Q And did that involve written testimony or oral testimony or both?

10

A Both.
Q Okay. And at different times you would provide testimony based upon what was requested?
A Yes.
Q Okay. Where are you currently employed?
A I'm employed by Consumers Energy in Jackson, Michigan.
Q And what is your position?
A Manager Next Generation.
Q How long have you been the manager of Next Generation?
A About nine months.
Q What are your responsibilities?
A I have two major responsibilities. One is the completion of a purchase of a large natural gas plant in Zeeland, Michigan. And the construction, design, and permitting of a new coal plant.
Q How long have you been employed by Consumers Energy?
A I joined Consumers Energy in the spring of 1981, so a little over 27 years.
Q Okay. Now, starting in 1981, can you please give me the positions you've held, give me an idea of what the responsibilities were, and how

11

long you held those positions?
A Yes, I can.
Q Okay. Please do that.
A I joined in the spring of 1981 at the Midland Nuclear Plant as an operations shift supervisor. I held that position for approximately two years.
Q Okay.
A And then went down to the -- in 1983 timeframe, went down to the Palisades Nuclear Plant in Covert, Michigan, as an operation shift supervisor --
Q Okay.
A -- and held that position until approximately 1994. From 1994 until approximately 2000, I was the Palisades operations -- I guess I don't remember the actual title that I held at that period, but I was operations, supervision, in support roles, several different roles.
Q Okay.
A And in 2000 I became the Palisades Nuclear Asset Director, and I held that position until about September of last year.
Q September of 2007?
A September of 2007, which is when I became

12

the manager of Next Generation.
Q Okay. Let's take the positions, the operation shift supervisor, that you had for both Midland and Palisades. In general, what were your responsibilities in those positions?
A In both of those positions I was responsible for an operating crew at both the Midland Nuclear Plant and the Palisades Nuclear Plant.
Q Okay. And what does that mean, responsible for operations? What does that mean you were doing?
A The operations crews, there were either five or six, depending upon the year that we were in, and those were the crews of between six and ten people that operated the plant on a day-to-day basis.
Q And you were responsible for making sure they were there doing their work and having work to do and things like that?
A That would be correct.
Q Okay. Now, let's talk about the position you held from 1994 to 2000. You said you were in Palisades operations and some supervisory roles. Can you explain to me what you were doing for

13

those six years?
A Yeah, there were -- a couple of those roles were developmental roles, developmental roles, new roles in the organization that supported outages, outage management, outage support, planning and scheduling.
Q Okay. Does that cover the responsibilities for those positions or were you supervising them?
A Yes, all of those roles were supervision roles or management roles. The last year or two of that was more in the maintenance oversight than it was in operations.
Q And what's the difference between being in an operations oversight role and a maintenance oversight role?
A Two different types of crews; ones that are operating the plant and ones that are doing maintenance, both preventative and corrective maintenance at the plant.
Q And let's talk about that position you held from 2000 to 2007 as the Nuclear Assets Director. Who did you report to in that position?
A For the majority of that time, until Mr. Fenech -- F-e-n-e-c-h -- retired, it was

14

Robert Fenech.
Q And what was his position?
A **He held a couple different titles, but effectively it was Vice President of Generation.**
Q Okay.
A **There was a role there for a while where we used the Senior Vice President of Generation but I don't remember the timing of that.**
Q Okay. So you reported to Mr. Fenech but what, in terms of what your responsibilities were and what you were doing day to day, what was going on as the Nuclear Asset Director?
A **In the year 2000, Consumers Energy contracted with a company called the Nuclear Management Company to provide operations, maintenance, engineering oversight and operation of the Palisades Nuclear Plant. In my role, I maintained oversight of that large company that was running our plant for us.**
Q Were you a Consumers employee or were you an NMC employee?
A **I was a Consumers Energy employee.**
Q And were you located at Palisades?
A **Yes, I was.**
Q So in a sense were you the contact

15

between NMC and Consumers?
A **That would be correct.**
Q And I also understand that during that period of time the Palisades Nuclear Power Plant was sold to Entergy Corporation?
A **That is correct.**
Q What was your involvement in that?
A **I led the sale team and the sale transition team after the sale was completed.**
Q And can you give me an idea of the period of time from when you were leading the sales team through the sale? When did you first start working on that?
A **On that particular...?**
Q Project.
A **We started in probably April of 2006 looking at the potential of a sale of Palisades. It became public in December of 2006. And then I stayed with that team through the sale completion and turn-over to Entergy and several months after that, so through about this time in -- this time last year in 2007.**
Q And did you have any -- when you were the Nuclear Asset Director, did you have any other large -- any projects as large as or as important

16

as the sale of the plant that was in '06? Going back to 2006, did you have any other large items that you performed?
A **Well, the oversight of the Nuclear Management Company was a very large role.**
Q Okay.
A **That was my full-time job during that period.**
Q Okay. I was just thinking if there was, you know, that you had ongoing responsibilities in the oversight of the NMC, but then this sale of Palisades came up. I was just wondering if there was anything else that came up that was as large an item as that.
A **No, there was nothing as large as the sale.**
Q Okay. And I have some questions on your educational background. Do you have an undergraduate degree?
A **I do not.**
Q Do you have any undergraduate training?
A **I do not.**
Q Okay. Prior to coming to Consumers Energy in 1981, did you have prior employment history?

17

A **Yes.**
Q And what was that?
A **After leaving high school, I joined the United States Navy for about nine and a half years.**
Q And what did you do in the Navy?
A **I was a nuclear electronics technician onboard submarines.**
Q And what rank did you leave the Service at?
A **I left as an E-6, petty officer.**
Q Third class?
A **First class.**
Q First class.
MR. FINN: Okay. Let's mark that as number 1.
(Wawro Exhibit 1 was marked.)
BY MR. FINN:
Q During the course of the deposition today, Mr. Wawro, I will hand exhibits to the court reporter. She will give them to me -- or she will give them to you and we can discuss those.
The document you've been handed that I marked as Exhibit 1 is a copy of what's known as

102

in this; correct?
A That's correct.
Q If not all of them; right?
A Many of them, correct.
Q Okay.
A A lot of them were not -- were not controversial and just lived the way they were originally.
Q Okay. So as we sit here today -- well, let me ask you this. In terms of the Department of Energy claim, did that portion of the document change during the course of the negotiations?
A I don't know whether that ever changed but I think it was -- my understanding it was quite clear from Entergy that they wanted rights to sue after closing date and they wanted us to keep the rights prior to closing date.
Q Okay. And was that a -- was that how the original Asset Sale Agreement that CEA had proposed, is that how it read at that time?
A I don't know how that read at the time.
Q Okay.
A I don't know if that was the way it was or not.
Q But there's no doubt you had an

103

understanding at the time?
A I had an understanding and surely what we expected out of the outcome from the beginning.
Q And if I asked you your understanding, do you understand I'm not requesting a legal interpretation from you; is that correct?
A I understand that.
Q Okay. What was your understanding of subsection -- under number (54), "Department of Energy Claim," there is a subsection (ii) that I read up to that says, "...the recovery of any damages of the kind described in clause (i) and arising post-Closing in respect of the Big Rock ISFSI up to" the "amount equal to the Big Rock Amount."
Do you have an understanding of what's being discussed there?
A My understanding of that section is that allowed us to attempt to regain back from the Government the costs that we were going to pay Entergy to take Big Rock ISFSI from us.
Q Okay. Now, the last sentence of that section, "The Department of Energy Claim shall not include, and Buyer shall have the right to pursue, damages against the Department of Energy arising

104

after the Closing in respect of Palisades and, to the extent Buyer has not been compensated for such damages pursuant to Section 6.25, the Big Rock ISFSI."
Do you have an understanding of the last portion of that sentence, that one that starts, "...to the extent Buyer has not been compensated..."? Do you have an understanding of what that language meant?
A Again, not a legal opinion but my understanding of that is that Entergy would have the right to file for damages for spent nuclear fuel costs with the Department of Energy after the closing date but not for the purchase price, you know, that we paid them.
So if we paid them $30 million, the first 30 million they would not be able to claim to the Department of Energy. That's my understanding of that section.
Q Okay. So I'm just tying to get my head around how that was supposed to work. At the time of closing in 2007, just tell me -- just see if I understand this correctly, and I'll ask you if that comports with your understanding.
At the time of closing in 2007, Consumers

105

paid Entergy $30 million for the Big Rock Point ISFSI. And your agreement was Consumers could seek that cost in this litigation; correct?
A That's correct.
Q Okay. Now, Entergy was going to incur costs for spent fuel storage at the Big Rock ISFSI but they were limited in their ability to come and seek costs from the Government until they had exceeded $30 million; correct?
A That was our understanding, correct.
Q Okay. Let me ask this. The 30 million dollar payment as of April 2007, those costs, were they costs for spent fuel storage that had been incurred or would be incurred in the future?
A My understanding it would be strictly for future cost that Entergy would be incurring, you know, on a daily basis after closing.
Q Okay. Let's go to page 3823.
MR. THEUER: Could you give me that number one more time.
MR. FINN: Okay. Excuse me, 3823.
BY MR. FINN:
Q Okay. On 3823, we get into a section or an article that is 6.14, titled "Standard Spent Fuel Disposal Contract; Spent...Fuel Litigation."

266

document?
A I recognize, meaning that I'm a --
Q Do you have an understanding of what it is?
A I definitely have an understanding of what it is.
Q And what is it?
A It's a letter from Jim Holthaus, who was a Nuclear Management Company employee responsible for the overall decommissioning studies for all of the Nuclear Management Company nuclear plants. And it's a note to myself but more importantly to the fuel managers at both Big Rock and Palisades.
Q And the note on page 182, the first page of Exhibit 25, says, "Attached is the proposed SNF shipping/storage schedule for Palisades/Big Rock Point using the 2010 DOE Repository start date and Acceptance Schedule. Please review the schedule and submit your comments or questions to me at your earliest convenience."
Did you have an understanding of what Mr. Holthaus was talking about?
A I'll tell you up front is as the asset manager I was copied or to'd to many, many of the letters that went to the rest of the management

267

team at the sites. I would not have taken action based on this e-mail. I had no information or anything I can add of value to this e-mail.
Q All right. Let me just draw your attention, then, to the third page of the e-mail, which is Bates number 184. Are you there?
A Yes, I am.
Q And there's a table on the prior page at 183, and the notes to the table are on page 184. And the first note is "DOE begins fuel acceptance." [1]. And that, if you look on the prior page, on page 183, note 1 is in column -- the third column -- fourth column. It says "DOE Regional Waste Acceptance" and "(MTU/year)." If you go down that column, it starts -- the column numbers begin at 2010.
And that says, "Based on the 1995 Acceptance Priority Ranking and the Annual Capacity Report, DOE/RW-0457." Do you have an understanding of what's being referred to there?
A In generally terms only.
Q Okay. And what's that?
A He's referencing the acceptance rate that the Department of Energy has communicated to the utilities that they would start taking our fuel.

268

Q Okay. And in your experience as the Director of Fuel Management for planning and studies that were being done, do you remember other rates being used?
A I have to question your comment. I was never the Director of Fuel Management.
Q Oh, Director of Nuclear Management. Excuse me.
MR. THEUER: Nuclear Assets.
THE WITNESS: Nuclear Assets.
BY MR. FINN:
Q Nuclear Assets, excuse me.
A Which is a general overview of the operation of the facility by others.
Q Okay. I'm sorry. I misstated that. But in that position did you come to see for planning purposes other rates being used?
A I -- I couldn't tell you whether I do or not. It was not uncommon for me to get 50 or a hundred of these a week as people copied me on correspondence to other folks who were actually making the decisions.
Q So if I were to then ask you questions, looking at the table on page 183, regarding that column that has note 1 in it and the note that's

269

on page 184, regarding why that was -- why that rate was used and the effect it had, would you be able to answer my questions?
A Absolutely not.
Q Very well. Okay.
Now, if we look at note number 7 on page 184, it says, "Based on spent fuel pool capacity of 757 assemblies." Do you see that?
A Yes, I do.
Q Do you have knowledge of the spent fuel pool capacity at Palisades as of the time that you were working there?
A In general terms I saw, you know, routine reports of that, and one of those reports we provided to the bidders.
Q Okay. And do you recall whether 757 assemblies is the total structural capacity, in other words, total cells, or does 757 assume that there's certain cells that can't be used?
A There are several cells that cannot be used at Palisades.
Q Okay.
A And by his note I would surely make the assumption that he was well aware of that and just used usable cells.

270

Q Okay. And the full core off-load requirement at 249 spaces in the fuel pool, do you know if that was just to off-load the core or did that assume more spaces than that?
**A No, the 249 assumes 204 fuel bundles and 45 control rods. Control rods also go into spaces in the pool.**
Q And is that generally how the full core off-load requirement for Palisades was computed in the time you were there, being both the off-load of the core and the fuel blades?
**A Yeah, we don't have fuel blades at the core, we have control rod blades.**
Q Okay. Control rods.
**A And in order to off-load the core, you have to off-load the 45 control rod blades.**
Q Okay.
**A Whether you place them in spaces in the pool or whether you create, build, and have a different way of storing those, I believe that we have looked at it both ways.**
Q Okay. But the way that Mr. Holthaus has it here, with 249 spaces, in general was that the way in most documents that you were using at this time in terms of planning and understanding what

271

space was available in the spent fuel pool, would full core off-load requirement have been tallied as 249?
**A If you were doing a planned off-load, you would always plan to put the control rods blades in spaces and not in the temporary storage. And planning purposes would always look for 249 empty spaces to put the fuel for core off-load.**
Q Okay. And for planning purposes, you did not include the 11 by 11 rack, did you?
**A Did I in what?**
Q In terms of planning for fuel spaces and storage capacity.
**A Typically you would not use that because that would then limit your ability to load dry fuel storage. You cannot load dry fuel storage with the 11 by 11 rack in. So for typical planning purposes you would not plan on using the 11 by 11 rack. You would for emergency occasions.**
Q But if you loaded the 11 by 11 rack in an emergency situation and for some reason could not, then, unload that 11 by 11 rack, you would also lose the capability to load the dry storage; correct?
**A That is correct.**

272

Q So it truly is a last resort, using the 11 by 11 rack?
**A That would be correct for that reason and other reasons.**
Q What other reasons?
**A You would irradiate the 11 by 11 rack, you would contaminate it with radioactive particles, which would make future storage of the rack more cumbersome.**
Q Okay.
MR. FINN: Why don't we take just five minutes.
(Recess - 4:21 p.m. to 4:22 p.m.)
MR. FINN: Okay. Back on the record.
At this time, I don't have any more questions.
MR. THEUER: We would like to reserve read and sign, and I've got no questions.
(Deposition concluded at 4:22 p.m.)

273

SIGNATURE OF WITNESS

I, STEPHEN T. WAWRO, certify that I have read my deposition given on Wednesday, June 25, 2008, In the Matter of Consumers Energy Company versus The United States, and have attached my corrections hereto.

_______________________
Stephen T. Wawro

State of _______________)
County of _______________)

SUBSCRIBED and SWORN TO before me this ________ day of ____________________, 2008.

_______________________
NOTARY PUBLIC

My Commission Expires: ____________.

CERTIFICATE OF NOTARY

STATE OF MICHIGAN)
) SS
COUNTY OF INGHAM )

I, MICHELE E. FRENCH, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.

Dated: 7-8-08

Michele E. French, CSR-3091, RMR, CRR
Notary Public, Ingham County, Michigan
My Commission expires: December 2, 2011

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

CONSUMERS ENERGY COMPANY, :

Plaintiff, : No. 02-1894C

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, July 2, 2008

Deposition of JOHN J. REED, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Concentric Energy Advisors, 1717 Rhode Island Avenue, N.W., Washington, D.C., at 8:59 a.m., Wednesday, July 2, 2008, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.



COPY

APPEARANCES:

On behalf of the Plaintiff:
JEFFREY S. THEUER, ESQ.
Loomis, Ewert, Parsley, Davis & Gotting, P.C.
124 W. Allegan Street
Suite 700
Lansing, MI 48933
(617) 482-2400
jstheuer@loomislaw.com

On behalf of the Defendant:
SCOTT DAMELIN, ESQ.
STEPHEN FINN, ESQ.
Commercial Litigation Branch
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0466



ALSO PRESENT:
Eric Heintz
Harvey J. Messing
Arunas T. Udrys



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| JOHN J. REED | DEFENDANT |
| By Mr. Damelin | 6 |

Afternoon Session - Page 130


EXHIBITS


| REED EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - 10/21/05 letter to Wawro | 17 |
| 2 - 10/05 Assessment for Palisades | 22 |
| 3 - Concentric Bid Assumptions 7/10/06 | 64 |
| 4 - Schedules to Asset Sale Agreement | 96 |
| 5 - Asset Sale Agreement 7/11/06 | 158 |
| 6 - 12/19/06 letter to Erickson from Robinson | 115 |
| 7 - Palisades Bid Evaluation Model 6-30-06.xls | 121 |
| 8 - Palisades Bid Evaluation Model 7.6.2006.xls | 121 |
| 9 - Schedules to Asset Sale Agreement 6/29/06 | 130 |




EXHIBITS


| REED EXHIBIT NO. | PAGE NO. |
|---|---|
| 10 - Big Rock ISFSI 2006_0_24.xls | 140 |
| 11 - 4/19/06 draft memorandum to Wawro | 141 |
| 12 - 7/3/06 handwritten notes | 195 |
| 13 - Email 1/3/07 from Robinson, Re DOE Litigation | 209 |

6

PROCEEDINGS
Whereupon,
JOHN J. REED,
was called as a witness by counsel for Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. DAMELIN:
Q. Good morning, sir. Can you please state your full name for the record.
A. My name is John J. Reed.
Q. And Mr. Reed, my name is Scott Damelin, I'm an attorney with the Department of Justice. We've met before. With me today is Eric Heintz and Stephen Finn, and we are here today to take your deposition in the case of Consumers Energy Company versus United States in the Court of Federal Claims. Mr. Reed, where are you currently employed?
A. I'm the chairman and chief executive officer of Concentric Energy Advisors and CE Capital.
Q. And how long have you been in that position?

7

A. Since both companies were formed, May of 2002 for Concentric, and I think it was July of '04 for CE Capital.
Q. And for today's deposition, are you represented by counsel?
A. Yes.
Q. And who is that counsel?
A. Mr. Theuer.
Q. And when did you retain Mr. Theuer to represent you at today's deposition?
A. I don't know the date.
Q. Was it within the last few months?
A. I think it first arose longer ago from that, probably closer to a year ago, but again, I don't recall.
Q. And what were the purposes of -- well, let me ask you this. Did you enter into a retainer agreement with Mr. Theuer or his law firm?
A. I think it was done through my client, Consumers.
Q. So did you or Concentric execute any type of retainer agreement either directly with

8

Mr. Theuer, his law firm, or through Consumers?
A. I don't recall.
Q. And in terms of the retention of Mr. Theuer's firm, was that specifically related to this litigation?
A. Yes.
Q. And did that -- did that retention either directly with Mr. Theuer's firm or through Consumers involve your intention to work as an expert witness or consultant in this litigation?
A. Not as an expert, but to be available as a fact witness in the case if called.
Q. So that agreement for that representation related to your involvement from what you stated as a fact witness in this case?
A. Currently, that's my understanding of the role I would be playing, if any.
Q. Now, have you been asked to or actually been retained by Consumers or someone working on its behalf to potentially offer expert testimony in this case?
A. Expert testimony? Not that I'm aware of.

9

Q. Have you -- as of today, have you done any work on this case that you would categorize as expert witness testimony?
A. No, I have not.
Q. For today's deposition, did you do anything to prepare yourself for your testimony?
A. Yes.
Q. What was that, please?
A. I met with Mr. Theuer and Mr. Messing and Mr. Udrys, they showed me some discovery documents that had been provided out of my files. And I reviewed other documents in my files relating to the transaction and regulatory approvals.
Q. The meeting you mentioned with counsel, how many meetings did you participate in with them?
A. One.
Q. And when did that take place?
A. Yesterday.
Q. Besides the meeting yesterday, did you have other communications with them concerning today's deposition?
A. No. I did not.

Q. Did you, in preparation for the -- specifically for the deposition, did you have any communications with any person from Consumers?
A. I assume that Mr. Udrys is not in that category.
Q. Apart from legal counsel?
A. No.
Q. Did you discuss or communicate with anyone else at Concentric about today's deposition?
A. My secretary in terms of scheduling it, and Ms. Tara Nolan, in terms of logistics and setting it up.
Q. And what did you discuss with Miss Nolan?
A. Simply the fact that counsel wanted to have me available as a fact witness in the case and the government wanted to depose me, that the schedule was in this time frame. There were no substantive discussions. Just logistical.
Q. So in addition to logistical, did you have any substantive discussions about the topics or about the testimony of today's deposition with anyone at Concentric?



A. Nope.
Q. In your prior answer, you noted that you had reviewed some documents from Concentric files with Mr. Theuer and Mr. Udrys and Mr. Messing, is that correct?
A. Yes.
Q. When you say Concentric files, to what are you referring?
A. These were documents that we had produced, I believe originally for the Michigan Public Service Commission case that, as I understand now, had been supplied to the government in this case having to do with our bid evaluation and development of auction protocols for the sale of Palisades and Big Rock.
Q. And you had also mentioned that you had reviewed other documents?
A. Yes.
Q. From where did you obtain those documents, apart from the ones that counsel gave you?
A. From my electronic files that were associated with the Palisades and Big Rock sale process.



Q. And you reviewed those documents when?
A. Last night.
Q. And what documents did you review?
A. The asset sale agreement. My testimony before the Michigan Commission. The presentation made to the board of directors summarizing the transaction. The CCO model for Big Rock and Palisades. And the company's application to the Michigan Commission for approval of the transaction.
Q. The presentation made to the board of directors, you're referring to the Consumers or CMS Energy board of directors?
A. Yes. Consumers Power.
Q. And when was that presentation made?
A. On or about July 10th.
Q. So that was, I believe, shortly before the actual closing date of the sale to Entergy Nuclear Palisades?
A. Not the closing date. Shortly before the announced date or the signing of the transaction.
MR. THEUER: That's July 10th, 2006.
THE WITNESS: Yes. I'm sorry. 2006.



BY MR. DAMELIN:
Q. Maybe that was my confusion. The CCO model you just referenced in your prior answer, what does that acronym stand for?
A. Cost of continuing operation.
Q. And there was a separate model for Palisades and Big Rock Point.
A. Yes.
Q. And in what form did you review that model, meaning was it in hard copy, electronic, when you reviewed it yesterday?
A. It was a PDF of the printout.
Q. And that CCO model, was there a particular version of the model that you looked at during your review?
A. The version that was prepared just before final bid instructions went out to the bidders.
Q. And what was the date of that particular version?
A. On or about May 26th, 2006.
Q. And was that version of the CCO model from on or about May 26, 2006, was that provided to

bidders in the auction process?
A. The model was not, but the output was.
Q. And in what form was the output provided to bidders?
A. It was embedded in and attached to a memo from me to all the bidders.
Q. And when you say the output was provided, at what level of detail are you saying the output was provided?
A. I think it was at a summary level essentially, the bottom line. But I'd have to see the document to refresh my recollection on that.
Q. Was the detail of the CCO model that you described, either the May 26 version or another version, provided to any of the bidders during the auction process?
A. Some of the details were, yes.
Q. And in terms of providing the details to the bidders, why were some details provided and others not provided?
A. More detail was provided on Palisades than for Big Rock. And that was largely in response to



bidder requests for information.
Q. And in terms of the Big Rock CCO, do you recall what level of detail, and I can show you some documents later, but just as a general matter, what level of detail was provided to bidders during the auction process?
A. To have a firm answer, I'd have to see the documents, but my recollection was that the CCO for Big Rock was essentially at the bottom line level and the CCO for Palisades was more detailed as to bidders.
Q. So when you say bottom line, you mean more of a summary output level?
A. Yes.
Q. In terms of the CCO model, did you review any versions in preparation for today's deposition that were prepared later than on or about May 26, 2006?
A. Not of the CCO model. No.
Q. Were there versions of the CCO model that were prepared as part of the bid process that were dated later than May 26 of -- May 26, 2006?



A. Not that I'm aware of.
Q. In terms of the sale process or the auction process for Palisades and Big Rock Point, what role, first of all, did Concentric play in that process on behalf of Consumers?
A. We were the financial advisor to Consumers and auction manager. We also had previously served as strategic advisor to the CMS and Consumers boards with regard to whether to initiate a process.
Q. And so that strategic advisor work that Concentric performed, that would have been prior to the initiation of its auction and sale process?
A. Yes.
Q. What was the time frame that Concentric provided this strategic advisor work to CMS?
A. In the third and fourth quarters of '05.
Q. And for the record, when you reference I think CMS Energy in your prior answer, to what are you referring to?
A. The parent company board.
Q. Parent company of Consumers?
A. Consumers.



(Reed Exhibit No. 1 was marked for identification.)
BY MR. DAMELIN:
Q. Mr. Reed, I'm handing you what's been marked as Exhibit Number 1 for purposes of today's deposition. Take a moment to review that.
A. I briefly reviewed it.
Q. And do you recognize what's been marked as Exhibit Number 1?
A. Yes.
Q. And what is it?
A. It's a copy of our engagement agreement as we sent it to Consumers.
Q. And the date of this agreement is what?
A. October 21st, 2005.
Q. And on the third page of this letter, you signed it as chairman and chief executive officer, is that correct?
A. Yes. I did.
Q. Now, the attachments are -- that you had originally attached in this letter are not included in this exhibit, is that correct?

Page 18

A. Yes.
Q. Now, on the bottom of page 3, there is also a line for agreement to and acceptance by CMS Energy, is that correct, on the third page?
A. By the client, whoever the client is going to end up being.
Q. And was this agreement eventually agreed to or accepted by the client?
A. Yes.
Q. And what -- in terms of this particular engagement letter, who was the client?
A. Consumers Energy was the client. I believe it was signed by Mr. Webb, but that's subject to verification.
Q. I didn't catch the name?
A. Mr. Webb.
Q. And who is Mr. Webb?
A. The CFO of the company.
Q. On the first page of the letter, it's addressed to a Steven Wawro, W-A-W-R-O, director of nuclear assets for CMS Energy. Why did you send the letter to Mr. Wawro?

Page 19

A. He was the one that had requested it.
Q. And what was your understanding of Mr. Wawro's role at -- concerning the proposal that you set forth in Exhibit Number 1?
A. It was my understanding that if the company decided to go forward with the auction process, that they would use Mr. Wawro as the internal manager of that process.
Q. And when Consumers decided to proceed with the auction process, did Mr. Wawro in fact fill that role in the process?
A. Yes, he did.
Q. Was Mr. Wawro, from Concentric's involvement in the Palisades and Big Rock sale, the responsible party for -- responsible person on behalf of Consumers? For its interaction between Concentric and Consumers?
A. Yes. He was the manager of the relationship.
Q. In terms of the work that Concentric performed for Consumers, was Concentric reporting to or responsible to any other individual at Consumers

Page 20

as part of the auction sale?
A. Yes. Technically, we were reporting to the steering committee for the sale and to the board of directors.
Q. And the steering committee you mentioned, who in terms of the names of the individuals was on the steering committee?
A. Mr. Joos, J-O-O-S, Mr. Webb, the general counsel of the company. I can't remember who else was on that, but those three individuals.
Q. Those three individuals and maybe some others. Is it fair to say that these were higher level managers or individuals at Consumers?
A. Higher than Mr. Wawro? Is that your question?
Q. Sure.
A. Yes.
Q. And to whom did Mr. Wawro report to as part of this auction sale process?
A. I believe his reporting relationship was to Mr. Fenech. And by the way, Mr. Fenech was also on the steering committee, but for purposes of this

Page 21

project, he answered to the steering committee.
Q. You had mentioned an earlier presentation you made to the board of directors July 10th, 2006. During Concentric's involvement in the auction and sale process, were presentations either by you or other people at Concentric made specifically to the steering committee?
A. Yes.
Q. And how many presentations were made to the steering committee as part of that process?
A. I don't recall the specific number. Less than six.
Q. And in what form did these six or less presentations take? And by that I mean, were they written presentations or just oral presentations, that type of thing?
A. They were oral presentations usually with written materials that went along with it.
Q. And for the presentations that you recall, who from Concentric actually made those presentations?
A. I led all the presentations. Ms. Nolan,

that Consumers instructed or proposed that you use or was that an idea that Concentric proposed to Consumers?
A. I think it's probably --
MR. THEUER: Object to the form of the question. Go ahead.
THE WITNESS: I think it was probably one that we proposed. It was discussed between Consumers and us. And it was agreed that's what we would put in the final bid instructions.
BY MR. DAMELIN:
Q. And in terms of an annual support payment, what exactly was that intended to be in the transaction for Big Rock Point?
A. It was intended to be a payment by Consumers to the winning bidder as compensation for the costs the new owner of Big Rock would get -- would incur to maintain and operate the ISFSI, the Big Rock ISFSI.
Q. Right. And in return, at least in return for the annual support payment as compensation, would the entity that was responsible for Big Rock Point



ISFSI, were they going to purchase and take title to the ISFSI and the spent nuclear fuel in return for these annual support payments?
A. Obviously the deal was more complicated than that, but those two elements were part of the deal. Yes.
Q. And put another way, Consumers after the transaction, in return for making these annual support payments, would no longer own or have title to the Big Rock Point ISFSI and the spent nuclear fuel?
A. That was our proposal. Yes.
Q. And to what point in time was that the proposal to the bidders, meaning the bidder would receive annual support payments as part of the process?
A. That proposal was put to them through the final bidding instructions, which as I said, I think were on or about May 26th. And we reserved the right to verify those assumptions and asked bidders to bid on a revised basis at a later date.
Q. And was -- at a later date, was the idea



of the annual support payments no longer proposed by Consumers as part of the process?
A. We proposed an alternative in addition to that, which was the payment of a lump sum termination payment for the new owner taking the Big Rock ISFSI and spent fuel for a lump sum termination.
Q. And when was that alternative offered?
A. As I recall, we asked bidders to bid on that basis or resubmit a variation on that basis shortly after the final bids came in.
Q. When were the final bids received from the bidders?
A. I'd have to go back and check my notes. In early July of 2006.
Q. So the request to bidders to -- or this alternative to the annual support payments, meaning the lump sum termination payment, bidders were asked to resubmit bids based on that at some point after early July 2006?
A. It was still in the first half of July.
Q. Okay. And so I don't forget to ask you, the final bids that were received from the bidders,



are those -- all of those the actual bid documents still in Concentric's possession, to your knowledge?
A. I don't know.
Q. Would those have been the type of documents that would be retained by Concentric as part of this type of process?
A. Typically we would retain them for at least a year. I don't know if they are still retained.
Q. And would Consumers, as a client, also be provided with a copy of all bid documents received?
A. It was. Yes.
Q. I'm sorry?
A. It was. Yes.
Q. And in terms of the -- this request for bidders to resubmit bids for this alternative Big Rock Point payment, was that communicated to the bidders in writing either by Consumers or Concentric?
A. Yes.
Q. And in what form was that communicated?
A. Through an email to the bidders.
Q. And who sent that email?

174

A. $30 million. It's a defined term of the contract, essentially the $30 million.
Q. And what was the purpose of subsection 8?
A. To help establish which rights were the buyer's and which rights were the seller's with regard to pursuing the DOE claim.
Q. And I think you indicated earlier also, based upon the earlier section 6.14, that seller, meaning Consumers, retained the right to pursue the claim for the $30 million Big Rock Point payment against the government?
A. Yes.
Q. And what in terms of the business point that you worked on, what were the business points of subsection E?
A. Just that. That we had the preclosing damages for Big Rock and for Palisades. That they, Entergy, had the post closing claims except for the claim associated with the Big Rock amount for the Big Rock ISFSI assets.
Q. And you would consider that business points as opposed to legal points?

175

A. Yes.
Q. What are the legal points of subsection A?
MR. THEUER: Objection. Calls for a legal conclusion.
THE WITNESS: Drafting it so that the business points were clear and enforceable.
BY MR. DAMELIN:
Q. So was the legal aspect of subsection E really a drafting exercise?
A. In a way, I would describe it, yes. The business people had reached an agreement on business points. It was up to the legal team to reach an agreement and establish language that made that set of business points clear and enforceable.
Q. Can you describe for me or tell me what in excess of the Big Rock amount means in the context of subsection 8?
A. Damages that Entergy incurs, if any, above and beyond the $30 million amount that we are essentially -- or Consumers was essentially providing to Entergy.
Q. And how is that amount in excess of the

176

Big Rock amount to be determined?
A. I think that's a question of how one calculates damages going down the road, whether you use a present value determination or whether you use again a nominal dollar determination. And we didn't want to constrain Entergy and their approach to quantifying and pressing for damages so -- we left that issue just as drafted.
Q. So the agreement between Consumers and Entergy, to your understanding, does not define or express how one would interpret in excess of the Big Rock amount?
A. Again, without offering a legal opinion, I don't think there is -- I don't recall there being language in the document which defines in excess of the Big Rock amount, whether that's to be done on a forward looking basis, a nominal dollar basis, a present value basis or whatever.
Q. And did Entergy, as part of the development of the ASA, communicate to you or anyone at Consumers their view on what that term meant?
A. No.

177

Q. Did Consumers have a position or understanding of what that term meant, whether or not it was actually reflected in the ASA?
A. Our understanding was clear with regard to our rights, which is we could assert the claim for the $30 million payment as of the date the payment was made. What Entergy's rights were, we didn't -- I didn't ever hear a view expressed by Consumers with regard to how the "in excess of" language would be applied in the future.
Q. You had mentioned the word damages earlier. What are Entergy's damages?
A. That's for Entergy to determine and try to prove to the Court. I haven't attempted to study that.
Q. Are the spent fuel related costs for storage at Big Rock incurred in excess of the $30 million by Entergy, are those in the future?
A. Yes. In the future as of today or as of the date --
Q. As of the time of the agreement?
A. I would say they were in the future as of

210

BY MR. DAMELIN:
Q. This is Exhibit Number 13. Did you have a chance to review Exhibit 13?
A. I did.
Q. And what is this document?
A. It appears to be an email from John Robinson to John Reed, Tara Nolan dated January 3rd, 2007.
Q. And on that date, Mr. Robinson forwarded to you copies of excerpt reports that had been prepared in the Consumers Energy case against the government, is that correct?
A. It appears so.
Q. There is an attachment. I did not include the attachments, but there is an attachment identified as Speyer expert report. Did you receive an expert report prepared by James Speyer for Consumers?
A. I believe we did.
Q. And did you also receive an expert report or reports prepared by Eileen Supko of ERI and for Consumers?

211

A. I'm not sure.
Q. Did you review Mr. Speyer's expert report?
A. I glanced at it.
Q. And I think you indicated you don't recall whether or not you received one from Miss Supko?
A. That's correct.
Q. Why did you receive the expert report from Mr. Speyer in January 2007?
A. Mr. Robinson had called us and indicated that there may be a need for us to appear as a fact witness in the case. And I said, is there any background information we can review to understand what the case is about and this is what he sent.
Q. Did -- you said you had glanced at Mr. Speyer's expert report. After glancing at it, did you communicate with anyone at Consumers or Mr. Speyer concerning your review of the report?
A. No.
Q. Did you review the report specifically for how it addressed the $30 million Big Rock payment we discussed today?
A. As I recall, I looked through it very,

212

very quickly just to see if it was there.
Q. And was it included in the report?
A. My recollection is that it was.
Q. And I think I asked you, did you have any communications with James Speyer about his report or as part of any part of your work for Consumers?
A. Not really. I saw Jim at some other event and said I noticed that he had been retained as an expert by Consumers, and that was it.
Q. Did you have any communications with Eileen Supko about her work or expert report in this case?
A. In this case?
Q. In this case, meaning the Consumers Energy litigation?
A. No.
Q. And did you review or receive any other expert reports that were prepared on behalf of Consumers Energy in this litigation?
A. No. I did not.
Q. Go off the record.
(Recess.)

213

BY MR. DAMELIN:
Q. Mr. Reed, have you discussed the Consumers case against the government at any time with Mr. Wawro?
A. No. Not since the transaction occurred.
Q. And at the time of the transaction, did you discuss with Mr. Wawro the Consumers case against the government?
A. In very general terms. I mean, his general guidance was go talk to -- I think Steve's view was he wasn't very close to what was going on in that litigation.
Q. And to the extent that there was information that you needed for the transaction related to the Consumers case against the government, that would have come more from Mr. Udrys, not from Mr. Wawro?
A. That's correct.
MR. DAMELIN: I have no further questions, Mr. Reed. One point, based upon some of the responses today, it appears that we may not have all of the documents that you referenced in your answers.

214

We did receive a number of documents from the subpoena that we issued and we received some from the regular document production, but there were a number of documents which we don't believe we have. But what we will do is we will review the documents we have and we will send a letter to counsel depending on that, but I would anticipate doing that shortly. And then following up.

MR. THEUER: Sure.

MR. DAMELIN: Unless you have any further questions, I think we are done.

MR. THEUER: I'd like to reserve read and sign, and I've got no questions.

MR. DAMELIN: Thank you very much.

(Whereupon, at 3:30 p.m., the taking of the instant deposition ceased.)

215

ACKNOWLEDGEMENT

____________________

Signature of the Witness

SUBSCRIBED AND SWORN to before me this ________ day of ____________________, 2008.

____________________

NOTARY PUBLIC

My Commission expires: ____________________

**Consolidated Edison Co. of NY v. U.S. (Live) Docket No. 04-33C (Hearing: 8/22/08) August 25, 2008**

**Page 1 to Page 57**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONSOLIDATED EDISON COMPANY )
OF NEW YORK, )
Plaintiff, )
)
v. ) Docket No. 04-33C
UNITED STATES, )
Defendant. )

Friday,
August 22, 2008
Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on August 25, 2008.)

APPEARANCES:

For the Plaintiff:
DAVID CHURCHILL, Esquire
Jenner & Block, LLP
1099 New York Avenue, N.W., Suite 900
Washington, D.C. 20001-4412
(202) 639-6000

For the Defendant:
PATRICK B. BRYANT, Esquire
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005

Page 2

APPEARANCES: (Cont'd)

For the Intervenor:
ALEXANDER TOMASZCZUK, Esquire
Pillsbury Winthrop Shaw
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7612

Page 3

P R O C E E D I N G S

(9:43 a.m.)

THE COURT: We're on the record this morning in the case of Consolidated Edison Company of New York v. United States, Docket Number 04-33C. Because the motion for joinder presented in this matter directly affects the Plaintiff in Entergy Nuclear Indian Point II, Case Number 03-2622C, I of course have invited Plaintiff's counsel in that matter to appear today.

First of all, I apologize for the Court's calendar today which indirectly said that this was on Defendant's motion for summary judgment. Obviously that is not the matter that we're hearing today. We're hearing Defendant's motion for joinder.

I decided to have two law clerks help me out in this matter. It's fairly complicated. I have both Loren and Pablo here today. Pablo is not going to testify.

(Laughter).

I think the way we'll do this today, I'll hear from the Defendant first since it's the Defendant's motion; then we'll hear from Consolidated Edison; and then we'll hear from Entergy.

Before we get started, let's have the appearances of counsel for the record.

Page 4

For Consolidated Edison?

MR. CHURCHILL: Good morning, Your Honor, David Churchill, Jenner & Block for Plaintiff, Consolidated Edison. With me is (inaudible) Robertson, Julie Carpenter and Tom Kim from my office.

THE COURT: Welcome to all of you.

Let's to Entergy also while we're over on the Plaintiff's side.

MR. TOMASZCZUK: Good morning, Your Honor. Alex Tomaszczuk of the Pillsbury Law Firm representing Entergy Nuclear Indian Point II, LLC. And with me representing Entergy is Jager Smith of the White Carter firm, (inaudible) Robertson, Julie Carpenter and Tom Kim from my office.

THE COURT: Welcome to both of you, again.

On the Defendant's side?

MR. BRYANT: Good morning, Your Honor. Patrick Bryant from the Department of Justice representing the United States. With me today at counsel table are GSA attorney Andrew Averbach, Scott Damelin and Madeline Rice.

THE COURT: Welcome to all of you.

Mr. Bryant, you may proceed.

MR. BRYANT: Good morning, Your Honor. May it please the Court.

Page 5

Pursuant to Rule 19(a) Defendant respectfully moves to join Entergy Nuclear Indian Point II, LLC in this case, or in the alternative for issuing a binding notice to Entergy pursuant to Rule 14(b) and 41 U.S.C. 114(b) of the Contractor Settlements Act.

Your Honor, joinder is mandatory here pursuant to Rule 19(a). Pursuant to Rule 19(a) an active party (inaudible) could potentially subject a party to the payment of double or multiple obligations, is a necessary party who must be joined to the action.

Here ENIP's non-joinder could potentially subject the United States to the payment of double or inconsistent obligations.

THE COURT: Is this any different from the motion to consolidate that Defendant has previously filed in this case? If so, how?

MR. BRYANT: It is different, Your Honor, in that at this point in the case we have a better understanding of what Consolidated Edison's theory of the case is. Specifically we've received the expert report, in fact we've received several revised editions of ConEd's expert report. We have received amended disclosures as we alerted the Court this week.

Page 6

Based upon the discovery that we've taken to date premised upon the expert reports and disclosures, we can now determine the nature of their claim. The claim is, and it's evident that had Entergy paid less for Indian Point than they otherwise would have (inaudible). In other words, ENIP proceeded to count when it purchased the claim.

Furthermore, according to the amended disclosures that we received last week from Consolidated Edison, ConEd is now claiming that the $23 million payment which was transferred to Entergy at the time of closing specifically to address future spent fuel storage costs at Indian Point. They were future in 2001, Your Honor, but ENIP's claim that it brought in 2004, they're seeking the same costs that allegedly they were compensated for at the time of closing.

How were they compensated? Well, we know from the report of Mr. John Reed issued in this case in discovery by ConEd, that essentially (inaudible), as I mentioned, by receiving the discounts for the purchase price, ConEd got more than it otherwise would have but for the breach.

THE COURT: So basically if I understand, the government's position is if we have to pay ConEd

Page 7

$23 million and then we have to pay all of ENIP's mitigation damages, we're basically paying twice.

MR. BRYANT: That's correct, Your Honor. In that case the inconsistent or double liability developed at Rule 19(a) is intended to prevent, Your Honor. Under the general principles of expectation damages, ConEd proves at trial that it sold Indian Point at a discount because of the breach, then (inaudible) must be binding (inaudible) and taken into account as some sort of offset or credit in this case against (inaudible). And furthermore, I think it's even more clear in the case of the $23 million transfer.

According to the amended disclosure this is a direct payment that was intended to compensate Entergy in advance for spent fuel storage costs that would occur in the future at Indian Point.

If ConEd can prove that they did transfer this money to ENIP for spent fuel storage costs, then by necessity they were compensated, received compensation for the breach and that compensation must be taken into account in this case.

Absent joinder there is the possibility that, as Your Honor articulated, if both parties prevail at trial the United States will face double

Page 8

liability for the same breach of contract related to the same plant.

THE COURT: Tell me how you see the relationship between Rule 19 and Rule 14 that you cite. You state the rules in the alternative, as I understand your motion, but how do they relate? For example, if I were to take an action under Rule 19 would I then have to do anything under Rule 14? Or not?

MR. BRYANT: I don't believe you would, Your Honor. If you find that any of the criteria under Rule 19(a) have been met in this case then joinder is necessary. I think the practical effects of either joinder or binding notice pursuant to 41 U.S.C. 114(b) would be the same in this case.

What the government is most concerned about is this issue of the offset, making sure that whatever diminished value damages are awarded to Consolidated Edison, that that amount is properly calculated and applied to ENIP in its separate case against the government for the very same damages.

So the practical effect, Your Honor, of either issuing, for purposes of the offset, I think it would be the same in each case. I don't think the (inaudible) rule for (inaudible). I don't think

Page 9

(inaudible) Rule 14(b) if we find that joinder is necessary according to Rule 19(a)(2).

THE COURT: Have you thought about how the trial might proceed if we were to put these cases together somehow? I do have some thought myself, and I'm wondering how the trial might proceed. Would it really be more efficient to do it that way, versus keeping them separate?

MR. BRYANT: Your Honor, I think it would be. I think judicial attention should be taken together. If the Court were to join ENIP's case to this case, I suppose the Court could hold one single trial, and based upon Your Honor's experience in the Carolina Power and Light case, I suppose ten days for each claim might be enough time for the trial.

Your Honor, if it turns out a bifurcated trial whereby we hear first the ConEd claim, and then we go to ENIP's claim, Your Honor could follow the timing set by Judge Lettow in Boston Edison where the two parties again were present at the same time (inaudible) claim at the same time.

But I do think absent joinder, if the two cases are allowed to go on parallel tracks, as we represented, there's no mystery about it, we are going to need certain offsets in the event that ConEdison

Page 10

prevails in the (inaudible) theory. In that instance, Your Honor, we would be put in the awkward position of having to essentially prove diminished value in the separate case involving ENIP, and frankly, Your Honor, I'm not sure how we would do that.

I would imagine that what we would do is we'd probably have to trot in many experts to testify for ConEd in ConEd's (inaudible) side of the case. The same fact witnesses would testify for ConEd in ConEd's case. And the same ENIP employees who are going to testify in this ConEd case. So in order to avoid the Court having to hear from all those witnesses twice I think it would make sense from a practical standpoint to conduct the trial at once, the joined claims at once.

THE COURT: Do you have anything further that you want to add?

MR. BRYANT: Well, Your Honor, do you have any more questions?

THE COURT: I really don't at this time. I think before we get too far ahead of ourselves, ConEd and ENIP may be squirming a little bit over here, so let's hear from Mr. Churchill.

MR. BRYANT: Very well, Your Honor. If there are no further questions, for the reasons stated

Page 11

in argument and in our brief, we respectfully request that ENIP be joined.

THE COURT: Before you sit down let me just confirm one thing.

My understanding is that these two cases right now are about four months apart in status. If you look at the discovery ending dates, I think it's October and February respectively.

MR. BRYANT: Yes, Your Honor. I believe that's correct. As Your Honor probably has read, there are no trial dates set yet for either case.

THE COURT: Right.

MR. BRYANT: I think, notwithstanding the representations in Plaintiff's breach, I think our cases actually are much more in parallel right now discovery wise than might otherwise be suggested. For example, they're still very much in the middle of fact discovery in Consolidated Edison's case as well as ENIP. We have just been notified by counsel for Consolidated Edison that they intend to provide expert reports in light of the Federal Circuit's recent decisions in Yankee Atomic and Pacific Gas and Electric with respect to the rate of acceptance issue. So in the near future we will be receiving a specialty set of reports. We'd likely

Page 12

have to take depositions again. We likely would have to amend some of our reports in spots. Therefore (inaudible) to join these cases.

I'm not certain that ENIP will be meeting its claim against the government in light of the Federal Circuit (inaudible) ruling, but I strongly suggest that they probably will. Again, that suggests if we're sort of, we're at the point now where we are amending claims in light of changing law. I think that would also alleviate, perhaps, the parties' concern with respect to where we are in discovery in those cases.

THE COURT: I'll just share with all of you, one of my reactions to the recent decisions from the Federal Circuit is that it ought to simplify these matters. I think a clear ruling on the appropriate acceptance rate to apply along with the parties' good faith implementation of the pre-trial order on damages, there ought to be really very little left in controversy as to mitigation damages.

MR. BRYANT: I don't disagree with Your Honor. Once those decisions become binding, certainly –

THE COURT: Yes.

MR. BRYANT: One other point if I may, Your Honor, my colleague just reminded me to mention. Our

Page 13

concerns over the risk of inconsistent judgment or double liability judgment in the two cases aren't just restricted to inconsistent and multiple trial levels. We're also concerned about what happens to these cases on appeal. And to the extent these cases are not joined, and let's say ConEd and ENIP proceed to trial separately, in the event that there are appeals of those decisions, once ENIP appeals and once ConEd appeals, what happens then? There's a risk that one three-judge panel at the Federal Circuit will decide an issue differently than the other three-judge panel at the Federal Circuit.

THE COURT: I understand that concern completely, and I think that even though the parties have the same judge at the Court of Federal Claims who hopefully could keep matters straight so as not to allow any double recovery, there is a risk on appeal that some of that might change. So I appreciate that.

MR. BRYANT: Thank you, Your Honor. If there are no further questions, for the reasons stated here and in our briefs we respectfully request that ENIP be joined to this case. Thank you.

THE COURT: Thank you. Mr. Churchill?

MR. CHURCHILL: Thank you, Your Honor.

Page 14

Your Honor, this is the government's fourth effort to combine these cases. Four times. Three times on slightly different theories, citing a different rule. This time they've come up with what they say is a mandatory joinder of these cases. The cases have proceeded smoothly to this point. Discovery is nearly completed. We have our discovery cutoff in mid October in the Consolidated Edison case. There is no practical reason in the world for these cases to be joined at this point. We have every confidence that because we're before the same trial judge and the cases are not years apart, that you will be able to determine if there is any risk of duplication or inconsistency. And with respect to the appellate issue, Entergy should deal with this more than I because they are involved in the (inaudible) case where the Federal Circuit in the case that was partially consolidated, now the Federal Circuit is asking, wait a minute. Who are the proper parties for the appeal? We thought this was a seller's case, but here on the appeal Entergy's the buyer, and their point of the appeal, they probably won't appeal at all. So I would suggest, Your Honor, that there are greater risks in consolidating or joining these cases

Page 15

on appeal, or now, so that they would be joined on appeal than leaving them completely separate. It's easy for the circuit, it seems to me, to understand that this is a seller's case. It's complete. There's a final judgment. And if the government wants to take an appeal, they can take an appeal just to that. There's no reason to join the buyer's case, whose proofs will not even be in yet at the time the seller's case is complete. There's another purely legal reason why these cases should not be joined. Rule 19 requires, in all cases for joinder, that the position of Entergy claiming an interest in the subject matter of the suit. And as I understand Entergy's papers, they are not claiming any percent of subject matter of the suit. The proofs in these cases are entirely different. They are made different because of the sale of the unit. Our cost and injury was complete and finalized as of the date of sale, September 2001. Entergy's damages start thereafter, and they aren't claiming any damages before 2002. So these cases are, from a damages point of view, entirely separate. And the theory of the damages are entirely separate. I would like, if Your Honor would indulge me

Page 16

for a moment or two, to talk about our different theory of damages. The government had the chance to look at our expert reports and they are now more knowledgeable about our theory of damages and --

THE COURT: I welcome that presentation. The one issue that's causing me difficulty, though, is the one that Mr. Bryant raised. If I were to keep the cases apart and let's say hypothetically I were to award ConEd $23 million or some number in that area for the payment that ConEd made to ENIP at closing for decommissioning costs, which seem to be directly related to ENIP's mitigation damages, the money they spent to deal with spent nuclear fuel, how can the government then raise that defense in the ENIP trial to say hey, wait a minute, you gave ConEd $23 million. We're having to pay double for the same event.

MR. CHURCHILL: Let me address that in two parts, Your Honor. One is, it's not a double payment. That addition to the decommissioning fund was made not at Entergy's request, it was made because all of the bidders during the auction process, and I will describe the auction process in more detail, but during the auction when ConEd sold these assets, all of the bidders raised concerns about the accuracy of

Page 17

the decommissioning fund because, they said, the government's not thinking about the spent nuclear fuel, it's going to be there when we have to decommission this plant, what, ConEdison, are you going to do about it?

So that money was placed into the decommissioning fund not for Entergy, but for anybody. So that simply was part of the determination of the fair market value of this asset. It was not a payment to Entergy.

The fact that Entergy paid the fair market value does not mean that our harm, that Consolidated Edison's harm being damaged by the government at the time of sale somehow is a windfall to Entergy. It wasn't a windfall. They paid a fair market value.

But our claim is that the government diminished the entire market, and thereby the purchase price that in this case in fact Energy paid, that doesn't mean Entergy benefitted or Entergy gained in any improper way. That's simply the effect of the market at that time. The market was depressed precisely because of the government's breach.

So I don't see an offset case here.

If there is an offset case, and this is my second point. If there is an offset case, as Judge .

Page 18

Lettow found in BECO, it is a case that is applicable only in the buyer's case, in the Entergy case.

This issue came up precisely in the first buyer case, the BECO case, as you know. And the BECO plant, the (inaudible) plant in Massachusetts before Judge Lettow. His decision on that case, now on appeal, and I'm quoting now from 80 Fed Claims at 495, where the government made the offset claim. He said, "The offset funds sought by the government against Entergy is not recoverable in an action brought by Boston Edison, the seller, because," he said, "it does not represent a present claim."

If there is an offset claim, if there were some benefit, and we don't agree that there is. But if there were some windfall that had been given to Entergy in the process, that claim would be the government's claim against Entergy, not against Consolidated Edison. That's what Judge Lettow found in BECO.

THE COURT: Let's assume there had been no sale. Let's say that the same nuclear plant owner had kept it and there had been no sale. In that even I presume the government would be liable for damages in the amount of whatever costs were incurred to store spent nuclear fuel and various related items.

Page 19

But in this case if the Court awards damages for those mitigation costs to both ConEd and to Entergy, the government really is being asked to pay millions more just because there was a sale, it seems to me.

MR. CHURCHILL: I think, Your Honor, that's the point. We're not asking for those costs. We're asking for the diminution of value that resulted from the additional risks that the market and therefore Entergy faced at the time of the sale. It's a different category of damages altogether. It's not costs alone.

If there were no sale, and there are many cases like that pending before this Court as I understand it, the Court is being asked to adjudicate the claims as they're incurred. As one of the companies has to buy casks to store the spent fuel they write a check and they come in with a canceled check and ask the government to pay it because that's a government breach. That's Entergy's case, that's the buyer's case. That has nothing whatsoever to do with our case. Although we do have some minimal conflict of a few million dollars before the date of the sale.

But our case is different. Our case is the

Page 20

effect of the, the added risks that were dependent on the government's breach at the time of the sale as an additional burden and impairment on the asset that existed at that time because of the breach.

Let me expand on that a little more.

In 2000 when ConEdison prepared to sell the plant, the plant sale was final in September of 2009. The sale started in 1999 and 2000.

At that time ConEdison was faced with a severe and rather immediate shortage of storage space for spent nuclear fuel. ConEdison had entered into a contract as everyone in the industry had 20 years earlier where the government promised to start taking that fuel in 1998. On that basis ConEd said okay, we're going to have adequate storage space at our facility because the government will start to take it out.

The government breached. ConEdison, just because of its physical location, had a rather immediate and severe storage problem. They were going to run out of storage space by the middle, the first decade of the new century. So by 2004, 2005, 2006, the plant facility, Indian Point, was going to be out of storage space.

So that was the situation at the time of the.

Page 21

sale. Not only the seller, ConEdison, was confronted with the lack of storage space, but all of the bidders who came during the auction process found out instantly that hey, you people have a rather serious problem here. Some of these plants can go many many years without running out of storage space. But ConEdison at Indian Point, you're going to run out in a few years. And if you run out of storage space and you can't build another one and you can't get it approved because of the NRC or because of local pressure against having this nuclear radioactive waste on the facility, then the plant shuts down and the asset value is completely lost.

So at the time of this auction there was the immediately pressing problem caused by the government's breach, and that affected everyone concerned. It affected the seller and it affected the buying entity as they came in to see that this was not some academic problem down the road, this was an immediate and pressing problem. As a result of that their valuation of the facility were lower than they otherwise would have been.

THE COURT: Then in order to sweeten the pot and attract buyers, if I understand correctly, it seems as if ConEd created this fund to deal with that

Page 22

ongoing problem for whoever bought the plant.

MR. CHURCHILL: The fund was created for different reasons. The Nuclear Regulatory Commission requires that this fund be extent in any situation whether they've been breached by the government or not. These companies have to have a fund, a decommissioning trust, so that when these plants inevitably do shut down and get decommissioned there are ample funds out there already provided for for the decommissioning effort.

What happened was, because of the government's breach and because the spent fuel would still be on site in large numbers at the time of decommissioning, ConEdison had to sweeten that pot, had to make that fund bigger than it otherwise would have been. That's in the government's brief. And that –

THE COURT: And that's part of your claim against the government.

MR. CHURCHILL: Yes, sir. That is one of the places where John Reed, who is our expert on that subject, has found damage, diminution in value, is in the decommissioning fund. It was larger than it would have needed to be had the government not breached the contract, and therefore ConEdison was out of pocket

Page 23

for that.

Now the government makes much of the fact that our expert, Mr. Reed, relies on Entergy data for the damages calculation, as if somehow our damages are going to be the same as Entergy's. It's not the case.

As the Court will remember, we had a series of subpoenas that we issued to third parties for their records. We had motions to compel and we appeared before Your Honor and you helped us with several of those subpoenas with reluctant third parties, other potential bidders, who were reluctant to give us their valuation materials because they were so sensitive. As a result of that we got a number of very very important documents and computer models. Some of Entergy's, some of Dominion Resources, some of Constellation, all companies that were in the bidding process, and we made our damages calculations using those materials.

Now Mr. Reed relies specifically on the Entergy materials. They're the most complete. They were the successful bidder, and Mr. Reed is an expert who is intimately familiar with these transactions. He's been involved in many of these things. So we asked him to look at the Entergy materials and tell us

Page 24

where, if anywhere, Entergy devalued the plant because of the government's breach. He found actually three different places. One is the decommissioning fund, as we've already discussed. He found two other significant areas where their valuation was devalued as a result of the government's breach.

One is it required a risk premium in its bid, because of these risks, because of the inherent spent nuclear fuel risk and because of this unusually pressing spent nuclear fuel risk at Indian Point, n required a risk premium.

Entergy also was unable to obtain project debt financing from the industry. The industry, the lending industry simply decided that these projects were too risky, and in part because of spent nuclear fuel, these projects are too risky. So Entergy had to fund the transaction by means of pure equity, which is much more expensive. Those three elements combined make up the damages that Mr. Reed found, and those amount to about $108 million. The amount that the Entergy team devalued the asset as a result of spent nuclear fuel.

We've also already talked about the $23 million on decommissioning, and let me address something that Mr. Bryant raised specifically.

Page 25

One of the elements that often appears in these buyers valuation models when they're trying to figure out what this is going to cost and they know they're going to have to have extra storage space for spent nuclear fuel, they'll put in their valuation model for cost the expected costs of these capital assets, dry casks, expensive dry casks to store the fuel indefinitely on site.

What we found in looking at the Entergy materials is initially they did reduce their valuation of the plant because of those capital costs, but at the last minute, for reasons we'll get into in a few months here at trial, they decided to take that out. They decided to wash that out of their valuation model. So Mr. Reed concluded, and ConEdison, we're seeking no damages at all because of the expected costs of those capital assets.

So when Mr. Bryant says they're the same costs that Entergy is not claiming, that's wrong. Even as a manner of calculation of the bid at the time, the valuation that Entergy arrived at, those costs came out of the valuation model, and they therefore have come out of our claim for damages. They are no part of our claim for damages. They are, as I understand it, the actual incurrence of those

Page 26

costs will eventually be a part of Mr. Tomaszczuk's claim for Entergy as the buyer, but only as those costs are incurred. Completely different damages model.

Now one other thing I'd like to point out to the Court is we don't rely only on the Entergy (inaudible). Your Honor helped us with these other companies. We got a number of the order valuation materials from Dominion Resources down in Virginia and from Constellation in Baltimore. And we have reviewed those materials. They're not as complete as the Entergy material, but once a successful bidder, in fact neither company actually submitted a final bid, but both were in the running. both looked very hard at this asset. They made site visits to Indian Point to determine whether they would bid, and they made calculations of what their bid might be.

We've also (inaudible) both of those companies about what the companies were thinking in terms of fuel risks. Was this an issue for the company? Both of them explained how their systems worked and both of them had told us that a major reason, if not the principle reason why those companies did not bid was the spent nuclear fuel risk and the immediate risk of shutdown in the first decade

Page 27

that they faced at Indian Point.

We've asked Steven Maloney, another industry expert, to help us assess these materials and he believes, just looking at the partial materials that we have that doesn't even include decommissioning materials, that the diminution in value that these companies found is in the neighborhood of about $60 million. Even more –

THE COURT: Sixteen or six-zero.

MR. CHURCHILL: Sixty million.

So in contrast to those damages models which we have used, Entergy as I understand it, and it's clear from the materials that the government has attached to its expert report, Entergy's claimed that it incurred costs. Once the sale took place they began incurring costs of storage and all the rest of it that are going to make up their claim against the government.

The proofs are entirely separate. There may be some witnesses who are the same, just because they were at the plant before 2000 and after 2000. But in terms of what they're going to be testifying about and their role in these damages calculations, it's entirely different. They are two separate proceedings, and I can't imagine any economy that

Page 28

would be achieved by joining these two cases.

THE COURT: I'll tell you, they seem like two pots of money intended to address the same problem. The problem being what to do in storing spent nuclear fuel. One is looking prospectively based on ConEd's estimate at the time of sale. And then the other one is what was actually incurred to cover the same problem.

MR. CHURCHILL: That's certainly the government's argument, Your Honor, and it has some superficial appeal, I admit. But it doesn't withstand scrutiny. What we're looking at are the risks of the transaction going forward. Entergy still has all of those risks. Entergy isn't making claim for that. Entergy is making a claim only for the incurred costs. But what happened when they looked at the risk at the time of sale, they diminished their bid and the other parties had the same reaction because of the government breach. So our claim was complete without the incurrence of any of these costs in the future which are Entergy's costs. Our injury was complete upon the industry's assessment of that risk and the dilution of their price for the asset. That's what happened, and that's why our claim legally is entirely separate from what is happening with Entergy.

Page 29

Your Honor, there's one other argument the government has made, which didn't come up this morning in Mr. Bryant's argument, but the cited Indiana-Michigan, the future damages case, for the proposition that what we're seeking, at least in part, is future damages. Damages that have not yet been incurred. I understand that's a problem for cases involving ongoing operation at nuclear plants. If we still own the plant and we're seeking damages that we expect to be incurred in 2011, 2012, that will present (inaudible). But we have no (inaudible) because our injury was complete in 2001. Our injury was incurred, actually caused, by the government's breach in 1998 and it was realized, just like on the sale of (inaudible), it was realized in September of 2001 when we sold the plant. At that point the effect of the government's breach hit ConEdison in a way that could not be retrieved.

THE COURT: We probably don't have to address that right now, but your point may be well taken.

Thank you, Mr. Churchill.

Mr. Tomaszczuk, you're next.

MR. TOMASZCZUK: Thank you, Your Honor. Good morning. May it please the Court.

Page 30

THE COURT: Good morning.

MR. TOMASZCZUK: I think for some of the reasons that Mr. Churchill stated and others that I hope to touch on briefly, joinder and/or consolidation and/or issue of notice under Rule 14, none of those is a good idea, would not serve the efficient administration of the cases and for that reason we'd oppose any of those alternatives.

First and foremost, let me just start briefly, and Mr. Churchill touched upon this, on the text of Rule 19. One of the predicates for invoking Rule 19 specifically is that the person claims an interest relating to the subject of the action. And we frankly do not meet that standard. The government hasn't addressed it. But let me just say here that my client, Entergy Nuclear Indian Point II, LLC, does not claim an interest in ConEd's action. That's their case, not our case. For that reason alone the government's reliance on Rule 19 is inadequate and should not be invoked by the Court.

THE COURT: But if I were to, let's just say hypothetically, if I were to award ConEd $23 million because of this fund that was set up and then that results in the inability of ENIP to recover mitigation damages in that amount because I conclude it's a

Page 31

double payment, then it seems to me you would have an interest.

MR. TOMASZCZUK: I think in that circumstance we would have an interest, Your Honor, but for reasons Mr. Churchill stated and for reasons which I'd like to articulate, I'm not sure that's correct. What the Court is asking about is an offset or a set-off claim by the government against ENIP. We certainly have every interest in defending against (inaudible).

Your Honor, I've been involved in this case for ten years and the Court has been involved almost that long.

THE COURT: You have my sympathy.

MR. TOMASZCZUK: It's never been clear to me, and I have not heard the government express to at least my understanding, why the government should be entitled to an offset against Entergy in these circumstances.

We were an innocent buyer. We participated in an auction process. We paid fair market price for this asset just outside of New York City. We continue to pay quarterly fees to the U.S. government. We are the appropriate successors to the contract with the government, and we feel strongly that the government

Page 32

has breached that contract and we're entitled to recover our mitigation damages as a result.

The government has not yet established as a matter of law or as a matter of fact that this entitles any set-off against Entergy in these circumstances, and none has been established by the government as a matter of fact or law and none has been adopted by the Court yet.

In point of fact the claims are different, and it seems to me consistent with the Federal Circuit ruling in Indiana-Michigan, they're different in one fundamental way. ConEd has a claim that runs up to the time of the sale, in or about September of 2001, and that's why I say we have no interest in ConEd's claim. They were a party to the standard contract. The government breached the contract prior to the date of the acquisition. ConEd's claim is ConEd's claim. We succeeded ConEd's interest in the contract after the date of the acquisition. We have damages going forward from the date of the acquisition into the future.

Our client at trial when we get there will seek those costs resulting basically from the date of the acquisition through the fiscal year prior to the date of trial. That's what Judge Lettow has ruled and

Page 33

that's what this Court has done.
It seems to me that those claims are fundamentally different claims. ConEd has their theory and they can recover those costs up to the date of the acquisition. We're entitled to recover those costs thereafter. It's not clear to me in those circumstances why the government is entitled to any set-off against ENIP.
To the extent that ConEd seeks to recover costs after that date, that's a problem from our standpoint because those are our costs and our claim and not theirs. But I did not hear Mr. Churchill say that.
The Court also asked about, or observed that the cases are really only four months apart, or so, but that's not really quite the whole story. In the ConEd case there's been a substantial amount of discovery. They submitted an expert report, I understand the government submitted an expert report. I haven't even seen the government's expert reports. There has been a whole process of discovery that's gone on in that case that neither I nor Mr. Smith nor anybody else involving Entergy has been involved with. That's one of the reasons why to grant this motion now would be prejudicial to us. It's been already decided

Page 34

not once, not twice, but at least three times that this is not a good idea.
So now that all this discovery has taken place in the ConEd case, the government now comes in with a slightly different wrinkle on an old theory and says we ought to be brought in. But we haven't been involved for the past ten months in the discovery process except for, just to be clear, the production of documents. As the Court's aware, we've produced a lot of documents and we've made some witnesses available for testimony.
But I as counsel, and Mr. Smith as counsel, have not been involved in that process, and I can represent today, the government didn't give me a copy of their expert reports, I haven't seen them. So to ask me to come in now and try to prepare jointly on some manner in that trial it seems to me is prejudicial to us.
So the four month gap, if you will, between the cases is not the full story.
The Court asked about how this is going to work practically if we were brought in. I think I can represent to the Court, with all due respect to Judge Lettow, the truth is, and this Court is aware of it, the Court is not really well designed to try

Page 35

tripartite litigation. Look at this room. Where does the third party go? That's an issue in that case. We had to bring in a separate table. We were right there behind witnesses, kind of had to peek behind the witnesses to keep an eye on the judge and the witness. So the Court is not really well set up for tripartite litigation and indeed that's why if you read the government's papers closely, why there aren't cases under Rule 19. There's almost no cases in the Court involving Rule 19 because (inaudible) issue. It doesn't happen very often because this Court has got unique jurisdiction designed for Plaintiff's against the government. It's not into tripartite type litigation.
Moreover, from an efficiency standpoint, I don't think there's much to be gained by joinder or consolidation or consolidation for a limited purpose. There will be some overlap in the testimony but I think it's going to be minimal, Your Honor.
With regard to full joinder, I don't know what we would do. I gather that ConEd would go first, since they're first in time. Their claims run up through September, and I presume Mr. Smith and I would be sitting there while the ConEd case and its witnesses proceed. And then we'd hear the Entergy

Page 36

part of the case and Mr. Churchill and his colleagues would be sitting there while we put on our case. That seems to me to be a colossal waste of time for counsel and for the parties and indeed for the Court.
There's another problem which Mr. Churchill alluded to and that is absent full joinder, I would respectfully submit that we would not be bound by any appeal that's taken in the ConEd case. And indeed, that is the issue that's before the Federal Circuit in the Boston Edison case. I think Judge Lettow actually got it right. I think he concluded, and I think what Judge Lettow intended, was that, and he certified in the Boston Edison case and left for another day any set-off claims by the government against the other Plaintiff in that case, (inaudible) Nuclear Generation Company. The Federal Circuit hasn't ruled on that issue yet, but our hope is that the Boston Edison deal goes forward we're not bound by it and at the time that the (inaudible) Nuclear Generation case is heard, Judge Lettow will have to decide any set-off claims by the government in that case.
Let me just say a few words about our damages theory. And I have to protect myself here, Your Honor. I have to note that by not responding to Mr. Churchill's assertions regarding what Entergy did

Page 37

or did not do, I can't be bound or necessarily concur in everything he says in matter of fact or law, but I'm not here to address that in this proceeding. But I have to preserve my right to address it at this time, until the merits of the cases are heard.

But let me be clear. We're not asking for decommissioning costs in the ENIP II case. We're asking for those costs incurred after the date of the acquisition through the fiscal year prior to trial. We hope we can get to trial in 2009 so the costs would hopefully include most of 2008. Those costs are basically hard costs, and the huge majority of those costs are associated with construction of a dry fuel storage facility at the plant. It will hold 75 casks. Because of the nature of the plant, because it's outside of New York and all of the number associated with that, it's an expensive facility. But that's the lion's share of the cost. It's not all of them. There are other applications and other issues, but the lion's share of those costs are going to be dry fuel storage costs.

We would submit that at such time as we get to trial, assuming that the PG&E, Yankee and (inaudible) cases are final and affirmed, we frankly share the Court's observation that the trial ought to

Page 38

be pretty straightforward. I mean once you take the spent fuel model and run that out, you can determine exactly how much spent nuclear fuel the government was supposed to pick up under the contract, when they were supposed to come, and the witnesses can testify about it. That's been in light of DOE's non-performance and what the costs are associated with that.

And in light of this Court's particular order with respect to a pre-trial order on damages, I would think we could get this trial down to maybe a week. It ought to be a fairly straightforward exercise.

But be clear. We're not asking for decommissioning costs. We're not going to be asking for future costs. There's going to be a firm cutoff date. We generally have agreed with the government on that. I would note we have an obligation to amend our complaint through August of this year. We will be doing that we predict in September. So it should be a fairly straightforward action.

Let me just finally say, Your Honor, I truly feel in these cases like, not me personally, but my client is a breaching party. I would just like to note for the record that we've been paying a huge amount of quarterly fees to the government. We've

Page 39

been performing our end of the bargain. We are not the breaching party here. It's the government's conduct and DOE's manifest failure to perform for a period of year after year after year with no end in sight, that is the cause of this problem. It's far from clear to me why the government in that circumstance has any right to set off an instant third party purchaser facility who has its own independent damages, which the Federal Circuit has basically said look, these are the damages you're entitled to. That's what they said in Indiana-Michigan.

Your Honor, in summary, we oppose joinder for the reasons I've stated. I don't think it's justified under Rule 19. It's certainly not justified under Rule 14. We're already before the Court. We're not a third party. We're here. We had our own claim. And indeed, if you look at Rule 14 and Rule 19 they contemplate reaching outside to somebody that's not here. We're here before the Court. And Your Honor is certainly capable of managing the docket and ensuring that there's not duplicative testimony in the cases, ensuring that no hardship or unfairness is worked on any party, even though I would ask the Court to keep in mind that the government's the breaching party, not us.

Page 40

For those reasons we oppose joinder, we oppose consolidation, we oppose limited consolidation. We'd like to get our case teed up for damages and trial in 2009. The costs are significant. The ability to recover any of the financing costs, the costs of borrowed funds is in question. Every day it works to the government's benefit and not to ours.

The discovery has started in the ENIP case. Witness depositions indeed are being held today and will continue next week. We've submitted our expert reports. We may have to tweak those a little bit to deal with the 2650 issue, but we would think certainly 2009 we'll get on with the trial.

We would respectfully request that we're entitled to do so in our own right. To have our day in Court separate and independent from any claims by ConEd.

THE COURT: Thank you, Mr. Tomaszczuk. Mr. Bryant, would you care to respond to any of these arguments?

MR. BRYANT: Very quickly. I'd like to start where Mr. Tomaszczuk left off and address ENIP's concerns with joinder. First of all, I think the points that Mr. Tomaszczuk just expressed to the Court are precisely

Page 41

the reasons why we need these two cases to be joined. Mr. Tomaszczuk just stated in Court, absent full joinder, we will not be bound by whatever decision this Court reasons in the claim of ConEd. That's exactly my point, Your Honor. I think it's very interesting to note that even in the Boston Edison case where Judge Lettow consolidated that case precisely for the purposes of determining the offset issue, even now ConEd is trying to escape the conclusive effect of Judge Lettow's consolidation order. Clearly in his final judgment he did not say that the offset issue was no longer an issue.

THE COURT: Did you mean Entergy instead of ConEd?

MR. BRYANT: Yes, Your Honor. I apologize. Thank you for correcting me. Boston Ed, in the final order by Judge Lettow, he did not say that the issue of the offset somehow had been erased. No. He said we will apply the offset in Entergy's separate case. That's because the cases are only partially consolidated. Why was it partially consolidated? It was partially consolidated because Entergy had not brought its claim yet against the government. It filed a complaint, but there had

Page 42

been no discovery, no initial disclosures, the damages had not been quantified. Here in this case, as Mr. Tomaszczuk just explained, their damages have been quantified. We received their expert reports. I think it's interesting to note that ENIP is claiming approximately $130 million in damages against the government and ConEdison is claiming approximately $130 million in damages against the government. I think the sentiment expressed by Mr. Tomaszczuk that absent full joinder they will not consider themselves bound by (inaudible) Your Honor is precisely why joinder needs to be entered (inaudible). Mr. Tomaszczuk said they're not seeking decommissioning costs and he also mentioned that some of the claims may not, there may not be a direct link between the type of spent fuel damages that ConEd is claiming that Entergy has been compensated for versus the spent fuel related costs that ENIP may be suing the government for. Your Honor, I'm not sure that's necessarily relevant. The issue is, has Entergy been benefitted or otherwise been placed in a better position because of the breach than it otherwise would have been? To the extent that it has, the Court must take that into

Page 43

account in determining ENIP's damages. So even though Entergy is not seeking decommissioning related damages in its case, it's certainly seeking costs associated with storage on site. And as Mr. Churchill said during his argument, that transfer of $14 million was precisely included as a payment that would be given to the buyer, ENIP, to account for their storage costs on-site at Indian Point. That has to be taken into account, Your Honor, like ENIP will be placed in a better position than it otherwise would have been. Mr. Tomaszczuk mentioned that (inaudible). I think that is another reason why perhaps it would be a good time for the cases to be joined. As I mentioned earlier, ConEdison (inaudible) its report; if Entergy is going to be a part of the claim we think it's likely they also will be (inaudible) the report, from what we just heard from Mr. Tomaszczuk. So now would be a good time for these cases to be joined. Also I though tit was interesting that Mr. Tomaszczuk noted he doesn't foresee the ability -- he doesn't foresee ENIP's trial lasting more than one week. If that's the case, Your Honor, clearly (inaudible) ConEdison in having to attend a joint trial. First of all, I'm not even sure prejudice to

Page 44

the Plaintiff or to the party to be joined is an element to be considered under Rule 19(a). I don't think prejudice to the parties is a factor that comes if it is adopted. But even if it is, Your Honor, the prejudice to the government and possibly having to pay twice for the same (inaudible), Plaintiff having to be essentially at trial for an extra week because of the joining of the claim. In fact if the claims are as distinct as Mr. Churchill thinks they ought to be, they need to send anybody to the trial, to the mixed portion of the trial. We have to take our time. We have to (inaudible). Further, Your Honor, you're talking about a case here in the aggregate. $130 million sought by ConEd, $130 million sought by ENIP, $260 million essentially at stake against the government, this is a pretty good case, and (inaudible) joint trial, with only a week or so overlap doesn't suggest they would be overly prejudiced if this case were to be joined. Particularly in light of the significant harm that the government might face as a result of double recovery. With regard to Mr. Tomaszczuk's concern that discovery in ConEdison has been conducted in his absence, I will note that there have been I think no less than seven depositions so far to date of ENIP's

Page 45

employees in which counsel for ENIP was present and had the ability to ask questions.

I further understand based upon discussions with (inaudible), additional depositions will be taken in the future.

Thirdly, to the extent there are fact witnesses, should the cases be joined, that ConEdison or ENIP would like to depose, we can reopen those depositions. We are still in the middle of discovery. And as I mentioned, both parties are (inaudible) claims against the government.

Mr. Tomaszczuk suggested the Court (inaudible). As Your Honor is probably aware, the Court (inaudible) contract (inaudible) third parties (inaudible), things of that sort. If the Court orders a third party (inaudible), it wouldn't be Rule 19. It would be the rules applicable to third party (inaudible) in this Court.

To the arguments Mr. Churchill made. Mr. Churchill suggests that rather than taking damages of Entergy, Entergy's valuation of the claims, they said (inaudible) a depressed market diminished value claim against the government. However you want to characterize it, I think it's really semantics. The bottom line is, as is revealed

Page 46

in ConEd's (inaudible) quite clearly, the theory of the case is that the purchaser of Indian Point, in this case ENIP, got a discount on its purchase of the plant. In other words, it paid less than it otherwise would have before. And moreover, as is made clear by the disclosures, they're not claiming that the purchaser having, that ENIP received a direct infusion of capital that could, that was intended to cover future spent fuel storage impacts. I think the (inaudible) depressed market, (inaudible) depends upon ENIP's (inaudible).

THE COURT: I will say that the analysis sometimes gets a little tricky because I think back to a Winstar case that I had not too long ago called Astoria Federal Savings where Astoria was the buyer of an injured bank, a bank that had been injured because of the government's breach of contract. The government argued, or at least the experts argued that Astoria didn't really incur any damages because they paid a fair market value for this injured bank and therefore any recovery would be a windfall. But while the expert made that comment, the lawyers for both parties agreed that that didn't eliminate the claim, that the damages still existed.

I could sort of do the same analysis here

Page 47

potentially, because of ENIP having paid a reduced amount for an injured party due to the government's breach. So it does get a little bit tricky. But that's really not a question, it's just an observation.

MR. BRYANT: Noted, Your Honor. Unfortunately I have not been able to (inaudible) that case as I came here today.

THE COURT: Nor would I expect you to be.

MR. BRYANT: I will just mention again, the very same (inaudible), how do we characterize the claim is obvious. I think it's the same. In that regard I haven't heard from either entity or ConEdison any response to the following proposition. Whatever benefit that ENIP was given must be taken into account. In other words whatever benefit they have received in purchasing the plant at a reduced price, whatever benefit they might receive, even $23 million in a direct infusion of capital, must be taken into account. Otherwise the entity will be placed in a better position than otherwise it would be but for the breach. And by the basic principles of expectation then, I haven't heard anyone address that critical point.

What happens to the benefits bestowed upon

Page 48

Entergy? ConEd is correct in its claim.

With regard to the merits of the offset claim, both Mr. Churchill and Mr. Tomaszczuk argue that offset is not appropriate in the circumstances because the claim may not be precisely the same in storage costs. I think I addressed that point earlier, Your Honor, but I will just say this as well. The Court need not determine the offset claim at this point. Under Rule 19(a)(2) the Court only needs to recognize the possibility that the government may be subject to double liability in order for –

THE COURT: I think the case you cite for that point, I'm not sure they got it right. I think the clear wording of the rule is that it has to be a substantial risk. I'm not quite convinced that a substantial risk equates to a possibility, but I think your point is still valid that we don't have to necessarily get to the merits and make a finding about liability for certain categories of costs.

MR. BRYANT: I'm looking at the language. The rule does say, "a person who is subject to (inaudible) the Court of jurisdiction over subject matter will be joined as a party. If the person's claimed interest relates to the subject of the action and is so situated as a good position (inaudible)

Page 49

already subject to potential risk (inaudible)."
I was (inaudible) that term may of the language of Rule 19(a). When you focus on that word may I think it's a --

THE COURT: My only point is that the phrase "substantial risk" may not equate to "possibility".

MR. BRYANT: I understand, Your Honor. And actually, I will address the point of Mr. Tomaszczuk raised. He said the government has not addressed the fact that Rule 19(a) is predicated (inaudible) parties having an interest relating to the subject. And interesting action, I think were the words he used. The language of the rule is the person has to have an interest relating to the subject of the action. The action is the transfer, the sale of Indian Point. I don't think anyone disagrees with the fact that they have an interest in the transfer of the plan, an interest in the $23 million payment that was made for Entergy to have related to future storage costs.
In short I think Your Honor was quite right on Mr. Churchill's presentation. There are two pots of money related to the same costs generally. That's what all these cases are about. That's what the government is held liable for. And (inaudible) here such as for the (inaudible) the same contract relating

Page 50

to the same claim.

THE COURT: Thank you, Mr. Bryant.

MR. BRYANT: Thank you, Your Honor. If you have no further questions, I (inaudible).

THE COURT: Thank you.
I think I have a good understanding of what's involved here. I do have a game plan for how I think we ought to go forward.
First of all let me say with regard to the omnibus motion that the government filed yesterday as I understand regarding a discovery and litigation plan for all of the pending spent nuclear fuel cases, I really can't say where that may lead and I'm not going to do anything right now because of that motion. We're going to move ahead here notwithstanding that motion. Then if things change in some respect down the road we'll just have to deal with it then.
I do conclude based upon a plain reading of Rule 19 that there is a substantial risk to the Defendant from these claims and possibly being found liable for double or multiple amounts of damages, that would not be proper.
Now in saying that I think there's a substantial risk, I'm certainly not making any determination of the merits. That's going to have to

Page 51

wait until a later date when we hear the merits of the case. And it may be that I ultimately may agree with Mr. Churchill and Mr. Tomaszczuk, that really these claims don't overlap for one reason or another. But that will remain for another day. All I'm saying today is that I think based upon what I've seen there is a substantial risk of a multiple payment by the government.
What makes the current status different from what we've had before in this case is that motions to consolidate, of course, are discretionary to the Court, and I believe Rule 19 is mandatory. And having found that there is a substantial risk, I think I have no choice but to join the matters for further proceedings.
I think also the cases have come closer together and so the prejudice certainly is reduced from having to treat the cases separately just because there was a huge lapse in the status of the proceedings. That has really dissipated with time.
I want to have you all think about the procedures that might be used for trial, but here is my approach and I think we can do this very efficiently both because I think you'll be able to resolve many of the dollar amounts that are really in

Page 52

dispute. Maybe not agree to them as to liability, but certainly agree as to the amount, and I think the Federal Circuit opinions help us in that regard, as I've stated.
But I would envision taking the claims in sequence. The way we might do this is to have ConEd's mitigation damage claim go first in which we would hear about the amounts they claim for having incurred mitigation damages due to the government's breach.
I think the diminished value claim could come next, and that seems to be the area that most implicates ENIP.
Then the ENIP claim would come last. So by treating the claims in sequence that way the parties can decide for themselves whether and to what extent they want to attend and participate in these other claims. It may be, for example, that you wouldn't haven't to have your full litigation team here, but maybe one person monitoring the proceedings would be sufficient. But you can really decide those issues.
I think also there may be protective order issues that need to be worked out. Much as we do in the bid protest litigation in government contracts, you should be able to work out a procedure where any protected information could at least be shared among

Page 53

counsel. I'll leave it to you to work out that question.

As to a possible trial period in this case, I want to get to that shortly. I'm not going to ask you to do it today because you may have some things to think about. But looking at my schedule we could try this case in June of 2009 or during some alternate period shortly thereafter. I think that would be reasonable under the circumstances. But you all can think about that and also think about the amount of time that you may need for trial. But I do want to get the trial period set in this case, and I think what we'll do is my law clerk will be in touch with you probably next week sometime and we can set up a time for a conference to talk about that.

I think that's all I had. Maybe there are questions.

MR. CHURCHILL: Yes, Your Honor. Do you contemplate the three pieces of the sequence in one sitting? Or do you expect to bifurcate –

THE COURT: That's a good question. I think what I would do is just run them back to back and I guess you could say they're consolidated. I do envision preparing one opinion in the case dealing with the claims of both parties. I think in that way

Page 54

if the case does go up to the Federal Circuit on appeal, the Federal Circuit then will have the whole picture at one time. I think that's a suitable approach for this.

Does that answer your question?

MR. CHURCHILL: Yes, sir.

THE COURT: Any other questions out there?

MR. BRYANT: Nothing from the government, Your Honor.

THE COURT: Anything from ENIP?

MR. TOMASZCZUK: No, Your Honor.

THE COURT: I think we will write a short published opinion on this motion. I think it's an important subject that has not been adequately addressed in the past, but you have the essence of the ruling this morning, then the opinion will follow as soon as we can get it completed.

MR. BRYANT: I apologize, my colleague made a very good point.

A suggestion in order to keep moving along the case. Might it be fruitful perhaps at a status conference to discuss where we are with respect to discovery in the case and if the parties need to (inaudible)? Would Your Honor find something like that helpful?

Page 55

THE COURT: That would be fine, too. Do you all have any thoughts about that? I'd like to try to get the trial period locked in. We have a large number of people whose schedules are involved in this and the sooner we do that, the better. But I would not be opposed to any kind of status conference you want to have about discovery or anything else.

MR. CHURCHILL: I personally would like to get the trial date locked in and then leave for us to try to work out the discovery issues if we can. That would be my feeling.

THE COURT: I agree with you fully. I think, one other thing I meant to say is I really do agree with the comment that Mr. Tomaszczuk made toward the end of his presentation that they are the Plaintiff and you are the Defendant and it's the Department of Energy that sort of created this mess. So I'm mindful as that as we go forward. We're going to do what we can to make this whole thing work and make it efficient. That's what we'll do.

In that regard I think it's important to move the cases along. We'll get the trial period established. And I think the discovery really should not be that onerous. As has been pointed out in the

Page 56

motion the government filed in all these cases, there are many depositions on record already. I'm sure you've been working with the damages under the pre-trial order. Anything that you really need in the way of further discovery should not get out of control. It should be very manageable.

Anything further this morning?

MR. BRYANT: Nothing Your Honor.

MR. CHURCHILL: Nothing Your Honor.

MR. TOMASZCZUK: Nothing, Your Honor.

THE COURT: We will stand adjourned.

(Whereupon, at 10:59 a.m., the hearing in the above-entitled matter was concluded.)

//
//
//
//
//
//
//
//
//
//
//
//

CERTIFICATE

DOCKET NO.: 04-33C
CASE TITLE: Consolidated Edison Company of New York v. U.S.
HEARING DATE: August 22, 2008

I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the United States Court of Federal Claims in the above-entitled matter.

Date: August 25, 2008

Marcia Thurmond
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

# In the United States Court of Federal Claims

(Filed: August 16, 2006)

| | | |
|---|---|---|
| VERMONT YANKEE NUCLEAR POWER CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | | No. 02-898C |
| ENTERGY NUCLEAR VERMONT YANKEE, LLC, and ENTERGY NUCLEAR OPERATIONS, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | | No. 03-2663C |

**CONSOLIDATION ORDER**

Before the Court are Defendant's May 3, 2006 Motions to Consolidate the above-captioned cases and Plaintiff's briefs in opposition thereto. Because the Court believes that the factual and legal commonalities in these cases justify a limited consolidation pursuant to Rule 42 of this Court's

Rules, Defendant's motions are hereby GRANTED IN PART and DENIED IN PART. Accordingly, the proceedings in these actions shall go forward as follows:

Pending Motions for Summary Judgment –The Court shall consolidate for purposes of decision the following issues concerning liability:

(1) Whether Defendant or Plaintiff is entitled to summary judgment upon Counts 1 and 2 of Plaintiff's Complaint;

(2) Whether Defendant or Plaintiff is entitled to partial summary judgment upon Defendant's asserted right to recover unpaid fees; and

(3) Whether Defendant is entitled to summary judgment regarding the allegedly invalid assignment of Plaintiff's Standard Contract and pre-existing claims from the partial breach of the Standard Contract.

Discovery – To the extent practicable, counsel for the parties shall regard these cases as consolidated for purposes of conducting discovery. Discovery efforts, such as serving and answering interrogatories, requesting and producing documents, requiring witnesses to appear for depositions, and serving and responding to requests for admissions, may be performed on a consolidated basis. Discovery in one case may be utilized as if performed in the other case. Duplication of discovery is to be avoided.

Trial Procedures – If necessary, following the Court's resolution of the pending motions for summary judgment, the Court will consult with counsel to establish trial procedures to avoid the duplicative presentation of testimony and exhibits.

Damages – If Defendant is found liable in either of the captioned cases, the Court will preserve Plaintiffs' request to proceed with separate trials on the issue of damages, except that a witness in the first trial will not be required to provide duplicative testimony in the second trial.

Unless and until the Court directs otherwise, all future pleadings in these proceedings shall include the name of the Plaintiff and the docket number of both cases.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

CERTIFICATE OF FILING

I hereby certify that on the 29th of August, 2008, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JOINDER OF ENTERGY NUCLEAR PALISADES, LLC, OR, IN THE ALTERNATIVE, FOR ISSUANCE OF BINDING NOTICE PURSUANT TO RCFC 14(b) AND CONTRACT SETTLEMENT ACT, § 14(b), 41 U.S.C. § 114(b)" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Stephen Finn